# IN THE SUPREME COURT OF IOWA

No. 21–0856

Submitted February 23, 2022—Filed June 17, 2022
Amended August 24, 2022

**PLANNED PARENTHOOD OF THE HEARTLAND, INC.,** and
**JILL MEADOWS, M.D.,**

Appellees,

vs.

**KIM REYNOLDS ex rel. STATE OF IOWA** and
**IOWA BOARD OF MEDICINE,**

Appellants.

---

Appeal from the Iowa District Court for Johnson County, Mitchell E. Turner, Judge.

In a case challenging the constitutionality of a law mandating a 24-hour waiting period for an abortion, the defendant state officials appeal the district court's grant of summary judgment to the abortion-provider plaintiffs. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which Waterman and Oxley, JJ., joined, and in which McDonald and McDermott, JJ., joined as to parts II, III, and IV.A–E, and in which Christensen, C.J., joined as to parts II, III, and IV.A–B. McDermott, J., filed an opinion concurring in part and dissenting in part, in which McDonald, J., joined. Christensen, C.J., filed an opinion

concurring in part and dissenting in part, in which Appel, J., joined as to parts I–II. Appel, J., filed a dissenting opinion.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, Samuel P. Langholz (argued) and Thomas J. Ogden, Assistant Attorneys General, for appellants.

Rita Bettis Austen (argued) of American Civil Liberties Union of Iowa Foundation, Des Moines, Alice J. Clapman, Camila Vega, and Christine Clarke (until withdrawal) of Planned Parenthood Federation of America, Washington, D.C., for appellees.

Alan R. Ostergren, Des Moines, for amici curiae Kirkwood Institute, Inc. and Members of the 89th General Assembly of Iowa.

Christopher P. Schandevel (argued) of the Alliance Defending Freedom, Ashburn, Virginia, Kevin H. Theriot and Elissa Graves of the Alliance Defending Freedom, Scottsdale, Arizona, and Chuck Hurley of the Family Leader, Urbandale, for amici curiae 60 Members of the Iowa Legislature.

W. Charles Smithson, West Des Moines, Robert J. Bird, Jr., Dexter, and Jake Heard, Urbandale, for amici curiae Ten Iowa State Senators.

Michael Streit and Colin C. Smith of Sullivan & Ward, P.C., West Des Moines, for amicus curiae League of Women Voters (Iowa Chapter).

Elizabeth A. Battles, Des Moines, and Joshua Opperman, Des Moines, for amici curiae Iowa Coalition Against Domestic Violence and Iowa Coalition Against Sexual Assault.

Thomas W. Foley of RSH Legal, Cedar Rapids, for amici curiae University of Iowa and Drake University Law Professors.

James C. Larew and Deborah K. Svec-Carstens of Larew Law Office, Iowa City, for amici curiae 33 Iowa State Legislators.

Kimberly A. Parker, Lesley Fredin McColl, and Nickole Medel of Wilmer Cutler Pickering Hale and Dorr, LLP, Washington D.C., Alan Schoenfeld of Wilmer Cutler Pickering Hale and Dorr, LLP, New York, New York, and Paige Fiedler of Fiedler Law Firm, PLC, Johnston, for amici curiae the American College of Obstetricians and Gynecologists, the American College of Physicians, the American Gynecological & Obstetrical Society, the American Medical Association, the Iowa Medical Society, the American Medical Women's Association, the American Psychiatric Association, the Council of University Chairs of Obstetrics and Gynecology, Iowa Chapter of the American Academy of Pediatrics, the North American Society for Pediatric and Adolescent Gynecology,

the National Association of Nurse Practitioners in Women's Health, the Society of Family Planning, the Society of Gynecological Oncology, the Society for Maternal-Fetal Medicine, and the Society of OB/GYN Hospitalists.

**MANSFIELD, Justice.**

### I. Introduction.

In this case, we again consider the right to an abortion under the Iowa Constitution. The right to an abortion under the Federal Constitution is framed by two landmark cases: *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). *Roe* first recognized a federal constitutional right to an abortion. 410 U.S. at 153. *Casey*, in a plurality opinion, held that regulations and restrictions on abortion before viability should be evaluated under an undue burden test. 505 U.S. at 878–79.

In 2015, this court applied the federal *Casey* undue burden test under the Iowa Constitution. *See Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.* (*PPH I*), 865 N.W.2d 252, 269 (Iowa 2015). We found that a statewide ban on telemedicine medication abortions, adopted by the board of medicine when it was otherwise approving the use of telemedicine, violated the Iowa Constitution. *Id.* Notably, Planned Parenthood had wanted us to recognize a state constitutional right to abortion that was broader than the federal constitutional right. *Id.* at 262 n.2. We did not reach that issue because we found the telemedicine ban was unconstitutional even under the federal undue burden test, a test that the State had conceded was applicable under the Iowa Constitution. *Id.* at 262–63.

Three years later, in *Planned Parenthood of the Heartland v. Reynolds* (*PPH II*), we confronted a mandatory 72-hour waiting period for abortion that the legislature had enacted in 2017. 915 N.W.2d 206, 220–21 (Iowa 2018). This time

we rejected the undue burden test. *Id.* at 240. Instead, we found that the Iowa Constitution—specifically, the due process clause—protected abortion as a fundamental right. *Id.* at 237–38. We determined that the waiting period could not survive strict scrutiny under that test and struck it down as unconstitutional. *Id.* at 244.

In 2020, in the waning hours of a legislative session that had been disrupted by COVID-19, the general assembly added a mandatory 24-hour waiting period for abortion to pending legislation limiting courts' ability to withdraw life-sustaining procedures. The 24-hour waiting period involved the same period of time that the United States Supreme Court had upheld in *Casey*. 505 U.S. at 844. Yet Planned Parenthood sued successfully in district court to block the statute from taking effect. The district court granted summary judgment to Planned Parenthood on two alternative grounds. First, it reasoned that the 2020 legislation violated the single-subject rule of the Iowa Constitution (article III, section 29) and, second, it concluded that our decision in *PPH II* invalidating a 72-hour waiting period had issue preclusive effect.

The State appeals. It argues that the 2020 legislation did not embrace more than "one subject, and matters properly connected therewith." Iowa Const. art. III, § 29. It also argues that issue preclusion doesn't apply and doesn't bar the State from seeking to overrule *PPH II*.

Today, we decide only the issues that *the parties* have presented to us in the current procedural posture of the case. On the single-subject rule, we conclude that a limit on abortion and a limit on withdrawing life-sustaining

procedures both pertain to the subject of "medical procedures," as stated in the bill's title. Therefore, no violation of the single-subject rule took place.

As to issue preclusion, we agree with the State that a 72-hour waiting period and a 24-hour waiting period are not identical. We also agree that issue preclusion does not bar a state's highest court from revisiting its decision on a broad question of constitutional law such as the right to an abortion. And, finally, we hold that any subsidiary fact-findings we made in *PPH II* occurred within a constitutional framework that placed every burden of persuasion and proof on the State. If we overrule that broad constitutional framework, as the State urges, the findings cannot have preclusive effect. Accordingly, after carefully considering the parties' arguments, we decide that *PPH II* can and should be overruled.

Although we overrule *PPH II*, and thus reject the proposition that there is a fundamental right to an abortion in Iowa's Constitution subjecting abortion regulation to strict scrutiny, we do not at this time decide what constitutional standard should replace it. As noted, in *PPH I*, we applied the undue burden test under our constitution when the State conceded that it applied. An amicus curiae argues that we should hold that the rational basis test applies to abortion regulations. But *the State* takes no such position; it simply asks that *PPH II* be overruled and stops there. Moreover, the State did not seek summary judgment below (except as to the single-subject rule); it argued only that Planned Parenthood should not prevail as a matter of law based on issue preclusion.

In addition, we are not blind to the fact that an important abortion case is now pending in the United States Supreme Court. *See Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2021) (Mem.) (granting certiorari). That case could alter the federal constitutional landscape established by *Roe* and *Casey*.[1] While we zealously guard our ability to interpret the Iowa Constitution independently of the Supreme Court's interpretations of the Federal Constitution, the opinion (or opinions) in that case may provide insights that we are currently lacking.

Hence, all we hold today is that the Iowa Constitution is not the source of a fundamental right to an abortion necessitating a strict scrutiny standard of review for regulations affecting that right. For now, this means that the *Casey* undue burden test we applied in *PPH I* remains the governing standard. On remand, the parties should marshal and present evidence under that test, although the legal standard may also be litigated further.

Accordingly, we reverse the district court's grant of summary judgment to Planned Parenthood and remand for further proceedings consistent with this opinion.[2]

---

[1]The Supreme Court has granted certiorari on "Question1 presented by the petition." *Dobbs*, 141 S. Ct. at 2620. That question presented the issue of "[w]hether all pre-viability prohibitions on elective abortions are unconstitutional." Petition for Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*, ___ S. Ct. ___, ___ (2022) (No. 19–1392), 2020 WL 3317135, at *i. The petitioners ask that *Roe* and *Casey* be overruled. *See id.* at ___ n.1, 2020 WL 3317135 at *5 n.1.

[2]In parts IV.A–B, this opinion speaks for a six-justice majority of this court. In parts IV.C–E, this opinion speaks for a five-justice majority of this court. Part IV.F is joined by a plurality of three justices. Two justices dissent from part IV.F because they would rule at this time that the 24-hour waiting period should be considered under a rational basis test. Two other justices would reaffirm *PPH II* and find that the 24-hour waiting period does not survive strict scrutiny.

**II. Background Facts and Proceedings.**

**A. Legislative History of House File 594.** House File 594 (HF 594) was introduced in the Iowa House of Representatives on March 4, 2019. *Bill History for House File 594*, The Iowa Legislature [hereinafter *Bill History HF 594*], https://www.legis.iowa.gov/legislation/billTracking/billHistory?ga=88&billName=HF594 [https://perma.cc/WJ9A-SU2U]. The original version of the bill, designated as "House File 233" at the time, was entitled, "An Act relating to limitations regarding the withdrawal of a life-sustaining procedure from a minor child." H.F. 233, 88th G.A., 1st Sess. (Iowa 2019). It stated the following:

> A court of law or equity shall not have the authority to require the withdrawal of life-sustaining procedures from a minor child over the objection of the minor child's parent or guardian, unless there is conclusive medical evidence that the minor child has died and any electronic brain, heart, or respiratory monitoring activity exhibited to the contrary is a false artifact. For the purposes of this section, "*Life-sustaining procedure*" means the same as defined in section 144A.2.

*Id.* § 1. This language passed the house on March 11, 2019, by a vote of 58–36. H. Journal, 88th G.A., 1st Sess., at 492 (Iowa 2019).

The bill then went to the senate and was assigned to the judiciary committee. *Bill History HF 594*. The judiciary committee recommended the bill's passage on April 2. *Id.* But shortly afterward, the bill was placed on the

---

Under the narrowest grounds doctrine, part IV.F sets forth the disposition of this case. For example, in *Godfrey v. State*, where three justices joined the lead opinion to reverse the district court, and three justices dissented and would have affirmed the district court, the dispositive opinion was that of the Chief Justice, whose opinion reversed the district court but did so on a narrower basis than the lead opinion. *See* 898 N.W.2d 844, 880–81 (Iowa 2017) (Cady, C.J., concurring in part and dissenting in part); *see also Wagner v. State*, 952 N.W.2d 843, 858 (Iowa 2020) (describing the Chief Justice's opinion in *Godfrey* as "dispositive").

unfinished business calendar, where it remained for over a year until June 13, 2020. *Id.*

The 2020 legislative session was an unusual one because of COVID-19. On March 16, as the pandemic was sweeping the nation, the house and senate suspended proceedings. *See* S. Journal, 88th G.A., 2d Sess., at 620–22 (Iowa 2020) [hereinafter S.J.]; H. Journal, 88th G.A., 2d Sess., at 605 (Iowa 2020) [hereinafter H.J.]. On June 3, the general assembly resumed its abbreviated session with certain health precautions in place. S.J. at 633; H.J. at 606. It was anticipated that the remainder of the session would be brief.

In the afternoon of June 13, the senate floor manager for HF 594 proposed a technical amendment, S–5151, to break the bill into subparts and add a definition of the term "minor." S.J. at 811–12, 1133–34. During floor debate on the amendment, three senators questioned the need for these changes. *Senate Video HF 594 – Life Support for Minor*, Iowa Legislature, at 4:03:35–4:13:20 PM (June 13, 2020) [hereinafter *Senate Video*], https://www.legis.iowa.gov/dashboard?view=video&chamber =S&clip=s20200613085856120&dt=2020-06-13&offset=25405&bill=HF%2059 4&status=i. One of those senators predicted the house would make abortion-related changes to the bill and send it back to the senate later that night. *Id.* at 4:10:50 PM. The technical amendment passed, 32–17. S.J. at 812.

HF 594 returned to the house, where another amendment, H–8314, was proposed. H.J. at 758. This amendment made two changes. First, it amended Iowa Code section 146A.1(1) (2019) so as to require a 24-hour rather than a

72-hour waiting period for performing an abortion. H.J. at 1391–92. The 72-hour waiting period had been found unconstitutional by our court in 2018. *See PPH II*, 915 N.W.2d at 246. Second, the amendment revised the title of the underlying legislation to read: "An Act relating to *medical procedures including abortion and limitations regarding the withdrawal of a life-sustaining procedure from a minor child.*" H.F. 594, 88th G.A., 2d Sess. (Iowa 2020) (emphasis added); H.J. at 1392.

A representative raised a point of order that, under the house rules, the amendment was not germane, stating, "I'm very confused on this amendment. Somehow, we ended up with an abortion amendment on a limitations on life-sustaining procedure [bill]. I'd ask the Speaker if this amendment is in fact germane because it doesn't appear to even relate to anything in the bill." *House Video HF 594 – Life Support for Child*, Iowa Legislature, at 10:20:41 PM (June 13, 2020) [hereinafter *House Video*], https://www.legis.iowa.gov/dashboard?view= video&chamber=H&clip=h20200613100758317&dt=2020-06-13&offset=598& bill=HF%20594&status=i. The acting speaker of the house agreed: "[Y]our point is well taken, the amendment is not germane." *Id.* at 10:21:08 PM. The amendment's sponsor moved to suspend the house rules. H.J. at 758. This motion passed 52–43. H.J. at 758–59. After approximately thirty-five minutes of debate, amendment H–8314 passed 53–42. *House Video* at 10:24:00–10:59:35 PM; H.J. at 759–60. HF 594, as amended, later passed by the same 53–42 margin. H.J. at 762.

The senate took up amended HF 594 with the waiting-period language approximately five hours later. *Senate Video* at 04:22:01 AM. By now, it was early

morning on June 14. After debating the bill for over an hour, the senate passed it around 5:40 a.m. by a vote of 31–16. *Id.* at 04:23:50–05:41:23 AM. The Governor signed the bill into law two weeks later, on June 29. H.F. 594, 88th G.A., 2d Sess. (Iowa 2020).[3]

**B. Current Requirements of the Challenged Statute.** Iowa Code section 146A.1 (2021) now requires the following steps to occur at least 24 hours before a physician may perform an abortion:

> 146A.1 Prerequisites for abortion — licensee discipline.
>
> 1. A physician performing an abortion shall obtain written certification from the pregnant woman of all of the following at least twenty-four hours prior to performing an abortion:
>
> *a.* That the woman has undergone an ultrasound imaging of the unborn child that displays the approximate age of the unborn child.
>
> *b.* That the woman was given the opportunity to see the unborn child by viewing the ultrasound image of the unborn child.
>
> *c.* That the woman was given the option of hearing a description of the unborn child based on the ultrasound image and hearing the heartbeat of the unborn child.
>
> *d.* (1) That the woman has been provided information regarding all of the following, based upon the materials developed by the department of public health pursuant to subparagraph (2):
>
> (a) The options relative to a pregnancy, including continuing the pregnancy to term and retaining parental rights following the child's birth, continuing the pregnancy to term and placing the child for adoption, and terminating the pregnancy.

---

[3]It may be worth noting that in 2021, both the house and the senate approved a constitutional amendment as follows: "[W]e the people of the State of Iowa declare that this Constitution does not recognize, grant, or secure a right to abortion or require the public funding of abortion." 2021 Iowa Acts ch. 187, § 26. To go into effect, this amendment would have to be approved by both houses of the next general assembly that takes office after the 2022 general election and by the voters of Iowa. *See* Iowa Const. art. X, § 1.

(b) The indicators, contra-indicators, and risk factors including any physical, psychological, or situational factors related to the abortion in light of the woman's medical history and medical condition.

These requirements do not apply in the case of a medical emergency. *Id.* § 146A.1(2).

A physician who violates this section is subject to licensee discipline. *Id.* § 146A.1(3). But the section "shall not be construed to impose civil or criminal liability on a woman upon whom an abortion is performed." *Id.* § 146A.1(4).

In *Casey*, as noted, the Supreme Court had upheld a similar 24-hour waiting period against a federal constitutional challenge. 505 U.S. at 887. The plurality explained that the State may "further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion." *Id.* at 883.

*PPH II* pointed out that there does exist a published, peer-reviewed study on waiting periods. *See* Sarah C.M. Roberts et al., *Utah's 72-Hour Waiting Period for Abortion: Experiences Among a Clinic-Based Sample of Women*, 48 Perspectives on Sexual & Reprod. Health 179 (2016). According to that study, after undergoing the 72-hour waiting period mandated by Utah law, "Eight percent of women [in the sample] reported changing their minds." *Id.* at 185. The *PPH II* majority and dissent disagreed on the significance of the eight percent number. *Compare PPH II*, 915 N.W.2d at 241–42, *with id.* at 255–56 (Mansfield, J., dissenting). In any event, Iowa law has waiting periods for other important decisions that implicate fundamental rights, including marriage, adoption, and

divorce. *See* Iowa Code § 595.4 (three-day waiting period for marriage); *id.* § 598.19 (90-day waiting period for divorce); *id.* § 600A.4(2)(*g*) (72-hour waiting period after birth for adoption).

**C. District Court Proceeding and Record.** On June 23, 2020, before HF 594 was actually signed into law, Planned Parenthood of the Heartland and its medical director, Dr. Jill Meadows, filed a petition in Johnson County District Court challenging the 24-hour waiting period. They named as defendants the Governor and the Iowa Board of Medicine.[4] The petition sought declaratory judgment and injunctive relief based on four alleged violations of the Iowa Constitution: (1) the single-subject clause in article III, section 29; (2) the due process clause in article I, section 9; (3) the rights of equal protection set forth in article I, sections 1 and 6; and (4) the inalienable rights clause in article I, section 1. The petition also maintained that the State was "precluded and collaterally estopped from re-litigating" the issues decided in *PPH II*.

Planned Parenthood filed an emergency motion for temporary injunctive relief on the same day, accompanied by materials from the *PPH II* record and supporting affidavits from physicians, a psychologist, a sociologist, a lobbyist, and an Iowa legislator. The physician affidavits largely reiterated points that had been made in the earlier *PPH II* litigation. A central concern is that the waiting period requires a woman who wishes to have an abortion to make two separate trips and results in additional travel time, travel expense, time away from work,

---

[4]We will refer to the plaintiffs collectively as "Planned Parenthood" and to the defendants collectively as "the State."

and childcare expenses. It also causes scheduling difficulties and creates health risks as the timing of the abortion itself is pushed back. In some instances, a woman would be unable to go through the safer and less invasive medication abortion, which is available only through the eleventh week.

The physician affidavits also pointed out that during the COVID-19 pandemic, waiting periods necessitating a second in-person visit would lead to increased medical risk for patients and healthcare workers.

A telephonic hearing on this motion took place on June 29. One day later, before the law went into effect, the district court granted the motion and temporarily enjoined the State from enforcing the 24-hour waiting period in Iowa Code section 146A.1(1).

On January 22, 2021, Planned Parenthood moved for summary judgment based on the single-subject rule and issue preclusion. Planned Parenthood urged that HF 594 constituted unconstitutional "log rolling" and that the State was precluded from relitigating issues it had lost on in 2018 when this court decided *PPH II*. The State resisted and cross-moved for partial summary judgment on the single-subject rule.

On June 21, the district court entered an order that granted summary judgment to Planned Parenthood and declared the 24-hour waiting period to be unconstitutional based on both grounds asserted by Planned Parenthood.

First, the court "wholeheartedly" agreed with Planned Parenthood that a single-subject violation had occurred. It noted that HF 594 was "passed under highly unusual circumstances" because there was little debate on "a polarizing

and highly controversial topic" when "most Iowans would have been asleep." The court found "the Amendment was clearly logrolled with other legislation, since [it] was attached to a non-controversial provision regarding withdrawal of life-sustaining procedures from a minor child." The court concluded that this was an "extreme case" in which "the Amendment [wa]s indisputably not germane to the underlying bill."

Second, the district court also granted summary judgment on the alternative ground that issue preclusion from the 2018 *PPH II* decision barred the State from defending an abortion waiting period, even one shorter in duration than the 72 hours involved in *PPH II*.

Reviewing our decision in *PPH II*, the district court indicated that our court had found mandatory delay laws do not benefit women seeking an abortion and do not change their minds. The district court further observed that *PPH II* found significant burdens associated with a waiting period that required two trips to an abortion clinic. The court reasoned that these factual findings applied equally to a 24-hour waiting period. Therefore, the district court concluded that *PPH II* was dispositive of the result in this case:

> The Court finds, upon review of the *entire PPH[II]* decision, that these same parties had a full and fair opportunity to litigate the issue of mandatory delay laws and patient decision-making in the first action. The Court finds that issue preclusion bars Respondents from re-litigating certain matters within *PPH[II]*, which includes the issue of whether "mandatory waiting periods" (whether it is 72-hour, 24-hour, or any time frame contrary to "PPH's current same-day regime") between women's informational and procedural abortion appointments "will impact patient decision-making," as these identical issues were raised and litigated in, and were material and

relevant to, the determination of issues by the Iowa Supreme Court that were essential to its ultimate opinion.

The State filed a timely appeal, which we retained. On appeal, the State challenges the district court's determination that HF 594 violated the single-subject rule set forth in article III, section 29 as well as the court's application of issue preclusion based on *PPH II* to a shorter 24-hour waiting period. The State also asserts that *PPH II* was wrongly decided and should be overruled.

### III. Standard of Review.

We review summary judgment rulings for correction of errors at law. *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 36 (Iowa 2018). "Whether the elements of issue preclusion are satisfied is a question of law." *Id.* (quoting *Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 445 (Iowa 2016)).

Constitutional claims are reviewed de novo. *Planned Parenthood of the Heartland, Inc. v. Reynolds* (*PPH III*), 962 N.W.2d 37, 45 (Iowa 2021). "In reviewing constitutional challenges to statutes, 'we must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt.' " *Id.* at 46 (quoting *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 31 (Iowa 2019)); *see also Godfrey v. State*, 752 N.W.2d 413 (Iowa 2008) ("We review claims based on a violation of our state constitution de novo.").

"In determining whether the single subject requirement has been complied with, we construe the enactment liberally in favor of its constitutionality." *State v. Iowa Dist. Ct.*, 410 N.W.2d 684, 686 (Iowa 1987).

**IV. Analysis.**

**A. Does HF 594 Violate the Single-Subject Rule?** Iowa's single-subject rule is found in article III, section 29. It states,

> Every Act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be expressed in the title.

Iowa Const. art. III, § 29.

Planned Parenthood contends—and the district court found—that HF 594 did not "embrace but one subject, [or] matters properly connected therewith." *Id.* In the district court's view, it was improper for the general assembly to couple a mandatory abortion waiting period with a limitation on the removal of life support because those matters involved different subjects. As we explain herein, we respectfully disagree.

Simply stated, both provisions of HF 594 related to a single subject as set forth in the bill's title—"medical procedures." In fact, their connection was closer than that. Not only did both provisions relate to medical procedures, but they also related to governmental regulation of medical procedures in the interest of promoting human life.

Consider what Planned Parenthood says in its brief: "These provisions are at odds in both substance and purpose: the first protects private medical decision-making from state interference, while the second explicitly enacts such state interference in individual medical decision-making." We recognize that Planned Parenthood disagrees with the *policies* behind the second

provision. But as their quoted summary of HF 594 shows, both provisions related to state regulation of individual medical decision-making. And both provisions were designed to preserve human life.[5]

In addition, considerations of history, precedent, and policy bolster our conclusion that the general assembly's enactment of HF 594 did not violate the single-subject rule.

1. *Historical background on the adoption of article III, section 29.* Iowa's original constitution had a different version of the single-subject rule, which was actually a "single object" rule. *See* Iowa Const. art. III, § 26 (1846). It stated, "Every law shall embrace but one object, which shall be expressed in the title." *Id.* In *State ex rel. Weir v. County Judge of Davis County*, our court took a deferential approach to interpreting this constitutional requirement. 2 Iowa (Clarke) 280, 284 (1855). That case involved an omnibus road bill that established, vacated, or relocated dozens of different roads across the state. *Id.* at 281–82. We needed to determine whether this act was directed at "one object" (as required by the former constitution) or multiple objects because it dealt with many different roads. *Id.*

We decided that the word "object" did not refer to particulars like specific roads, but rather referred to the goal of the legislation in a more general sense. *Id.* at 283 ("The unity of object is to be looked for in the ultimate end, and not in the detail or steps leading to the end."). Ultimately, we held that the act in

---

[5]The location of these provisions in the Iowa Code suggests a connection as well. They were codified within six pages of each other in Title IV, Subtitle 2, governing "Health-Related Activities." *See* Iowa Code chs. 144G–146A (Vol. II, pgs. 1119–25).

question did not violate the constitution's single-object rule, stating, "There is, undoubtedly, great objection to uniting so many particulars in one act, but so long as they are of the same nature, and come legitimately under one general denomination or object, we cannot say that the act is unconstitutional." *Id.* at 284.[6]

*Santo v. State* was decided on the same day in 1855 as *Weir*, and it reached the same result in another context. 2 Iowa (Clarke) 165, 188 (1855). Santo involved "An Act for the Suppression of Intemperance" that sought to curb drunkenness in various ways, including, for example, "the prohibition of the manufacture and sale of intoxicating drinks" and "declaring buildings a public nuisance." *Id.* at 174. The court found this to be constitutional, stating, "The whole act has reference to but one subject, viz: 'The prohibition of the traffic in liquors.' . . . All the provisions of the law, from section one to section eighteen, refer to the same object." *Id.* at 188.

---

[6]Notably, even though the 1855 court was less than ten years removed from the original constitution's ratification, it still looked to actions taken by the general assembly shortly after ratification as clues to the constitution's meaning. The court observed that the legislature had established multiple roads in a single act less than a year after the constitution was adopted. It noted,

> This is exactly like the one in the case at bar. Some weight is due to the fact that in this first General Assembly, were many men who were members of the convention which formed the constitution, and inserted this new provision. This consideration is not conclusive, by any means, it is true; but it assists us in arriving at the intent of the constitution.

*Weir*, 2 Iowa at 284. This suggests that we—165 years removed from the adoption of our constitution—can look to contemporaneous acts of the legislature and the judiciary to discern what the constitution was understood to mean at the time it was adopted. *See, e.g.*, *King v. State*, 818 N.W.2d 1, 14 (Iowa 2012) (pointing out that an 1859 case was a valuable interpretive tool because it was decided "at a time when the 1857 constitution was quite fresh in people's minds").

As it turned out, a constitutional convention would be held two years later, and these two cases would play a role in the single-subject rule debate. Rather than retain the language from the 1846 constitution, the delegates proposed new language that changed the phrase "embrace but one object" to "embrace but one subject, and matters properly connected therewith." *See* 1 *The Debates of the Constitutional Convention of the State of Iowa* 530 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], http://publications.iowa.gov/7313/. A delegate from Davis County, Mr. Palmer, moved to strike the word "subject" and replace it with "object," which he understood to be the narrower word. *Id.* He explained, "It appears to me that if we can embrace so many different provisions under the word 'subject,' it ought to be stricken out, and some other word substituted for it, which would confine the action of the legislature within some more limited range." *Id.*

A delegate from Johnson County, Mr. Clark, disagreed. *Id.* at 531. While arguing against Mr. Palmer's motion, he recounted the supreme court's opinion on the omnibus road bill at issue in *Weir*:

> [A] decision was rendered by two judges, sustaining the law as constitutional; that though it embraced a variety of objects, it embraced but one subject. From that decision the chief justice dissented. That decision now stands, though there are two judges in favor of it, and two against it. I think the construction put upon the act by the majority of the court was a correct one.

*Id.* Mr. Clark favored the court's broader construction, and he favored using the word "subject" in the new constitution because he understood it to allow more legislative flexibility. *Id.* He explained, "[T]he word 'subject' is a broader word, and more extensive in its application, than the word 'object.'" *Id.*

After this exchange, the convention rejected Mr. Palmer's motion. *Id.* Both sides of this debate at the convention understood the word "subject" to be broader—and that word won the day. *See id.* at 530–31.[7]

Aside from the debate regarding that specific word choice, other textual deviations from the earlier constitution weigh in favor of legislative deference. Most notably, article III, section 29 allows for "matters properly connected" to a bill's subject to be included in legislation without resulting in a constitutional violation. Iowa Const. art. III, § 29. The text does not require a *single* subject in the strictest sense; instead, it allows legislation to include *connected* matters, even if not the same subject per se. *Miller v. Bair*, 444 N.W.2d 487, 489 (Iowa 1989) ("[I]n order for a violation of the single-subject requirement to exist, the challenged legislation must embrace 'two or more dissimilar and discordant subjects that by no fair intendment can be considered as having any legitimate connection with or relation to each other.'" (quoting *Long v. Bd. of Supervisors*, 142 N.W.2d 378, 381 (Iowa 1966))); *Christie v. Life Indem. & Inv. Co.*, 48 N.W. 94, 96 (Iowa 1891) ("It is not true that an act may not embrace more than one subject. The act shall embrace but one subject, and matters properly connected therewith." (citation omitted)).

Given the text of article III, section 29 and its history, a flexible application of the single-subject rule is appropriate. *See Iowa-Neb. Light & Power Co. v. City*

---

[7]In *Weir*, the court stated in that there is "reason to believe" that the word "subject" is narrower than the word "object." 2 Iowa at 285. But at the constitutional convention, Mr. Palmer stated that he understood "subject" to be broader than "object." And Mr. Clark agreed that "subject" was broader. We do not wade into this debate. We merely note that the delegates ultimately chose what they intended to be the broader word.

*of Villisca*, 261 N.W. 423, 425 (Iowa 1935) (describing the "obvious . . . intention on the part of the framers . . . to give [the single-subject rule] a liberal construction" and collecting early cases that support that conclusion). While the rule is not entirely without teeth, the legislature should be afforded considerable deference. *See Long*, 142 N.W.2d at 381 ("All that is necessary is that the act should embrace some one general subject, and by that is meant, merely, that all matters treated therein should fall under some one general idea and be so connected with or related to each other, either logically or in popular understanding, as to be part of or germane to one general subject.").

2. *Caselaw on article III, section 29.* Our caselaw has generally adhered to this flexible approach. In *State v. Mabry*, we summarized our single-subject precedent as follows:

> There are longstanding rules for determining whether an act meets the constitutional mandate of article III, section 29. First and foremost, we construe "the [act] liberally in favor of its constitutionality." [*Iowa Dist. Ct.*, 410 N.W.2d at 686]. Before we can say the act is invalid we must find that the act "encompass[es] two or more dissimilar or discordant subjects that have no reasonable connection or relation to each other." *Id.*; *see also Western Int'l* [*v. Kirkpatrick*], 396 N.W.2d [359,] 364 [(Iowa 1986) (en banc)]. Even if the "matters grouped as a single subject might more reasonably be classified as separate subjects, no violation occurs if these matters are nonetheless relevant to some single more broadly stated subject." *Id.*

> . . . .

> Under this test "[l]egislation will not be held unconstitutional unless clearly, plainly and palpably so." [*Long*, 142 N.W.2d at 381]. And "[i]f the constitutionality of an act is merely doubtful or fairly debatable, the courts will not interfere." *Id.* So "[i]t is only in extreme cases, where unconstitutionality appears beyond a reasonable doubt, that this court can or should act. . . ." [*Id.* at 381–82].

460 N.W.2d 472, 474 (Iowa 1990) (first, third, seventh, ninth, and tenth alterations and second omission in original) (citation omitted).

This court has consistently rejected single-subject challenges to legislation when there is a common denominator consisting of an overall subject matter. *See, e.g., State v. Soc. Hygiene, Inc.*, 156 N.W.2d 288, 289, 292 (Iowa 1968) (finding that a bill with the stated purpose of "suppress[ing] the vending of articles of indecent and immoral use" that had a section criminalizing the sale of contraceptives in vending machines did not violate the single-subject rule because "the listing by the legislature of what it considers indecent and immoral is within the limitations of the Constitution"); *Rains v. First Nat'l Bank of Fairfield*, 206 N.W. 821, 822 (Iowa 1926) (holding that provisions governing appellate procedure in the supreme court and other provisions setting qualifications to be admitted to practice law in Iowa were both "clearly [] matter[s] connected with the subject of procedure in the Supreme Court").

And broad subject matters are acceptable. *See, e.g., Utilicorp United Inc. v. Iowa Utils. Bd.*, 570 N.W.2d 451, 454–54 (Iowa 1997) (en banc) (finding no violation because "[t]he act encompasse[d] one general topic—public utilities—and amend[ed] nothing other than various provisions in the public utility chapter of the Code"); *Iowa Dist. Ct.*, 410 N.W.2d at 685, 687 (determining that a provision removing magistrates' jurisdiction over first offense operating while intoxicated did not violate the single-subject rule even though the rest of the bill addressed the transportation of alcohol, the Sunday sale of alcohol, and the topic of minors and alcohol because all provisions were "rationally related to the

regulation of alcohol and its consumption or possession"); *Webster Realty Co. v. City of Fort Dodge*, 174 N.W.2d 413, 418 (Iowa 1970) (finding that "planning, achieving, and financing urban renewal" was one subject); *Frost v. State*, 172 N.W.2d 575, 580 (Iowa 1969) (finding that the "acquisition, purchase, construction, and financing of interstate bridges" was one subject); *Long*, 142 N.W.2d at 380 (finding that a courthouse hour provision did not violate the single-subject rule when it was added to a bill "relating to the compensation of county officers, deputies and clerks").

In fact, our cases have found a single-subject violation on only three occasions. As the following discussion demonstrates, all three differ from the present case in significant ways.[8]

In *Western International Insurance v. Kirkpatrick*, the general assembly passed a law entitled, "An act relating to code corrections which adjust and correct earlier omissions and inaccuracies, remove inconsistencies, and reflect or alter current practices, and providing penalties." 396 N.W.2d at 361. The primary goal of this legislation was technical: it was designed to make sixty-one

---

[8]Over the years, our court has seen claims based on article III, section 29 raised more than ninety times. *See State v. Nickelson*, 169 N.W.2d 832, 833–34 (Iowa 1969); William J. Yost, Note, *Before a Bill Becomes a Law—Constitutional Form*, 8 Drake L. Rev. 66, 67 (1958) [hereinafter Yost]. Among those cases, only thirteen statutes have been found to be invalid. *See State v. Taylor*, 557 N.W.2d 523, 526–27 (Iowa 1996); *Giles v. State*, 511 N.W.2d 622, 625 (Iowa 1994); *W. Int'l Ins. v. Kirkpatrick*, 396 N.W.2d 359, 365–66 (Iowa 1986) (en banc); *Nickelson*, 169 N.W.2d 832, 837; *Nat'l Benefit Acc. Ass'n v. Murphy*, 269 N.W. 15, 19 (Iowa 1936); *Smith v. Thompson*, 258 N.W. 190, 201 (Iowa 1934), *overruled on other grounds by Carlton v. Grimes*, 23 N.W.2d 883, 903–04 (Iowa 1946); *Chi., R.I. & P. Ry. v. Streepy*, 224 N.W. 41, 44 (Iowa 1929); *In re Breen*, 222 N.W. 426, 428 (Iowa 1928); *State v. Manhattan Oil Co.*, 203 N.W. 301, 303 (Iowa 1925); *Des Moines Nat. Bank v. Fairweather*, 181 N.W. 459, 462 (Iowa 1921); *State v. Bristow*, 109 N.W. 199, 200 (Iowa 1906); *Rex Lumber Co. v. Reed*, 77 N.W. 572, 574 (Iowa 1898); *Williamson v. City of Keokuk*, 44 Iowa 88, 92 (1876). All thirteen of those statutes had a faulty title; only three statutes were deemed to violate the single-subject clause as well. *See Taylor*, 557 N.W.2d at 526; *Giles*, 511 N.W.2d at 625; *W. Int'l Ins.*, 396 N.W.2d at 365.

"code corrections" to various parts of the Iowa Code that were "conflicting, redundant or ambiguous." *Id.* at 364. But the act also included substantive amendments to the workers' compensation statutes that permitted direct appeals from administrative decisions to this court. *Id.* at 361.

We found the substantive parts of the law to be constitutionally deficient on several grounds. First, they impermissibly tried to confer original jurisdiction on this court in violation of article V, section 4. *Id.* at 363–64. Also, the title of the act, which purported to "reflect or alter current practices," was insufficient to give notice of the changes to the workers' compensation laws, violating the article III, section 29 requirement that an act's subject be expressed in its title. *Id.* at 361, 365. Finally, we stated that the act violated the single-subject rule "by providing for substantive changes in a code corrections bill." *Id.* at 365.

Eight years later, in *Giles v. State*, we again dealt with a modification of appellate jurisdiction that had been included in a larger code-corrections bill. 511 N.W.2d 622, 625 (Iowa 1994). We tracked our earlier decision in *Western International* and again held that substantive legislation within a code-corrections bill violates the single-subject rule: "When [a code-correction] bill incorporates substantive changes, however, the portions that violate article III, section 29 must be stricken." *Id.* We found that the legislation had violated the title requirement as well. *Id.* ("Incorporating such a change in a Code correction bill violates the single subject and title requirement of the Iowa Constitution.").

Notably, both *Western International* and *Giles* involved technical corrections affecting many disparate areas of the Iowa Code. That in itself wasn't a problem. We indicated that the technical nature of the changes could be viewed in itself as the single subject of the legislation. *See Western International*, 396 N.W.2d at 365; *Giles*, 511 N.W.2d at 625. However, once substantive changes were woven into the same legislation, there ceased to be only one subject. *See Western International*, 396 N.W.2d at 365; *Giles*, 511 N.W.2d at 625. Our case does not involve a lengthy, wide-ranging code-corrections bill. Neither *Western International* nor *Giles* bears lessons for the present case.

*State v. Taylor*, 557 N.W.2d 523 (Iowa 1996), marked the third and only other time this court has found a violation of the single-subject rule. *Taylor* involved an adult defendant who was convicted of trafficking in stolen weapons. *Id.* at 524. That crime had been enacted as part of a much larger juvenile justice bill, and the defendant argued the legislation as a whole violated article III, section 29. *Id.* at 526–27. "The bill contain[ed] seventy-four sections embracing a variety of initiatives, all but six of which expressly relate[d] to juveniles." *Id.* at 526. We described the primary contents of the bill as follows:

> The legislation calls for training gang-affected youth in racial and cultural awareness; prohibits supplying or distributing alcohol, tobacco, and drugs to juveniles; sets up procedures for enforcing juvenile offenses; establishes community programs to support at-risk juveniles through intervention, prevention, and education; combats child abuse and sexually predatory acts; creates weapon-free school zones, prohibits selling guns and ammunition to minors, and provides punishment for juveniles using firearms; appropriates money to fund juvenile programs and services; and calls for a study of juvenile delinquency, including patterns of recidivism and rehabilitation.

*Id.* at 526 (citations omitted). The part of the act that criminalized trafficking in stolen weapons made no reference to juvenile justice. *Id.*

The State argued "that *any* weapons law could have an impact on juveniles." *Id.* But we rejected this argument because "[s]uch reasoning would bring within its orbit virtually any new crime whether germane to the subject of juvenile justice or not." *Id.* Also, as in the other cases where we have found an article III, section 29 violation, the title in *Taylor* was deficient. *Id.* at 527. It failed to convey that the bill enacted a new criminal offense. *Id.* The title suggested that the legislation would only affect juvenile delinquency. *See id.*

*Taylor* is the high-water mark for challenges to legislation under the single-subject rule. Even so, it is distinguishable. As in *Western International* and *Giles*, we were dealing in *Taylor* with a lengthy piece of legislation that contained a stray, out-of-place item: a large *juvenile* justice bill dwarfed the challenged *adult* criminal law that went unmentioned in the title. *See Taylor*, 557 N.W.2d at 526–27. And the State's suggested point of commonality between the criminal offense and juvenile justice could conceivably have applied to every criminal law. *Id.* at 526. Here, in contrast, the legislation made two conceptually related substantive changes to laws governing medical decision-making that were both mentioned in the bill's title. Neither of the provisions at issue is an alien wayfarer in some larger bill.

To summarize, both sections of HF 594 pertained to the identified subject of "medical procedures," specifically government regulation of medical procedures in the interest of preserving human life. That differs from the

situation in *Western International, Giles,* and *Taylor* and does not violate the single-subject rule.

3. *Circumstances of HF 594's passage.* We also believe that the circumstances of HF 594's passage—although not directly relevant to whether the legislation violated the single-subject rule—support the State's position that no constitutional violation occurred.

Contrary to the views of the district court, HF 594's passage did not occur through logrolling. We have explained,

> Logrolling occurs when a provision unrelated to the core of a bill and not itself capable of obtaining majority support is tied to a popular bill having majority support. Logrolling also occurs when several matters, none of which individually has majority support, are joined in one bill and passage procured by combining the minority in favor of each into a majority willing to enact them all.

*Iowa Dist. Ct.*, 410 N.W.2d at 686.

That is not what happened here. The 24-hour waiting period was separately approved by a house majority. HF 594 in its final form was then approved by majorities in both the house and the senate, where the debate focused exclusively on the merits of the 24-hour waiting period. *See Senate Video* at 04:23:50–05:41:23 AM; *House Video* at 10:24:00–10:59:35 PM. No legislator who voted for HF 594 contends they would have voted against the 24-hour waiting period as a standalone provision. No legislator contends they did not understand the contents of HF 594 or were misled as to what they were voting on.

In *Mabry*, we explained that article III, section 29 serves three purposes:

> First, it prevents logrolling. Logrolling occurs when unfavorable legislation rides in with more favorable legislation. Second, it facilitates the legislative process by preventing surprise when legislators are not informed. Finally, it keeps the citizens of the state fairly informed of the subjects the legislature is considering.

460 N.W.2d at 473 (citations omitted).[9] The single-subject requirement is primarily aimed at the first of these purposes: avoiding logrolling. *Iowa Dist. Ct.*, 410 N.W.2d at 686 ("The single subject requirement is primarily intended to prevent 'logrolling.' " (quoting *Western Int'l*, 396 N.W.2d at 364)); *see also Long*, 142 N.W.2d at 382 ("The primary and universally-recognized purpose of the one-subject rule is to prevent 'log-rolling' in the enactment of laws . . . ."). The other two purposes, avoiding surprise to legislators and avoiding surprise to citizens, are primarily achieved through the title requirement. *Iowa Dist. Ct.*, 410 N.W.2d at 686 ("The title requirement of article III, section 29, serves a separate purpose. By mandating the act's subject be expressed in its title, legislators and citizens alike are given notice of its contents, reducing the possibility of legislation by surprise or fraud."); *Long*, 142 N.W.2d at 383 ("The primary purpose of the title requirement is to prevent surprise and fraud upon the people and the

---

[9]*Mabry* said that "single-subject rule" served these three purposes. 460 N.W.2d at 473. We note, however, that *Mabry* referred to the single-subject requirement and the title requirement together as the "single-subject rule." *See id.* ("Most state constitutions require that 'no [legislative] act shall contain more than one subject, which shall be expressed in its title. . . .' This constitutional mandate is known as the 'single-subject' rule." (omission in original) (quoting 1A Norman J. Singer, *Sutherland Statutory Construction* § 22.08, at 187 (C. Sands 4th ed. 1985))). Also, in discussing the three purposes, *Mabry* cited to and relied on a Drake Law Review note that was referring to article III, section 29 as a whole. *See id.* (citing Yost, 8 Drake L. Rev. at 67). To avoid confusion in this opinion, we refer to the single-subject requirement and title requirement separately.

legislature.").[10] The single-subject rule and the title requirement are related, but they "have independent operation, have an independent historical base, and a separate purpose." *Long*, 142 N.W.2d at 383.

Ultimately, we should decide whether a violation of article III, section 29 occurred based on the text of HF 594, not the process of its enactment. But the process does not suggest that the purposes of the single-subject rule were thwarted. Our constitution does not prohibit the legislature from burning the midnight oil or passing significant legislation with relatively little public debate, as they often do at the end of a legislative session.

Article III, section 29 is not merely aspirational. We do not share the views of one amicus that the single-subject clause of article III, section 29 is totally nonjusticiable. But just as we would bristle at the legislature telling us how we should conduct our business internally, so should we be hesitant to pass judgment on how the legislature conducts theirs.

Finally, we turn to Planned Parenthood's contention that the acting house speaker's ruling on germaneness means that HF 594 as approved violated the single-subject rule. We disagree. The issue of whether H–8314 was germane to the bill it was amending is different from the issue of whether the final bill, once enacted, embraced a single, broader subject. *See* 88th G.A., *House Rules (House Resolution 11)* r. 38 (2019) ("An amendment must

---

[10]"The single subject limitation of article III, section 29, also facilitates an orderly legislative process. As we wrote in Long: 'By limiting each bill to a single subject, the issues presented by each bill can be better grasped and more intelligently discussed by [] legislators.' " *Iowa Dist. Ct.*, 410 N.W.2d at 686 (quoting *Long*, 142 N.W.2d at 382) (citation omitted).

be germane to the subject matter of the bill it seeks to amend. An amendment to an amendment must be germane to both the amendment and the bill it seeks to amend."). The frame of reference matters. Suppose you have pending legislation authorizing the building of a road in eastern Iowa. An amendment proposing to close a road in western Iowa may not be germane to the subject matter of that existing piece of legislation. But the combined legislation can be fairly said to deal with the single subject of "roads." *Cf. Weir*, 2 Iowa at 284. It logically follows, therefore, why the house can vote to suspend its own rules (and did so in this case), but the Iowa Constitution cannot be suspended. The rule requirements are more stringent than those of our constitution.

**B. Does Issue Preclusion Bar the State from Defending a 24-Hour Waiting Period on the Merits?** Planned Parenthood argues that the doctrine of issue preclusion forecloses the State from litigating the merits of the 24-hour waiting period that the legislature enacted in 2020 as part of HF 594. Specifically, Planned Parenthood contends it must be accepted for purposes of this litigation that "mandatory delay laws do not change people's minds" and that multiple trips to an abortion provider "impose[s] a range of medical, financial, emotional and social burdens."

As we have discussed, in 2018, our court struck down as unconstitutional a longer 72-hour waiting period. There, for the first time, we identified a fundamental right to an abortion as part of the Iowa Constitution. *PPH II*, 915 N.W.2d at 234–37 (majority opinion). Having found that such a right existed, we concluded that abortion-related legislation must be evaluated under the strict

scrutiny standard rather than the *Casey* undue burden standard. *Id.* at 240–41. Then, utilizing that strict scrutiny framework, we struck down the 72-hour waiting period for two independent reasons. First, it would not "result in a measurable number of women choosing to continue a pregnancy they otherwise would have terminated without the mandatory delay." *Id.* at 243. Second, "[e]ven if the Act did confer some benefit to the State's identified interest, it sweeps with an impermissibly broad brush." *Id.* at 243. We reasoned that it "takes no care to target patients who are uncertain when they present for their procedures but, instead, imposes blanket hardships upon all women." *Id.*

In short, *PPH II* decided one pure question of law, namely, that there is a fundamental right to abortion in the Iowa Constitution. Working from that legal determination, *PPH II* went on to find the 72-hour waiting period unconstitutional on two alternative (and arguably factual) grounds.

We have said that a party invoking issue preclusion must establish four elements:

> (1) the issue in the present case must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior case, and (4) the determination of the issue in the prior action must have been essential to the resulting judgment.

*Emps. Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012) (quoting *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 104 (Iowa 2011)); *see also Winger*, 881 N.W.2d at 451. Also, when issue preclusion is invoked offensively, as in the present case, two additional considerations are present:

> (1) whether the opposing party in the earlier action was afforded a full and fair opportunity to litigate the issues . . ., and (2) whether

any other circumstances are present that would justify granting the party resisting issue preclusion occasion to relitigate the issues.

*Van Haaften*, 815 N.W.2d at 22 (quoting *Soults Farms*, 797 N.W.2d at 104).

Our law of issue preclusion has drawn on the work of the Restatement (Second) of Judgments. *See, e.g.*, *Barker v. Iowa Dep't of Pub. Safety*, 922 N.W.2d 581, 588 (Iowa 2019); *Winger*, 881 N.W.2d at 451; *In re Pardee*, 872 N.W.2d 384, 391 (Iowa 2015); *Van Haaften*, 815 N.W.2d at 23.

We do not believe issue preclusion applies here. To begin, our decision in *PPH II* depended on our resolution of a single legal issue: whether there is a fundamental right to an abortion in the Iowa Constitution. We do not believe a court of last resort can be hemmed in by the doctrine of issue preclusion from deciding what our constitution means. This would have meant, for example, that the United States Supreme Court in the 1930s would have been precluded from altering its prior approach to economic regulation and upholding the legislation of Franklin D. Roosevelt's New Deal.

The Restatement (Second) of Judgments section 28(2) explains that relitigation of an issue is not precluded where "[t]he issue is one of law and . . . a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." Restatement (Second) of Judgments § 28(2), at 273 (Am. L. Inst. 1982) [hereinafter Restatement (Second) of Judgments]. Section 29, which concerns issue preclusion in subsequent litigation with others, goes further. *Id.* § 29, at 291–92. In addition to the section 28 circumstances, it lists other reasons for not applying issue preclusion. *Id.* These include when "[t]he

issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based." *Id.* § 29(7), at 292. Comment *i* to section 29 elaborates on this ground:

> When the issue involved is one of law, stability of decision can be regulated by the rule of issue preclusion or by the more flexible rule of stare decisis. See § 28, Comment *b*. If the rule of issue preclusion is applied, the party against whom it is applied is foreclosed from advancing the contention that stare decisis should not bind the court in determining the issue. Correlatively, the court is foreclosed from an opportunity to reconsider the applicable rule, and thus to perform its function of developing the law. . . . [I]t is also pertinent that the party against whom the rule of preclusion is to be applied is a government agency responsible for continuing administration of a body of law applicable to many similarly situated persons. When any of these factors is present, the rule of preclusion should ordinarily be superseded by the less limiting principle of stare decisis.

*Id.* § 29 cmt. *i*, at 297.

True, Planned Parenthood was the plaintiff in 2018 and is the plaintiff today. In that sense, the parties are technically identical in both cases. But this overlooks the fact that Planned Parenthood is not asserting *its own* constitutional rights. *See PPH III*, 962 N.W.2d at 56–57. The rights at issue are those of individual women who are not actually before this court as parties and who would not be bound under claim or issue preclusion principles by the decision in either case. So, in that respect, there is no mutuality. *See United States v. Mendoza*, 464 U.S. 154, 162–64 (1984) (holding that nonmutual collateral estoppel does not apply against the federal government). Both the

section 28(2)(b) and the section 29(7) exceptions to issue preclusion in the restatement come into play here.[11]

There is also authority that issue preclusion does not apply to pure questions of law. As a leading treatise has put it, "It is reasonably clear that preclusion does not extend to principles of law formulated in abstract terms that could apply to completely separate fact settings." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4425, at 696 (2d ed. 2016).

In 2018, we decided such an abstract question of law: we held for the first time that there is a fundamental right to an abortion under the Iowa Constitution. *PPH II*, 915 N.W.2d at 237. The rest of our opinion in *PPH II* flowed directly from that single, broad legal determination: strict scrutiny, compelling state interest, and narrow tailoring automatically came next. *Id.* at 238–41. We found that the 72-hour period was unconstitutional because it would not have a "measurable" effect on reducing abortions, and thus would not promote human life. *Id.* at 242. We *also* found that the 72-hour waiting period was unconstitutional because that waiting period was not narrowly tailored but instead applied to all women in Iowa who were interested in terminating a pregnancy, even those whose decisions would not be affected by a 72-hour waiting period. *Id.* at 243.

---

[11]Also, Planned Parenthood "performs 95% of the abortions in the State of Iowa." *PPH III*, 962 N.W.2d at 50. If issue preclusion applied as between Planned Parenthood and the State on the broad legal question of whether there is a fundamental right to an abortion in the Iowa Constitution, that could freeze constitutional interpretation on abortion rights based on the happenstance that one organization has a near-monopoly on providing abortions in Iowa.

Having found that issue preclusion does not bar us from reconsidering the basic legal question of the constitutional status of abortion, this removes any ground for affording issue preclusion to the rest of our 2018 opinion. Any fact-finding we did in 2018 was done under a legal standard—strict scrutiny— that put all the burden of justification on the State. *See PPH III*, 962 N.W.2d at 47–48 ("Under strict scrutiny, a law is presumptively invalid, and the burden is on the government to show that the law is 'narrowly tailored to serve a compelling state interest.' "); *Mitchell County v. Zimmerman*, 810 N.W.2d 1, 16 (Iowa 2012) (noting that under strict scrutiny, the government "has the burden to show that the ordinance serves a compelling state interest and is the least restrictive means of attaining that interest"). If that burden of proof were to change, issue preclusion could not apply. *See* Restatement (Second) of Judgments § 28(4), at 273 (noting that issue preclusion does not apply when "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action").[12]

---

[12]We note that in *Planned Parenthood of Middle Tennessee v. Sundquist*, the Tennessee Supreme Court held for the first time that there was a fundamental right to terminate a pregnancy under the Tennessee Constitution and struck down Tennessee's mandatory waiting period. 38 S.W.3d 1, 25 (Tenn. 2000). The court also concluded that Planned Parenthood was not barred by collateral estoppel from relitigating the constitutionality of that waiting period, an issue on which it had previously lost in federal court. *Id.* at 23 n.12. In the Tennessee Supreme Court's view, the two cases involved "different issues" because the first case was decided under an undue burden standard rather than a fundamental rights/strict scrutiny standard. *Id.*

Here, the converse is true. If we find that there is no fundamental right to an abortion in the Iowa Constitution, then the constitutionality of a mandatory waiting period becomes a different issue than it was under a fundamental rights/strict scrutiny analysis.

Moreover, neither of the two potentially factual determinations we made in *PPH II* were "essential" to the judgment. *See Van Haaften*, 815 N.W.2d at 22; Restatement (Second) of Judgments § 27, at 250 (stating that the determination must be "essential to the judgment"). Rather, our court made alternative determinations. *See PPH II*, 915 N.W.2d at 242–43. And we made them as a court of first instance since the lower court had ruled otherwise. *See id.* at 231. Such alternative determinations cannot have issue preclusive effect. *See* Restatement (Second) of Judgments § 27 cmt. *i,* at 259 ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.").

Additionally, a 24-hour waiting period is not identical to a 72-hour waiting period. Common sense would say that a 24-hour waiting period imposes less of a burden on women seeking an abortion than a 72-hour waiting period, yet also may be less likely to change minds. In *Planned Parenthood of Montana v. State*, the Montana Supreme Court declined to give preclusive effect to a prior decision invalidating an earlier version of an abortion parental notification law. 342 P.3d 684, 688–89 (Mont. 2015). The new laws had the same basic components—a required parental notification with a judicial bypass—but contained differences. *Id.* That was sufficient to foreclose the use of issue preclusion. *Id.* at 688 ("The question before us is only whether the issues in the two cases are identical.").

In its briefing in *PPH II*, Planned Parenthood argued that the 72-hour waiting period involved in that case was "triple the mandatory [24-hour] delay

period upheld in *Casey*, and the evidence at trial confirmed the obvious fact that a longer required delay is more burdensome."

In support of its motion for summary judgment on issue preclusion, Planned Parenthood submitted an affidavit of a physician who said, "[A]lthough a 24-hour mandatory delay law in theory imposes less automatic delay than a 72-hour mandatory delay law, in practice, it will still cause substantial delay and other harms." Planned Parenthood submitted an affidavit from another physician who said, "A 24-hour mandated delay is no less harmful in practical terms than a 72-hour requirement." This strikes us as an unusual approach to issue preclusion. If the issues are identical, it should not be necessary to submit affidavits like this *at all*. And offering an opinion that two different waiting periods result in the same practical harm does not establish an identity of issues.

In the end, therefore, Planned Parenthood must argue that the doctrine of issue preclusion freezes the State from ever seeking to overturn the legal postulate that terminating a pregnancy is a fundamental right under our state constitution. Our court has never applied issue preclusion in that context. Planned Parenthood cites to *Penn v. Iowa State Board of Regents*, 577 N.W.2d 393 (Iowa 1998) (per curiam), and *Burns v. Board of Nursing of the State of Iowa*, 528 N.W.2d 602 (Iowa 1995), as cases applying issue preclusion in constitutional litigation. But *Penn* simply applied issue preclusion to the subordinate question of when the plaintiff's constitutional claims accrued for statute of limitations purposes. 577 N.W.2d at 399–400. And *Burns* applied issue preclusion when the plaintiff, within the same case, sought to relitigate constitutional issues it had

already litigated and lost before us in an earlier stage of the same case. 528 N.W.2d at 605. Perhaps the issue in *Burns* was wrongly titled; the constitutional claims should have been rejected under "law of the case" rather than issue preclusion. Regardless, *Burns* bears no resemblance to the present proceeding.

It would be unfathomable to say that issue preclusion prevents the State from asking us to revisit a broad principle of constitutional law. For example, earlier this term, three members of this court urged that we should overrule a recent case and find that the Iowa Constitution does not bar police from removing trash from trash cans put out for collection. *See State v. Kuutila*, 965 N.W.2d 484, 487–90 (Iowa 2021) (Waterman, J., dissenting, joined by Christensen, C.J., and Mansfield, J.). Last term, we overruled a case requiring law enforcement to obtain a search warrant before conducting a breath test on a boater whom they have probable cause to believe is intoxicated. *State v. Kilby*, 961 N.W.2d 374, 383 (Iowa 2021) (overturning *State v. Pettijohn*, 899 N.W.2d 1 (Iowa 2017)). If Planned Parenthood were right, then constitutional adjudication in Iowa would be a one-way ratchet. Once we decided that a right existed under the Iowa Constitution, the State could never ask us to reconsider that right in a later case.

For all these reasons, we conclude that issue preclusion does not apply in this case.

**C. Should Stare Decisis Prevent Us From Reconsidering *PPH II*?** We next turn to whether *PPH II*'s holding that there is a fundamental right to terminate a pregnancy in the Iowa Constitution should be revisited. The State

has asked that we overrule *PPH II*. Planned Parenthood resists both on stare decisis and on the ground that *PPH II* was correctly decided.

Stare decisis—"to stand by things decided"—cautions us against overturning our past decisions. *See State v. Feregrino*, 756 N.W.2d 700, 708 (Iowa 2008) ("The doctrine of stare decisis counsels caution before we overturn prior precedent of this court.").

But stare decisis is not an "inexorable command." *Bd. of Water Works Trs. of City of Des Moines v. Sac Cnty. Bd. of Supervisors*, 890 N.W.2d 50, 86 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) ("In close cases, the determination of whether to apply stare decisis is a matter of judgment, not inexorable command."). "Within a system of justice, courts cannot blindly follow the past. Instead, we are obligated to depart from past cases when they were erroneously decided." *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 849 (Iowa 2014). "[I]t is our obligation to revisit a prior decision of our court if we conclude the previous decision is unsound." *Doe v. New London Comm. Sch. Dist.*, 848 N.W.2d 347, 360 (Iowa 2014) (Wiggins, J., dissenting). "Of course, stare decisis is a factor to consider. At the same time, we recognize that stare decisis is not always determinative. Otherwise, the law would be like a fly imprisoned in volcanic rock." *State v. Short*, 851 N.W.2d 474, 500 (Iowa 2014) (citation omitted).

There are several reasons why stare decisis has less force here than it might in other contexts. First, *PPH II* was a constitutional decision. "Stare decisis has limited application in constitutional matters." *Kilby*, 961 N.W.2d at 386 (McDonald, J., concurring specially). "Constitutional cases tend to invoke a weak

or less strict form of stare decisis, on the theory that only the courts can correct bad constitutional precedent, absent constitutional amendments. In other words, courts must be free to correct their own mistakes when no one else can." Tyler J. Buller & Kelli A. Huser, *Stare Decisis in Iowa*, 67 Drake L. Rev. 317, 322 (2019) [hereinafter Buller & Huser] (footnote omitted).

Also, an empirical study indicates that our court has overruled precedents at a rate of approximately four per year between 1990 and 2018, and that between 2011 and 2018 our court "overruled comparatively more constitutional decisions than [in] any other period in the history of the Iowa Supreme Court since 1857." *Id.* at 345, 356. As the authors put it, "This suggests comparatively weak constitutional stare decisis by [the court during the 2011–18 period], at least compared to its predecessors." *Id.* at 356. So, our court has been more willing to revisit constitutional precedents in recent years.

Second, *PPH II* was decided only four years ago. It is certainly not "long-standing." *Cf. Venckus v. City of Iowa City*, 930 N.W.2d 792, 802 (Iowa 2019) ("Venckus offers no compelling justification to overrule our long-standing precedents . . . ."). It is not "well-established" or "settled." *Cf. Schmidt v. State*, 909 N.W.2d 778, 818 (Iowa 2018) (Mansfield, J., dissenting) ("I would not abandon our settled precedent, unanimously reaffirmed eight years ago . . . ."). Precedents generally grow deeper roots as they age. "A court that overturns much older cases arguably undermines the predictability and stability of the law more than a court that overturns primarily newer cases because litigants and citizens

have come to rely on the long-standing decisions." Buller & Huser, 67 Drake L. Rev. at 346.

Stare decisis should be less of an obstacle when the decision to be overruled is recent and itself overruled other precedent. *See State v. Williams*, 895 N.W.2d 856, 867–69 (Iowa 2017) (Mansfield, J., concurring specially) (analyzing how the decision being overruled broke from precedent).

Third, *PPH II* was overtly based on the notion of a "living" constitution. *See PPH II*, 915 N.W.2d at 236. We "consider[ed] current prevailing standards that draw their 'meaning from the evolving standards . . . that mark the progress of a maturing society.' " *Id.* (omission in original) (quoting *Griffin v. Pate*, 884 N.W.2d 182, 186 (Iowa 2016)). To the extent *PPH II* viewed constitutional interpretation as an evolutionary process rather than a search for fixed meaning, it is hard now to argue that the evolutionary process had to end as soon as *PPH II* was decided. Does the Iowa Constitution get to "live" until 2018, at which point it must stop living?

A group of distinguished law professors from the University of Iowa and Drake filed an amicus brief in this case on the subject of stare decisis. We respect their views, but we disagree with them.

The professors argue that a precedent should only be overruled when "stare decisis has lapsed"—that is, a sufficient time period has passed. In the professors' view, four years is not enough. Overruling a four-year-old precedent "would suggest that this Court had not deliberated adequately in 2018."

To be clear, we do not contend that the court failed to deliberate adequately in 2018. But we do not agree that every state supreme court decision is entitled to some minimum try-out period before it can be challenged. In the same month that our court decided *PPH II*, we also decided *TSB Holdings, L.L.C. v. Board of Adjustment for City of Iowa City*, 913 N.W.2d 1, 11–14 (Iowa 2018), which unanimously overruled a case decided only one year prior. In *TSB Holdings*, we explained at some length why the prior decision was wrong. *See id.* And that decision was joined both by all members of the *PPH II* majority (except for two justices who took no part) and by the *PPH II* dissenters. *Id.* at 19.

The professors urge that adhering to a precedent when the membership of a court changes "refutes the cynical view that a supreme court is a political institution guided by the justices' personal values, rather than the law." But we know that the professors do not share that cynical view, so why do they ask us to act in fear of it? Shouldn't we instead follow our solemn oaths to uphold the Iowa laws and constitution? In the end, court decisions should be—and we believe are—judged by the strength of their reasoning, not by the identity of the persons who wrote or joined them.[13]

The professors maintain that "[o]n appropriate occasions, a supreme court may overrule a prior case to bring the law up to date." Yet, constitutional law isn't just a matter of bringing the law up to date; sometimes it also involves restoring original principles. "Constitutional interpretation is not Darwinian

---

[13]The professors implicitly acknowledge this point. They defend *PPH II* by making the modest claim that "[t]he reasoning in [*PPH II*] is as good as or better than the reasoning in many cases."

evolution, and a decision of this court today is not superior to the decisions that preceded it just because it is more recent." *Schmidt*, 909 N.W.2d at 817.[14]

The professors also refer to a reliance interest, but their reference is to *Roe*, which is forty-nine years old, rather than *PPH II*, which is four years old and goes well beyond *Roe*. Reconsideration of *Roe* is not before us, nor could it be.

We believe the views of Justice Amy Coney Barrett, who was writing at the time as a law professor, are worth quoting:

> To be sure, partisan politics are not a good reason for overturning precedent. But neither are they a good reason for deciding a case of first impression. One who believes that an overruling reflects votes cast based on political preference must believe that all cases (or at least all the hot-button ones) are decided that way, for there would be no reason for politics to taint reversals but not initial decisions. If all such decisions are based on politics, there is no reason why the precedent-- itself thus tainted--is worthy of deference. (Nor, for that matter, would there be reason to accept the legitimacy of judicial review.) Basic confidence in the Supreme Court requires the assumption that, as a general matter, justices decide cases based on their honestly held beliefs about how the Constitution should be interpreted. If one is willing to make that assumption about the decision of cases of first impression, one should also be willing to make it about the decision to overrule precedent.

---

[14] *Brown v. Board of Education*, 347 U.S. 483 (1954), is a good example of a case that overruled precedent and restored the rightful meaning of our Federal Constitution. The Fourteenth Amendment had enacted to prevent state governments from discriminating against Black Americans, yet it had been distorted so that it had become a license to discriminate. As Professor Charles Black memorably said,

> [I]f a whole race of people finds itself confined within a system which is set up and continued for the very purpose of keeping it in an inferior station, and if the question is then solemnly propounded whether such a race is being treated "equally," I think we ought to exercise one of the sovereign prerogatives of philosophers—that of laughter.

Charles L. Black, Jr., *The Lawfulness of the Segregation Decisions*, 69 Yale L.J. 421, 424 (1960).

Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1729 (2013).

In conclusion, we think any stare decisis considerations are relatively weak here because *PPH II* was a constitutional decision, it was decided only four years ago, it has not been reaffirmed, and it was consciously based on the notion that constitutional interpretation is subject to change.

**D. Should *PPH II* Be Overruled?** We now come to the question of whether *PPH II* should be overruled. Perhaps a good place to start is with the plurality opinion in *Casey*, where the Supreme Court declined to overrule *Roe*. The plurality in *Casey* focused on several considerations. 505 U.S. at 855–59. Although *Roe* had engendered opposition, it had in no sense proved practically "unworkable." *Casey*, 505 U.S. at 855. Also, over nearly two decades, people had "ordered their thinking and living around that case." *Id.* at 856. Additionally, *Roe* had been expressly reaffirmed in 1983, ten years after it had been decided. *Casey*, 505 U.S. at 858. And *Roe* doctrinally fell within a larger group of cases that recognized the need to balance a State's interest in the protection of human life with individual liberty. *Casey*, 505 U.S. at 857.

None of those observations applies to *PPH II*. To begin with, we question the workability of *PPH II*. The issue isn't whether *the result* in *PPH II* is workable. Clearly, it is possible to administer a rule that a 72-hour waiting period is not allowed. The issue is whether *the doctrine* set forth in *PPH II* is workable. Here we have doubts.

As used in *PPH II*, "fundamental right" means that any regulation of abortion must target only women who would benefit from that particular regulation—for example, in that case, "patients who are uncertain when they present for their procedures." *PPH II*, 915 N.W.2d at 243. Otherwise, the regulation "sweeps with an impermissibly broad brush." *Id.*

That's an impossible-to-meet standard unless the point is to eliminate all regulations governing abortion. It is exceedingly difficult to tailor *any* regulation so it applies only to those who would benefit from that specific regulation. For example, how would you know which gun purchasers might fail a background check until you run the background check? Likewise, how do you know who is truly uncertain and could benefit from additional information about pregnancy, childbirth, and abortion until you have provided that information and given them time to review it? Under *PPH II*, even a simple informed consent requirement would be unconstitutional if it applied to all women seeking an abortion. Needless to say, *PPH II* also calls into question the constitutionality of Iowa's parental notification law. *See* Iowa Code ch. 135L.

Normally, we allow laws to take effect, and then allow persons who are adversely affected by those laws to bring "as applied" challenges. But *PPH II* involved a facial challenge. 915 N.W.2d at 232. "[T]o succeed on a facial challenge, the petitioner must prove a statute is 'totally invalid and therefore, "incapable of any valid application." ' " *Id.* (quoting *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001)). Thus, under *PPH II*, any abortion regulation is facially unconstitutional for all purposes unless as drafted it contains every conceivable

necessary exception that the court can think of. *See id.* at 243 (listing various exceptions missing from the 72-hour waiting period). That's rational basis deference in reverse.[15]

*PPH II* has no discernible endpoint until childbirth. *See id.* at 237 (defining the fundamental right, without qualification, as "the ability to decide whether to continue or terminate a pregnancy"). Any burden on abortion—even very late in the pregnancy—must be narrowly tailored to promote a compelling state interest. *See id.* at 244. Whereas *Roe* and *Casey* make clear that the constitutional right to terminate a pregnancy ends at viability, *PPH II* dismisses that approach with the statement, "We do not, and could not, endeavor to discern the precise moment when a human being comes into existence." *Id.* at 243.

Yet, after our court had said all these things in *PPH II*, we also proclaimed, "[W]e do not today hold, that a woman's right to terminate a pregnancy is unlimited." *Id.* at 239. But how then is it limited? *PPH II* doesn't say, or even suggest, a possible answer.[16]

Such an internally contradictory approach is unworkable.

---

[15]As discussed below, Florida also subjects abortion regulations to strict scrutiny based on a specific privacy right that was added to the Florida Constitution in 1980. *See Gainesville Woman Care, LLC v. State*, 210 So.3d 1243, 1246 (Fla. 2017). But in practice, Florida does not follow *PPH II*'s approach of invalidating a law on its face unless every potential application of that law furthers a compelling state interest. *See State v. Gainesville Woman Care, LLC*, 278 So. 3d 216, 222 (Fla. Dist. Ct. App. 2019) (reversing a summary judgment invalidating a 24-hour notice requirement and explaining that "[f]or this facial challenge, the correct legal test is not whether the 24-hour Law violates the constitutional rights of some women in some circumstances, but whether it violates the rights of all women in all circumstances").

[16]Today's dissent defending *PPH II* offers no reassurance, either. Unlike *PPH II*, today's dissent does not even acknowledge that the State has a compelling interest in promoting human life. *See PPH II*, 915 N.W.2d at 239 ("[T]he state has a compelling interest in promoting potential life."). No such language appears in today's dissent.

Furthermore, one cannot say that people in Iowa have "ordered their thinking and living" around *PPH II*. *Casey*, 505 U.S. at 856. In fact, as one of the amici supporting Planned Parenthood writes, *PPH II* "did not change the status quo." *PPH II* invalidated a recently enacted 72-hour waiting period. That left the situation for women seeking an abortion in Iowa as it had been before.

Also, *PPH II* has not been reaffirmed. That is not surprising since it was decided only four years ago.

Doctrinally, *PPH II* stands virtually alone, both inside and outside Iowa. *PPH II* found a fundamental right to an abortion where others had not: in the due process clause as a right "implicit in the concept of ordered liberty." *PPH II*, 915 N.W.2d at 237. While some other state supreme courts have found a fundamental right to an abortion within their state constitution, as is discussed below, they have done so based on one or more substantive constitutional guarantees. Conversely, states that find a right to an abortion in a state constitutional due process clause have gone no further than the undue burden test. *See id.* at 254 (Mansfield, J., dissenting) ("[S]tates relying on the due process clauses of their state constitutions typically have applied the undue burden test.").

In 2019, one year after *PPH II*, the Kansas Supreme Court recognized a fundamental constitutional right to an abortion. *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 502 (Kan. 2019) (per curiam). However, unlike our court, it relied on the inalienable rights clause while specifically *declining* to rely on the due process clause. *See id.* at 485–86. The Kansas Supreme Court explained its

hesitation to rely on the due process clause, highlighting the distinction between substantive and procedural rights:

> A final and notable language distinction between section 1 [the inalienable rights clause] and the Fourteenth Amendment arises from another phrase found in the Amendment but not in section 1: "without due process of law." In other words, the text of section 1 demonstrates an emphasis on substantive rights—not procedural rights. In contrast, the Fourteenth Amendment's use of "the term 'due process' seem[s] to speak of procedural regularity." Currie, The Constitution in the Supreme Court: The First Hundred Years, 1789–1888, at 272 (1985). Thus, section 1's focus on substantive rights removes from our calculus one of the criticisms of *Roe* and other decisions of the United States Supreme Court relying on substantive due process rights under the Fourteenth Amendment.

*Id.* at 626–27.

Elsewhere, the story is similar. Minnesota has recognized a fundamental right to an abortion under a combination of guarantees in the Minnesota Constitution. *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 19 (Minn. 1995). California has found a fundamental right to an abortion under California's constitutional privacy clause. *Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 819 (Cal. 1997). Likewise, Alaska has found a fundamental right to an abortion encompassed within the right to privacy in the Alaska Constitution. *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997); *see* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed."). Montana has found a fundamental right to an abortion based on a constitutional guarantee of individual privacy that has no counterpart in the Iowa Constitution. *Armstrong v. State*, 989 P.2d 364, 382 (Mont. 1999); *see* Mont. Const. art. II, § 10 ("The right of individual privacy is essential to the well-being

of a free society and shall not be infringed without the showing of a compelling state interest."). Tennessee, until the court's decision was overturned by a constitutional amendment, likewise relied on various grants of rights within the Tennessee Constitution "more particularly stated than those stated in the federal Bill of Rights." *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 13–15 (Tenn. 2000), *superseded by constitutional amendment*, Tenn. Const. art. I, § 36. New Jersey has found a fundamental right to an abortion within the "natural and unalienable rights" clause of the New Jersey Constitution. *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 629, 638 (N.J. 2000). Florida has pinpointed a fundamental right to an abortion within Florida's constitutional right to privacy, which was added to the Florida Constitution in 1980 and which establishes the right of every person to "be let alone and free from governmental intrusion into [one's] private life." *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1246, 1252 (Fla. 2017) (alteration in original); *see* Fla. Const. art. I, § 23.[17]

Meanwhile, state courts focusing specifically on the due process clause have overwhelmingly found that the right to an abortion in the state constitution is no broader than the federal right (if it exists at all). *See, e.g., Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 757, 760 (Ill. 2013) (finding a due process right to an abortion in the Illinois Constitution congruent with the federal right

---

[17]In *Hope v. Perales*, the New York Court of Appeals found a fundamental right to an abortion under the due process clause of the New York Constitution. 634 N.E.2d 183, 186 (N.Y. 1994). But the court did not hold that the right was any broader than the right to an abortion under the United States Constitution. *See id.* So as a practical matter, it was not "fundamental" in the sense that *PPH II* used that term.

and rejecting the existence of a right to an abortion within the privacy clause); *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 185 S.W.3d 685, 691–92 (Mo. 2006) (en banc) (per curiam) (applying the due process clause of the Missouri Constitution as giving the same protection to a pregnant woman recognized by *Casey*); *Pro-Choice Miss. v. Fordice*, 716 So. 2d 645, 655 (Miss. 1998) (en banc) (applying the undue burden test under the Mississippi Constitution and noting that "[t]he abortion issue is much more complex than most cases involving privacy rights"); *Preterm Cleveland v. Voinovich*, 627 N.E.2d 570, 584 (Ohio Ct. App. 1993) ("[W]e find no reason under the circumstances of this case to find that the Ohio Constitution confers upon a pregnant woman a greater right to choose whether to have an abortion or bear the child than is conferred by the United States Constitution, as explained in the plurality opinion of [*Casey*]."); *see also Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 188–90 (Ariz. Ct. App. 2011) (applying the federal undue burden test under the Arizona Constitution even though it contains an express privacy clause); *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 983–84 (Ind. 2005) (holding that Indiana's inalienable rights clause provides protection similar to the *Casey* undue burden test); *Planned Parenthood League of Mass., Inc. v. Att'y Gen.*, 677 N.E.2d 101, 103–04 (Mass. 1997) (explaining that Massachusetts does not follow federal abortion precedent under the Massachusetts due process clause which has different wording, but the reviewing court does engage in balancing and does not require the state to advance a compelling state interest); *State v. Koome*, 530 P.2d 260, 263 (Wash.

1975) (en banc) (applying federal abortion precedent to strike down a Washington statute under both federal and state due process).

So, our point is: State courts recognizing broader, "fundamental" abortion rights have at least had textual grounds for doing so other than the due process clause.

Not only does *PPH II* deviate from the approach taken by other states, but it also departs from the approach taken by our court prior to 2018. Previously, even when we deemed a right related to parenting fundamental and "implicit in the concept of ordered liberty" for purposes of substantive due process, we analyzed whether the governmental restriction "directly and substantially intrude[d] upon" it. *Hensler v. City of Davenport*, 790 N.W.2d 569, 581, 583 (Iowa 2010) (recognizing that the right to control the parenting of a child is fundamental). We explained that such fundamental rights are "not absolute." *Id.* at 583. As we put it, "Not every government action that relates in any way to a fundamental liberty must be subjected to strict-scrutiny analysis." *McQuistion v. City of Clinton*, 872 N.W.2d 817, 833 (Iowa 2015) (stating that there is a fundamental right to procreate). Instead, the alleged infringement would be unconstitutional only if it had "a direct and substantial impact" on the fundamental right. *Id.* (quoting *State v. Seering*, 701 N.W.2d 655, 663 (Iowa 2005), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)), *as recognized in In re T.H.*, 913 N.W.2d 578, 587–88 (Iowa 2018)); *see also In re K.M.*, 653 N.W.2d 602, 608–09 (Iowa 2002) (using a blend of tests to uphold a statute that shifted the balance

in parental termination cases in favor of the best interests of the child and against reunification).

In other words, what we followed pre-2018 with respect to rights to family, procreation and child-rearing was something like the undue burden test of *Casey*. The government could not unduly burden those rights; that would trigger strict scrutiny. But it could take actions that affected the right without triggering strict scrutiny so long as the action did not have a direct and substantial impact. *Cf. Casey*, 505 U.S. at 877 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.").

Constitutional interpretation should begin with the constitutional text itself. *See State v. Wright*, 961 N.W.2d 396, 402–04 (Iowa 2021) (interpreting the Iowa Constitution by starting with the text and using "precedent, history, custom, and practice" as aids to determine its meaning). We note that on the specific topic of abortion, the Iowa Constitution is silent: if one were to search the constitution's text for terms such as "abortion" and "pregnancy," it would yield no results.[18] Therefore, if a right to have an abortion is in our state's constitution, it must be encompassed in some more general textual source. In *PPH II*, we named the due process clause as that broader source. 915 N.W.2d at

---

[18]The *Roe* Court, which found abortion to be a protected right because of a general right to privacy, acknowledged, "The Constitution does not explicitly mention any right of privacy." 410 U.S.113, 152 (1973); *see also State v. Hartog*, 440 N.W.2d 852, 855 (Iowa 1989) (noting that "rights of privacy have been found in the shadows of specific constitutional provisions").

232–33 (majority opinion). But, upon examination, the language of that provision does not support *PPH II*'s ultimate holding.

Textually, there is no support for *PPH II*'s reading of the due process clause as providing fundamental protection for abortion. Article I, section 9 states, "[N]o person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Section 9 doesn't speak in terms of absolutes. If liberty cannot be limited *without* due process of law, the logical implication is that liberty can be limited *with* due process of law. Certainly that conclusion seems correct when there are important interests—such as life itself—on both sides.

Only one opinion in *PPH II* discussed the ratification debates on article I, section 9. That was the dissenting opinion:

> The Chairman of the Committee on the Bill of Rights, Mr. Ells, explained to the convention that this clause had been "transcribed . . . from" the United States Constitution, and that due process means "no person shall be deprived of life, liberty or property, without a legal proceeding based upon the principles of the common law, and the constitution of the United States." [*The Debates* at 101–02.] The due process clause, in other words, guarantees certain *procedures*. The idea of substantive due process would have made no sense to our framers.

*PPH II*, 915 N.W.2d at 247 (Mansfield, J., dissenting).

Historically, there is no support for abortion as a fundamental constitutional right in Iowa.[19] As the *PPH II* dissent pointed out, abortion became

---

[19]*PPH II* did not even attempt to find historical support for a fundamental right to abortion. The Kansas Supreme Court, to its credit, at least made an effort to articulate a "historical and philosophical basis" for its fundamental-right holding. *Hodes & Nauser, MDs, P.A.*, 440 P.3d at 480. Its opinion quoted John Locke, Edward Coke, and William Blackstone as evidence for natural rights to personal autonomy and bodily integrity. *See, e.g., id.* (quoting Locke's statement that "every Man has a *Property* in his own *Person*" and Edward Coke's observation "that an ordinance setting requirements on the clothes that certain merchants could

a crime in our state on March 15, 1858—just six months after the effective date of the Iowa Constitution—and remained generally illegal until *Roe v. Wade* was decided over one hundred years later. *Id.*

Planned Parenthood doesn't dispute this. Instead, it notes that the common law only recognized abortion as a criminal offense after "quickening"—when the mother first feels fetal movement. *See Roe,* 410 U.S. at 132; *Abrams v. Foshee,* 3 Iowa (Clarke) 274, 278–80 (1856) (finding that an accusation that a woman had an abortion could not be slander because pre-quickening abortions were not a crime at common law and, in 1856, Iowa had no law prohibiting abortion). But abortion at any stage of pregnancy had been criminalized by statute in Iowa as early as 1843. *See* Iowa Rev. Stat. ch. 49, § 10 (Terr. 1843) ("[E]very person who shall administer to any woman, pregnant with a child, any medicine, drug, or substance whatever, or shall employ any other means with intent thereby to destroy such child, and thereby cause its death, unless the same shall be necessary to preserve the life of the mother, shall be deemed guilty of manslaughter.").

---

wear was against the law of the land 'because it was against the liberty of the subject, for every subject hath freedom to put his clothes to be dressed by whom he will' ").

But further digging into these sources reveals that the quoted jurists and philosophers that heavily influenced American law would almost certainly not have considered abortion to be included in an individual's natural rights. *See* Skylar Reese Croy & Alexander Lemke, *An Unnatural Reading; The Revisionist History of Abortion in Hodes v. Schmidt,* 32 U. Fla. J.L. & Pub. Pol'y 71, 82–86 (2021). Locke, a physician, "explicitly condemned abortion." *Id.* at 82. From a medical ethics perspective, he considered abortion to be in the same vein as suicide. *Id.* at 82–83. Coke stated that an abortion after quickening was a serious misdemeanor. *Id.* at 84. Blackstone believed an abortion after quickening to be manslaughter and stated, "An infant . . . in the mother's womb, is [s]uppo[s]ed in law to be born for many purpo[s]es." *Id.* at 85–86 (alterations in original) (quoting 1 William Blackstone, *Commentaries on the Laws of England* 129–30 (1765)).

For whatever reason, the 1843 statute criminalizing abortion in Iowa did not carry over in the codification that occurred in 1851. *See* Iowa Code ch. 138 (1851) (listing "offenses against the lives and persons of individuals" without including an abortion-related crime). But in March 1858, as noted, the Iowa legislature once again passed a law outlawing abortion. *See* 1858 Iowa Acts ch. 58, § 1 (codified at Revs. of 1860, Stats. of Iowa § 4221 (1860)). That law provided criminal penalties for willfully using any means to procure a miscarriage at any stage of pregnancy. Revs. of 1860, Stats. of Iowa § 4221. It stated,

> [E]very person who shall willfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with the intent thereby to procure the miscarriage of any such woman, unless the same shall be necessary to preserve the life of such woman, shall upon conviction thereof, be punished by imprisonment in the county jail for a term of not exceeding one year, and be fined in a sum not exceeding one thousand dollars.

*Id.*[20]

Planned Parenthood argues that this early ban on abortion simply maintained the common law distinction between abortions before and after quickening. But our first and only case to address this issue, *State v. Fitzgerald*, interpreted the law to apply throughout pregnancy. 49 Iowa 260, 261 (1878). In *Fitzgerald*, the defendant challenged the district court's refusal "to instruct the jury that the crime could not be committed upon a woman who was not quick

---

[20]A few years after this law took effect, our court had to decide whether a woman performing her own abortion could be convicted under section 4221. *Hatfield v. Gano*, 15 Iowa 177, 178 (1863). Although the prohibition applied to "every person," we determined "that it was the person who used the means with the pregnant woman to procure the abortion, and not the woman herself, that the Legislature intended to punish." *Id.*

with child." *Id.* We rejected this argument, stating, "The statute makes no such qualification. . . . The crime is complete if the attempt be made at any time during pregnancy." *Id.*

Planned Parenthood also makes the valid point that women's rights were quite limited in 1857 and have expanded since then. But even as women's rights expanded, the ban on abortion remained in place until *Roe* superseded it. *See* Iowa Code § 701.1 (1973) ("If any person, with intent to produce the miscarriage of any woman, willfully administer to her any drug or substance whatever, or, with such intent, use any instrument or other means whatever, unless such miscarriage shall be necessary to save her life, he shall be imprisoned in the penitentiary for a term not exceeding five years, and be fined in a sum not exceeding one thousand dollars.").

Beyond its textual and historical flaws, *PPH II* is also flawed in its core reasoning. Constitutions—and courts—should not be picking sides in divisive social and political debates unless some universal principle of justice stands on only one side of that debate. Abortion isn't one of those issues. "Each side in the debate is motivated by a serious, legitimate concern: on the one hand, a woman's ability to make decisions regarding her own body; on the other, human life." *PPH II*, 915 N.W.2d at 246 (Mansfield, J., dissenting). *PPH II* has a one-sided quality to it. According to the majority, abortion advocates speak for "the very heart of what it means to be free." *Id.* at 237 (majority opinion). On the other

hand, abortion opponents are raising mere "moral scruples." *Id.* at 244.[21] Therefore, unsurprisingly, under the fundamental rights/strict scrutiny approach taken in *PPH II*, there is no effort to balance: Having an abortion *without delay* is deemed more important than preserving unborn life.

One remarkable characteristic of our society is that courts have been successful leaders at times. By invoking first principles, they have spurred social and political changes that received consensus support only after they were mandated by court decisions. *Brown v. Board of Education*, 347 U.S. 483 (1954), is one example of this phenomenon. In our state, *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009), may be another. But no one suggests that any of the abortion rulings have achieved this status. Our country remains as divided as ever on abortion.

Consider also a defense of *PPH II* published in America's most prestigious law review. *See* Recent Case, *State Constitutional Law—Abortion Law—Iowa Supreme Court Applies Strict Scrutiny to Abortion Restriction.—*Planned Parenthood of the Heartland v. Reynolds, *915 N.W.2d 206 (Iowa 2018),* 132 Harv. L. Rev. 795, 799–802 (2018). What is striking is how little of substance the

---

[21]The dissent in *PPH II* further explained the majority's one-sidedness:

> [T]he majority uses the word "life" at times, but typically as part of the phrase "promoting potential life." This anodyne phrasing treats restrictions on abortion as if they were analogous to tax credits for having more children. Elsewhere, the majority characterizes Senate File 471 as based on "moral scruples" against abortion. Here again, the majority's language minimizes the anti-abortion position. As a practical matter, it equates opposition to abortion with opposition to gambling.
>
> To be clear, many if not most abortion opponents view it as ending a life.

915 N.W.2d at 249 (Mansfield, J., dissenting).

authors can say on behalf of the *PPH II* decision. In the end, they praise *PPH II* as a "laudable example of a state court's contribution to the constitutional discourse" because it "untethers Iowa from a weak and vulnerable federal standard and provides a stronger layer of protection for abortion rights in a state where abortion access is already limited." *Id.* at 802. This is not an analytical defense, it is a defense based purely on outcomes.

In summary, *PPH II* lacks textual and historical support. It is doctrinally inconsistent with prior Iowa jurisprudence concerning family rights that followed a balancing approach. Its rhetoric is one-sided. Its constitutional footing is unsound. While it is true that some other states have provided heightened protection for abortion rights, they have done so by invoking more relevant substantive constitutional guarantees—such as the right of privacy—not a procedural clause like due process.[22]

**E. Is *PPH II*'s Equal Protection Discussion a Basis for Upholding the Decision?** *PPH II* also found that the 72-hour waiting period violated the equal protection clause in article I, section 6. 915 N.W.2d at 244–46.[23] Our treatment

---

[22]*See PPH II*, 915 N.W.2d at 254 (Mansfield, J., dissenting) ("Yet a crucial distinction is that those states typically have explicit guarantees of privacy in their constitutions. And for the most part, those privacy guarantees have been adopted only recently.").

[23]*PPH II* also quoted article I, section 1, Iowa's inalienable rights clause, and seemed to characterize it as *part* of our equal protection clause. 915 N.W.2d at 244. Typically, we use the term "equal protection clause" to refer to article I, section 6. *See, e.g.*, *LSCP, LLLP v. Kay-Decker*, 861 N.W.2d 846, 858 n.6 (Iowa 2015). Regardless, with the exception of one case involving a limit on common law nuisance claims, *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168 (Iowa 2004), we have not recognized in any case decided in the last century that the inalienable rights clause carries any independent force. Instead, we have said that it replicates the rational basis test:

> Where liberty or property rights are allegedly infringed by a statute or ordinance, our inalienable rights cases have held that, even if the plaintiff's asserted interest is within the scope of the inalienable rights clause, the rights

of equal protection was brief. We discussed two cases from 1872 and 1910 that took a primeval view of women's rights. *See id.* at 244–45. We then discussed two cases from 1982 and 1996 that took a more modern view. *See id.* at 245. We quoted from Justice Ginsburg's famous law review article on *Roe*, written before she became a justice. *See id.* (quoting Ruth Bader Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L. Rev. 375 (1985)). We then concluded that restrictions on abortion deny women "the right . . . to be equal participants in society." *Id.* "Without the opportunity to control their reproductive lives, women may need to place their educations on hold, pause or abandon their careers, and never fully assume a position in society equal to men, who face no such similar constraints for comparable sexual activity." *Id.*

On reflection, there are flaws in this analysis. The text of article I, section 6 requires that general laws "shall have a uniform operation" and the general assembly "shall not grant to any citizen or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. By its terms, this language is directed at laws that on their face treat some citizens differently than others. The favorable cases on which the majority relied dealt with laws that could have treated men and women the same and didn't. *See PPH II*, 915 N.W.2d at 244–45 (citing a case that

---

guaranteed by the provision are subject to reasonable regulation by the state in the exercise of its police power. This formulation, of course, is virtually identical to the rational-basis due process test or equal protection tests under the Federal Constitution.

*City of Sioux City v. Jacobsma,* 862 N.W.2d 335, 352 (Iowa 2015) (citations omitted).

involved a military academy that did not admit women, *United States v. Virginia*, 518 U.S. 515 (1996), and a case that involved a nursing program that did not admit men, *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)).

*PPH II* skipped a step in the equal protection analysis—the first one. Under our well-established equal protection precedent, before finding a violation, we first needed to find that women were similarly situated to men as it related to the purposes of the law. *See, e.g.*, *State v. Treptow*, 960 N.W.2d 98, 104 (Iowa 2021) ("The first step in our equal protection analysis is to determine whether the challenged law makes a distinction between similarly situated individuals with respect to the purposes of the law."). Women undeniably are not. Planned Parenthood's brief acknowledges as much, stating, "Women and men are not similarly situated in terms of the biological capacity to be pregnant . . . ."

As the *PPH II* dissent put it,

> Equal protection requires treating *similarly* situated people alike, *see, e.g.*, *Tyler v. Iowa Dep't of Revenue*, 904 N.W.2d 162, 166 (Iowa 2017), yet the very gist of the majority's argument is that women are situated *differently* from men. They alone bear the burdens of pregnancy. The majority cites no other court that has accepted this line of thinking—i.e., that an abortion restriction per se discriminates against all women while unconstitutionally favoring men.

915 N.W.2d at 258 (Mansfield, J. dissenting).

The relationship between abortion and women's quest for equal participation in society is more complicated than *PPH II* recognized. *See, e.g.*, Kristina M. Mentone, *When Equal Protection Fails: How the Equal Protection Justification for Abortion Undercuts the Struggle for Equality in the Workplace*, 70 Fordham L. Rev. 2657, 2659 (2002) ("The equal protection argument for abortion

fails to truly equalize women by intimating that, for women to be fully equal members of society and to participate more fully in the professions, they must be able to choose not to bear children. This reasoning may help to equalize women who choose not to be mothers, but it perpetuates the view that mothers cannot be truly equal because motherhood interferes with their professional success. Thus, the equal protection argument for abortion aggravates the work/family conflict for mothers." (footnotes omitted)).

Finally, *PPH II*'s equal protection discussion was to some extent an afterthought that did no real work in the actual legal analysis. We applied the fundamental rights/strict scrutiny branch of equal protection review. *See PPH II*, 915 N.W.2d 245–46 (majority opinion). And why did we do so? Because we had already found that the right to an abortion was protected as a fundamental right by substantive due process. *See id.*

For these reasons, we conclude that *PPH II*'s equal protection rationale cannot independently sustain that decision and does not alter our determination today to overrule it.

**F. How Should We Dispose of This Appeal?** The State moved for summary judgment only on count I of the petition, which alleged that HF 594 violates the single-subject rule. For the reasons stated in part IV.A, we conclude that this claim fails as a matter of law.

The State did not move for summary judgment on Planned Parenthood's claims in counts II, III, and IV of the petition. Those allege that the 24-hour waiting period enacted by HF 594 violates article I, section 9 (due process);

article I, sections 1 and 6 (equal protection); and article I, section 1 (inalienable rights) respectively. In lieu of moving for summary judgment itself, the State simply resisted Planned Parenthood's motion for summary judgment on counts II and III based on issue preclusion.

On appeal, the State *does* ask that *PPH II* be overruled. That issue is fully briefed by the State and by Planned Parenthood. As we have explained in part IV.B, that issue is intertwined with the question of whether issue preclusion applies here. If the basic legal holding of *PPH II* does not stand, there is no basis to apply issue preclusion in this case.

For the reasons we have discussed in parts IV.C–E, we conclude that *PPH II* should be overruled and that the grant of summary judgment based on issue preclusion should be reversed as to counts II and III.

The State *does not* take a position on whether the undue burden test or the rational basis test should replace *PPH II*'s fundamental rights/strict scrutiny standard. In the only paragraph of its briefing devoted to this issue, the State says that when strict scrutiny is not appropriate, the Iowa Constitution "typically" requires that a statute need only meet the rational basis test but then adds that "this Court could choose to follow *Casey*." Quoting *Casey*, the State observes that "[t]he undue-burden test could provide an 'appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty.'" *Casey*, 505 U.S. at 876. Notably, we applied the undue burden test in *PPH I* based on the State's concession for purposes of that case that the Iowa

Constitution afforded a right to abortion consistent with the federal standard. 865 N.W.2d at 254.

We conclude that we should not go where the parties do not ask us to go. *See Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010) ("Our obligation on appeal is to decide the case within the framework of the issues raised by the parties."). That is, we should not engage in "freelancing under the Iowa Constitution without the benefit of an adversarial presentation." *See PPH II*, 915 N.W.2d at 255 n.11 (Mansfield, J., dissenting) (quoting *State v. Tyler*, 830 N.W.2d 288, 299 (Iowa 2013)).

It is true that an amicus curiae asks us to specifically hold that the 24-hour waiting period is subject to rational basis review. But normally we do not allow amici curiae to raise new issues. *Iowa Assn. of Bus. & Indus. v. City of Waterloo*, 961 N.W.2d 465, 476 (Iowa 2021). Planned Parenthood has not briefed the issue, so there is no adversarial briefing. *Cf. id.* (reaching an argument raised by an amicus where the opposing party also briefed it so there was "a fully developed adversarial presentation on the issue").[24] Also, because of the

---

[24]The 2017 *Godfrey* case is another recent example where we declined to reach a legal issue that an amicus urged us to decide, instead leaving that issue in the first instance for briefing by the parties before the district court, for district court consideration and determination, and ultimately for our review. 898 N.W.2d 844. There, we held that the Iowa Constitution allowed direct claims for violations of due process rights. *Id.* at 847, 880. Amici curiae urged us to decide whether the plaintiff even had a viable due process claim under the law of Iowa. *See id.* at 898 (Mansfield, J., dissenting). We declined to decide that issue, stating that "we take no view on the merits of any due process claim raised in this case." *Id.* at 876 (majority opinion). As we put it, "We emphasize our holding is based solely on the legal contentions presented by the parties." *Id.* at 880.

Four years later, after the district court had ruled that the plaintiff had a legally viable due process claim and a jury had awarded damages, we reached the legal question we had deferred and reversed the district court unanimously. *See Godfrey v. State*, 962 N.W.2d 84, 117

substantive differences between the undue burden test and the rational basis test, deciding this issue could result in granting the State more relief than it requested on appeal. It is one thing to consider an additional *argument*, another to grant additional *relief* not sought by the appellant.

Lastly, the United States Supreme Court is expected to decide an important abortion case this term. *See Dobbs*, 141 S. Ct. 2619. That case could decide whether the undue burden test continues to govern federal constitutional analysis of abortion rights. We expect the opinions in that case will impart a great deal of wisdom we do not have today. Although we take pride in our independent interpretation of the Iowa Constitution, often our independent interpretations draw on and contain exhaustive discussions of both majority and dissenting opinions of the United States Supreme Court.

We do not prejudge the position our court will take. We agree with the *PPH II* majority that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." 915 N.W.2d at 237 (majority opinion). We also agree that "being a parent is a life-altering obligation that falls unevenly on women in our society." *Id.* at 249 (Mansfield, J., dissenting). Yet, we must disapprove of *PPH II*'s legal formulation that insufficiently recognizes that future human lives are at stake—and we must disagree with the views of today's dissent that the State has no legitimate interest in this area.

---

(Iowa 2021). We held that the plaintiff as a matter of law had no due process claim and vacated the award of damages. *Id.* at 113–14, 117; *see also id.* at 149–50 (Appel, J., concurring in part and dissenting in part).

**V. Conclusion.**

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Waterman and Oxley, JJ., join this opinion, McDonald and McDermott, JJ., join this opinion as to parts II, III, and IV.A–E, and Christensen, C.J., joins this opinion as to parts II, III, and IV.A–B. McDermott, J., files an opinion concurring in part and dissenting in part, in which McDonald, J., joins. Christensen, C.J., files an opinion concurring in part and dissenting in part, in which Appel, J., joins as to parts I–II. Appel, J., files a dissenting opinion.

#21–0856, *Planned Parenthood of the Heartland, Inc. v. Reynolds*

**McDERMOTT, Justice (concurring in part and dissenting in part).**

I join almost all parts of the court's opinion, including its resolution of the plaintiffs' single-subject challenge and issue preclusion claim, and its overruling of *Planned Parenthood of the Heartland v. Reynolds* (*PPH II*), 915 N.W.2d 206, 220–21 (Iowa 2018). But I dissent from my colleagues' remand directing the district court to apply an "undue burden" standard, subject (apparently) to the standard being "litigated further" by the parties. In my view, we should emphatically reject—not recycle—*Casey*'s moribund undue burden test and instead direct the district court to apply the rational basis test to the plaintiffs' constitutional challenge.

Lest we forget, we already have well-established tiers of constitutional scrutiny for the type of challenge presented in this case. When someone brings a claim alleging a violation of a due process right as the plaintiffs do in this case, the nature of the individual right at stake dictates the constitutional test that the court applies. If the government action implicates a "fundamental" right or classifies people "on the basis of race, alienage, or national origin," we apply the strict scrutiny test and determine whether the government's action is narrowly tailored to serve a compelling government interest. *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005). But if the right at stake is not a fundamental right, then we apply the rational basis test and determine whether the law is "rationally related to a legitimate state interest." *Id.* at 817–18 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

A "fundamental right," as we apply that term in our constitutional analysis, doesn't simply mean "important." *King v. State*, 818 N.W.2d 1, 26 (Iowa 2012). To qualify as a fundamental right, the alleged right at issue must objectively be "deeply rooted" in our "history and tradition" and "implicit in the concept of ordered liberty." *Hensler v. City of Davenport*, 790 N.W.2d 569, 581 (Iowa 2010) (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003)). Whether abortion is deeply rooted in our history and tradition determines whether it's a fundamental right and thus whether it's protected by the Iowa Constitution. It isn't for us, as justices on a court, to decide whether the Iowa Constitution *should* provide a right to abortion; we must decide whether the Iowa Constitution in fact *does* provide a right to abortion. "[T]he rule of law is in unsafe hands when courts cease to function as courts and become organs for control of policy." Justice Robert H. Jackson, *The Struggle for Judicial Supremacy* 322 (1941).

As the majority opinion thoroughly describes, abortion rights weren't rooted at all in our state's history and tradition, let alone "deeply" rooted. The deep roots that exist are, in fact, of common law and statutory prohibition in favor of protecting all life. As this court explained around the time of Iowa's founding:

> The common law is distinguished, and is to be commended, for its all-embracing and salutary solicitude for the sacredness of human life and the personal safety of every human being. This protecting, paternal care, enveloping every individual like the air he breathes, not only extends to persons actually born, but, for some purposes, to infants *in ventre sa mere*. The right to life and to personal safety is not only sacred in the estimation of the common law, but it is inalienable. . . . The common law stands as a general

> guardian holding its ægis to protect the life of all. Any theory which robs the law of this salutary power is not likely to meet with favor.

*State v. Moore,* 25 Iowa 128, 135–36 (1868) (citation omitted). Abortion is not a fundamental right protected under the Iowa Constitution.

Yet having declared this, and thus that the strict scrutiny test that the district court applied under *PPH II* isn't the correct constitutional standard, my colleagues remand the case with directions to the district court to apply "the *Casey* undue burden test." This test, of course, originates from the United States Supreme Court's plurality opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 845–46 (1993) (plurality opinion). In *Casey,* the Supreme Court reaffirmed several propositions of the holding in *Roe v. Wade,* 410 U.S. 113 (1973), including that the Constitution protects a right to an abortion before "fetal viability" (referring to the date the unborn can survive outside the womb) "without undue interference from the State." *Id.* at 846. *Casey* further declares that the state, from the start of the pregnancy, possesses a legitimate interest in protecting the health of the mother and the life of the unborn, and that the state *may* restrict abortions after viability if the abortion regulation contains exceptions for pregnancies endangering the mother's life or health. *Id.* Under *Casey*'s undue burden test, an abortion regulation will be held unconstitutional if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before" viability. *Id.* at 878.

The three-justice plurality in *Casey* attempted to salvage the "essential holding" in the Court's opinion in *Roe* that abortion ranks as a fundamental right while distancing itself from much of *Roe*'s actual constitutional analysis. *Id.* at

869–78. In *Roe*, the Court stitched together several rights in the Bill of Rights that the Court described as having created "zones of privacy" and then held that a right to an abortion fell within these "zones." *Roe*, 410 U.S. at 152–53. *Roe*'s constitutional analysis has received criticism from academics and jurists across the ideological spectrum. *See, e.g.*, Akhil Reed Amar, *Foreward: The Document and the Doctrine*, 114 Harv. L. Rev. 26, 110 (2000) (noting "it is hardly a state secret that *Roe*'s exposition was not particularly persuasive, even to many who applauded its result"); John Hart Ely, *The Wages of Crying Wolf: A Comment on* Roe v. Wade, 82 Yale L.J. 920, 947 (1973) (concluding that *Roe* "is bad because it is bad constitutional law, or rather because it is *not* constitutional law and gives almost no sense of an obligation to try to be"); Ruth Bader Ginsberg, *Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L. Rev. 375, 376 (1985) (concluding that the *Roe* Court "presented an incomplete justification for its action"). The *Casey* plurality abandoned *Roe*'s "zones of privacy" analysis in favor of a "liberty" interest arising under the due process clause of the Fourteenth Amendment. 505 U.S. at 846. The federal constitutional test that arose from the *Casey* plurality's efforts—the undue burden test—is thus a creature of unusual and contentious origin.

As the *Casey* dissenters predicted, the undue burden test has vexed courts trying to apply it. The undue burden test requires judges to determine whether the abortion regulation will "prevent" or "deter" a "significant number of women from obtaining an abortion." *Id.* at 893–94. But the test offers no guidance on how much prevention or deterrence will cause an abortion regulation to violate

the Constitution. Many states have passed abortion regulations in the years since *Casey* endeavoring to achieve the enigmatic balance of "due" and "undue" burdens. Scores of court battles with frequently varying outcomes have followed. *See, e.g., Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 171 (4th Cir. 2000) (holding that abortion clinic licensing requirements did not impose an undue burden); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2318 (2016) (holding that surgical center requirements for abortion providers imposed an undue burden); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 692 (7th Cir. 2002) (holding that a mandatory second visit did not impose an undue burden); *Planned Parenthood of Del. v. Brady*, 250 F. Supp. 2d 405, 410 (D. Del. 2003) (holding that a mandatory 24-hour waiting period imposed an undue burden where the statute didn't explicitly provide an exception for maternal medical emergencies); *Whole Woman's Health v. Paxton*, 10 F.4th 430, 451 (5th Cir. 2021) (holding that a 24-hour waiting period caused by a drug injection intended to ensure "a less brutal pregnancy termination" did not impose an undue burden). In *Stenberg v. Carhart,* members of *Casey*'s own plurality that created the undue burden standard disagreed about how to apply the test to a partial-birth abortion regulation. 530 U.S. 915, 947–51 (2000) (O'Connor, J., concurring); *id.* at 956–79 (Kennedy, J., dissenting). The undue burden test has proved, from its inception, to be an unworkable standard for courts to apply.

The "inherently standardless nature" of the undue burden test opens wide the gate for judges to inject their own policy preferences in deciding whether a

particular restriction creates an undue burden to getting an abortion. *Casey*, 505 U.S. at 992 (Scalia, J., concurring in the judgment in part and dissenting in part). How "undue" a burden might be "depends heavily on which factors the judge considers and how much weight" the judge assigns them. *June Med. Servs., L.L.C. v. Russo, LLC*, 140 S. Ct. 2103, 2180 (2020) (Gorsuch, J., dissenting) (quoting *Crawford v. Washington*, 541 U.S. 36, 63 (2004)). An undue burden standard inevitably leaves courts unable to provide predictability, consistency, or coherence in its application. Regardless of outcome, the rule of law inevitably loses when courts are made to attempt the undue burden test's balancing act. We need not adopt it in Iowa, and we should not adopt it in Iowa.

Again, we already have coherent, well-established tiers of review that we routinely apply when analyzing whether a regulation infringes constitutional due process rights. The waiting period statute challenged in this case implicates no suspect classifications such as race, alienage, or national origin. *See Sanchez*, 692 N.W.2d at 817. And as discussed, abortion is not a fundamental right. When "no suspect class or fundamental right is at issue, we apply the rational basis test." *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 458 (Iowa 2013). The court should apply the rational basis test in analyzing the plaintiffs' challenge to the abortion regulation in this case.

Statutes are presumed constitutional, and we will not declare something unconstitutional under the rational basis test unless it "clearly, palpably, and without doubt infringe[s]" a constitutional right. *Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 50 (Iowa 2016) (alteration

in original) (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 8 (Iowa 2004)). Plaintiffs who challenge a statute under the rational basis test bear "a heavy burden" to show that the state's action is unconstitutional. *Racing Ass'n of Cent. Iowa*, 675 N.W.2d at 8. The state "is not required or expected to produce evidence to justify its legislative action." *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). A court need only find a "realistically conceivable" basis for the statute advancing a legitimate state interest. *McQuistion v. City of Clinton*, 872 N.W.2d 817, 831–32 (Iowa 2015). And that basis need not be supported by evidence in the traditional sense:

> "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." A statute is presumed constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," whether or not the basis has a foundation in the record.

*Baker v. City of Iowa City*, 867 N.W.2d 44, 57–58 (Iowa 2015) (alterations in original) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319–21 (1993)). Contrary to the view expressed by the dissent, respect for and preservation of prenatal life at all stages of development is a legitimate state interest. *See Moore*, 25 Iowa at 135–36.

Rather than directing the district court to apply our well-established rational basis test, a plurality of this court directs the district court to apply the undue burden test. Yet even as to the application of the undue burden test my colleagues inject uncertainty, stating that although *Casey*'s undue burden test as applied in *PPH I* provides the governing standard, "the legal standard may also be litigated further." But it's *our* duty to decide and declare the applicable law in

state constitutional matters. *See State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010) (stating that "a state supreme court cannot delegate to any other court the power to engage in authoritative constitutional interpretation under the state constitution"). It's *our* function to decide the constitutional standard necessary for the resolution of this case on remand. *See Nehring v. Smith*, 49 N.W.2d 831, 837 (Iowa 1952). "Litigants," we have said, "should not unnecessarily be put to the expense and delay of two appeals to ascertain our view upon a vital issue." *Id.*

The plurality's undue-burden-subject-to-further-litigation test to be applied on remand leaves many questions unanswered. For instance, will the State need to make an extensive evidentiary showing that the statute places a "due" measure of burden on abortion to prevail? Will the plaintiffs, conversely, need to make an extensive evidentiary showing that the statute's waiting period crosses some unfixed threshold into the realm of "undue"? These evidentiary-burden questions are answered—definitively—with a remand to apply the rational basis test, under which the plaintiffs would need to prove that the law doesn't serve any conceivable legitimate state interest or isn't a reasonable way to advance that interest.

Overruling a precedent always introduces some confusion. But we only magnify that confusion by requiring the district court to apply a nebulous test that practically demands that judges read in their own views instead of applying a time-tested standard with doctrinal stability as we find with the rational basis test. Even the most well-intentioned judge attempting to apply the undue burden

standard will not be able to overcome "the underlying fact that the concept has no principled or coherent legal basis." *Casey*, 505 U.S. at 987 (Scalia, J., dissenting). As a constitutional test, it generates answers so subjective as to make Hermann Rorschach envious, presenting not so much an exercise in constitutional interpretation as imagination.

I thus respectfully dissent from those parts of the opinion ordering the application of an undue burden standard (or that the standard be further litigated) and would remand the case for further proceedings only after having made clear that the constitutional test to be applied is rational basis review.

McDonald, J., joins this concurrence in part and dissent in part.

#21–0856, *Planned Parenthood of the Heartland, Inc. v. Reynolds*

**CHRISTENSEN, Chief Justice (concurring in part and dissenting in part).**

"[The doctrine of] stare decisis can fairly be characterized as the workhorse of constitutional decisionmaking. The doctrine has its greatest bite, however, when it constrains a justice from deciding a case the way she otherwise would." Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 Tex. L. Rev. 1711, 1714 (2013) (footnote omitted) [hereinafter Coney Barrett]. That is the decision that our court faces today.

I join the majority's holdings that the challenged legislation does not violate the single-subject rule and that issue preclusion does not prevent our court from reviewing this case. Out of respect for stare decisis, I cannot join the majority's decision to overrule *Planned Parenthood of the Heartland v. Reynolds* (*PPH II)*, 915 N.W.2d 206 (Iowa 2018), because I do not believe any special justification "over and above the [majority's] belief 'that the precedent was wrongly decided' " warrants such a swift departure from the court's 2018 decision. *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 455–56 (2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)).

### I. Stare Decisis in Constitutional Cases.

"Stare decisis—in English, the idea that today's Court should stand by yesterday's decisions—is 'a foundation stone of the rule of law.' " *Id.* at 455 (emphasis omitted) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014)). "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing

that a precedent should be overruled before taking such a step." *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 249 (Iowa 2018) (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005)). Although it is not unyielding, stare decisis effectively operates as the default course in judicial decision-making "because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2478 (2018) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)); *see also State v. Brown*, 930 N.W.2d 840, 854 (Iowa 2019) (discussing the importance of stare decisis). It is also vital to "maintaining public faith in the judiciary as a source of impersonal and reasoned judgments." *Moragne v. States Marine Lines*, 398 U.S. 375, 403 (1970).

The legitimacy of judicial review hinges in part on the public perception that we are applying the rule of law regardless of our personal preferences instead of merely engaging in judicial policymaking. "If courts are viewed as unbound by precedent, and the law as no more than what the last Court said, considerable efforts would be expended to get control of such an institution—with judicial independence and public confidence greatly weakened." Henry Paul Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 Colum. L. Rev. 723, 753 (1988). Ultimately, stare decisis is "no doctrine at all" if we ignore precedent simply because we disapprove of it on the merits. *Hubbard v. United States*, 514 U.S. 695, 716 (1995) (Scalia, J., concurring in part and concurring in judgment).

Since 2018, the makeup of our court has significantly changed with the appointment of four new justices to replace outgoing justices. Coincidentally, all four outgoing justices were part of the 5–2 majority that recognized a fundamental right to decide whether to continue or terminate a pregnancy in the 2018 case, which the State asks us to overrule just four years later. *See generally PPH II*, 915 N.W.2d 206. Of the three justices who remain on our court from that 2018 decision, two dissented and only one joined the majority in *PPH II. Id.* at 246 (Mansfield, J., dissenting, joined by Waterman, J.).

This rather sudden change in a significant portion of our court's composition is exactly the sort of situation that challenges so many of the values that stare decisis promotes concerning stability in the law, judicial restraint, the public's faith in the judiciary, and the legitimacy of judicial review. As then-Professor Amy Coney Barrett proclaimed, stare decisis "serves as an intertemporal referee, moderating any knee-jerk conviction of rightness by forcing a current majority to advance a special justification for rejecting the competing methodology of its predecessor." Coney Barrett, 91 Tex. L. Rev. at 1723. This is not to say that we may never overrule precedent that is clearly incorrect because we are worried about the public's perception of our decision in relation to the change in our court's makeup. *See Miller v. Westfield Ins.*, 606 N.W.2d 301, 306 (Iowa 2000) (en banc) ("[S]tare decisis does not prevent the court from reconsidering, repairing, correcting or abandoning past judicial announcements when error is manifest . . . ."). In fact, just last term, we overturned this court's 2017 holding that article I, section 8 of the Iowa

Constitution required a search warrant for a breathalyzer test of an intoxicated boater because the 2017 decision was "manifestly erroneous." *State v. Kilby*, 961 N.W.2d 374, 378 (Iowa 2021) (overruling *State v. Pettijohn*, 899 N.W.2d 1 (Iowa 2017)).

"[T]he Court's power to overrule is vital for maintaining constitutionalism by correcting mistakes and updating the law" and is also "essential to the constitutional system's continuing legitimacy." Steven J. Burton, *The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication*, 35 Cardozo L. Rev. 1687, 1697 (2014). But we must only use this power when there is a " 'special justification'[ ]over and above the belief 'that the precedent was wrongly decided.' " *Kimble*, 576 U.S. at 455–56 (quoting *Halliburton Co.*, 573 U.S. at 266); *see also Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."). That special justification existed last term when we decided in *Kilby* to overrule *Pettijohn. See Kilby*, 961 N.W.2d at 378–83. I cannot yet say the same in this case.

Two members of today's majority dissented in *PPH II. See PPH II*, 915 N.W.2d at 246. They believed *PPH II* was wrongly decided then, and little has changed in the four years since *PPH II*. But the fact that little has changed in the four years since *PPH II* is precisely why I cannot join the majority in holding *PPH II* was so wrongly decided that we must already overrule it. In summary, I believe it is too soon to conclude that the strict scrutiny standard established for abortion challenges under the Iowa Constitution in 2018 "has proven to be

intolerable simply in defying practical workability" or that the facts or related principles of law have so changed "as to have left the old rule no more than a remnant of abandoned doctrine" or "to have robbed the old rule of significant application or justification." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 854–55 (1992) (plurality opinion).

**II. The Merits of Stare Decisis in this Case.**

When we reexamine a prior holding, we analyze "a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." *Id.* at 854. These considerations include:

> whether the rule has proven to be intolerable simply in defying practical workability, whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation, whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, or whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification.

*Id.* at 854–55 (citations omitted). The Supreme Court recently reiterated these considerations in 2018 when it identified "the quality of [the opinion's] reasoning, the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision" as relevant factors in deciding whether to overrule a prior decision. *Janus*, 138 S. Ct. at 2478–79. While *PPH II*'s newness weighs in favor of overruling it because it is not "subject to a kind of reliance that would lend a special hardship to the consequences of overruling," the considerations cumulatively weigh in favor of adherence. *Casey*, 505 U.S. at 854.

The majority begins by questioning the workability of *PPH II*, reasoning the strict scrutiny standard applied in *PPH II* is a virtually "impossible-to-meet" standard because "[i]t is exceedingly difficult to tailor *any* regulation so it applies only to those who would benefit from that specific regulation." While that may prove true, there has not been enough time to determine one way or the other whether the standard is unworkable. This is our first opportunity to consider a constitutional challenge to an abortion regulation since *PPH II*.

"Unworkability signals that a precedent cannot be logically applied, even by those who agree with the substance of the original opinion," not that a precedent is substantively flawed. Mary Ziegler, *Taming Unworkability Doctrine: Rethinking Stare Decisis*, 50 Ariz. St. L.J. 1215, 1254 (2018); *see also Janus*, 138 S. Ct. at 2481 (concluding the precedent in question was unworkable because the precedent's "line between chargeable and nonchargeable union expenditures has proved to be impossible to draw with precision"); *Kimble*, 576 U.S. at 459 (holding challenged precedent had not proved unworkable because "[t]he decision is simplicity itself to apply"). Notably, other state courts have had no problem logically applying strict scrutiny to their review of abortion-related regulations, including reviews of abortion waiting periods. *See Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997); *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1254 (Fla. 2017); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 494, 502 (Kan. 2019) (per curiam); *Women of the State of Minn. ex rel. Doe v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995); *Armstrong v. State*, 989 P.2d 364, 373–74, 384–85 (Mont. 1999). For

example, Florida has been applying strict scrutiny to abortion regulations since 1989 without undue difficulty in various cases. *See Gainesville Woman Care, LLC*, 210 So. 3d at 1253–55 (discussing Florida's history of cases applying strict scrutiny to abortion regulations). Likewise, Montana has recognized the fundamental right of "procreative autonomy," which encompasses "a woman's moral right and moral responsibility to decide, up to the point of fetal viability, what her pregnancy demands of her in the context of her individual values, her beliefs as to the sanctity of life, and her personal situation" since 1999. *Armstrong*, 989 P.2d at 377. In doing so, the Montana Supreme Court, too, held that any legislation infringing on this right must meet strict scrutiny. *Id.* at 375 (explaining that the Montana Constitution's right to procreative autonomy requires the government to demonstrate a compelling state interest for infringing upon that right).

Like those courts, our court proved capable of logically applying the strict scrutiny standard to the 72-hour waiting period at issue in *PPH II* and nothing suggests our district courts have struggled to apply *PPH II*. Strict scrutiny is an exceedingly difficult standard to meet regardless of the fundamental right at issue because it starts with the presumption that the challenged law is invalid. *Planned Parenthood of the Heartland, Inc. v. Reynolds* (*PPH III*), 962 N.W.2d 37, 47–48 (Iowa 2021). Thus, the majority's doubt about the workability of the standard, because it is "exceedingly difficult" to meet in the abortion context, speaks more to the majority's view that abortion is not a fundamental right in Iowa that can only be infringed upon by legislation that is narrowly tailored to

effectuate a compelling state interest than it does about the standard's workability.

Moreover, I cannot say that factual and legal developments in the four years since *PPH II* have "left the old rule no more than a remnant of abandoned doctrine" or "robbed the old rule of significant application or justification." *Casey*, 505 U.S. at 855. As I stated earlier, there has not even been a chance for the central rule of *PPH II* to change because this is our very first opportunity to apply it. Therefore, nothing has changed so significantly as to render the "rule no more than a remnant of abandoned doctrine" or rob it of "significant application." *Id. PPH II* "is not the kind of doctrinal dinosaur or legal last-man-standing for which we sometimes depart from stare decisis." *Kimble*, 576 U.S. at 458 (emphasis omitted).

Admittedly, stare decisis is at its weakest in constitutional cases because the only way to change constitutional precedent outside of the courts is through a demanding constitutional amendment process. Coney Barrett, 91 Tex. L. Rev. at 1713; *see Payne*, 501 U.S. at 828. Although the constitutional amendment process is strenuous, it is not impossible. After the Tennessee Supreme Court held that "a woman's right to legally terminate her pregnancy is fundamental" under the Tennessee Constitution and applied strict scrutiny to its review of an abortion waiting period, the Tennessee legislature and voters superseded that decision by a constitutional amendment in a comparable procedure to Iowa's. *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 16–17 (Tenn. 2000), *superseded by constitutional amendment*, Tenn. Const. art. I, § 36

(amended 2014), *as recognized in Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 482 (6th Cir. 2021) (en banc); *see also* Tenn. Const. art. XI, § 3 (describing the state constitutional amendment process in Tennessee).

Perhaps the most important reason not to overrule *PPH II* today is that the Iowa legislature has already started the process to amend our state's constitution on this very issue by passing the following constitutional amendment: "[W]e the people of the State of Iowa declare that this Constitution does not recognize, grant, or secure a right to abortion or require the public funding of abortion." 2021 Iowa Acts ch. 187, § 26. If the majority truly wants to leave this issue to the will of the people, it should let the people have their say through the ongoing constitutional amendment process. Both the house and senate approved that amendment in 2021. *Bill History for House Joint Resolution 5*, The Iowa Legislature (June 9, 2022), https://www.legis.iowa.gov/legislation/ billTracking/billHistory?billName=HJR%205&ga=89 [https://perma.cc/56Y2-KEKZ]. Thus, the amendment will go into effect if both houses of the general assembly that take office after the 2022 general election approve of it and the voters of Iowa agree. *See* Iowa Const. art. X, § 1 (describing the process for amending the Iowa Constitution). We should at least give our legislature and Iowans the time and voice to go through the full amendment process before rushing to overrule *PPH II*. This is especially so while we await the United States Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, which could drastically alter the federal constitutional landscape. *See* 141 S. Ct. 2619 (2021) (granting certiorari).

"Legal authority must be respected; not because it is venerable with age, but because it is important that courts, and lawyers and their clients, may know what the law is and order their affairs accordingly." *Stuart v. Pilgrim*, 74 N.W.2d 212, 216 (Iowa 1956). Today's decision only injects more confusion into the current labyrinth that is our state and federal abortion jurisprudence. By overruling *PPH II* today, the standard governing our constitutional analysis of abortion regulations under the Iowa Constitution at least temporarily reverts back to the federal undue burden test that we applied in *Planned Parenthood of the Heartland, Inc. v. Iowa Board of Medicine* (*PPH I*), 865 N.W.2d 252, 269 (Iowa 2015). Yet, there is no stability in that standard because the majority is also remanding this case so that the parties on remand can advocate for their standard of choice through the adversarial process. While I agree that this is the better option than going where the parties do not ask us to go and deciding upon a new standard today, it still leaves abortion providers, the legislature, and lawyers and their clients in a state of confusion about the appropriate response to today's decision.

Current state and federal constitutional abortion jurisprudence is like a game of Jenga, progressively becoming more unstable until it collapses. Before today, the standard applied to our constitutional analysis of abortion regulations was strict scrutiny. *PPH II*, 915 N.W.2d at 240–44. Now, the standard changes back to the federal undue burden test only for so long as it takes for the parties to go through the adversarial process and come before us again, when we may once again decide upon a different standard. Add to this the potential change in

the federal constitutional landscape and the ongoing constitutional amendment process, and Iowans are left with no stable state or federal abortion law. "People must be able to order their affairs, and they cannot do so if a Supreme Court case is a 'restricted railroad ticket, good for this day and train only.' " Coney Barrett, 91 Tex. L. Rev. at 1730 (quoting *Smith v. Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting)). Flawed as the majority believes *PPH II* to be, it at least untethered Iowa from the vulnerable federal standard to provide some sense of stability to Iowa's abortion jurisprudence. *See State Constitutional Law—Abortion Law—Iowa Supreme Court Applies Strict Scrutiny to Abortion Restriction*, 132 Harv. L. Rev. 795, 799 (2018).

"[S]tare decisis requires us, absent special circumstances, to treat like cases alike." *June Med. Servs. L.L.C. v. Russo,* 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring in judgment) (emphasis omitted). In this case, it requires us to examine the 24-hour waiting period at issue in the same way that we examined the 72-hour waiting period at issue four years ago in *PPH II* by applying strict scrutiny. The State asks us to overrule *PPH II* and apply a standard other than strict scrutiny, but it never argues on appeal that the 24-hour waiting period survives strict scrutiny by being narrowly tailored to further a compelling government interest. *See PPH II*, 915 N.W.2d at 233 (" 'If government action implicates a fundamental right, we apply strict scrutiny' and determine whether the disputed action is 'narrowly tailored to serve a compelling government interest.' " (quoting *Hensler v. City of Davenport*, 790 N.W.2d 569,

580 (Iowa 2010))). Perhaps this is because the 24-hour waiting period fails strict scrutiny for the same reasons the 72-hour waiting period failed in *PPH II*.

Specifically, the law sweeps too broadly to survive strict scrutiny. It "indiscriminately subjects all women" to a delay in care and takes no steps "to target patients who are uncertain when they present for their procedures but, instead, imposes blanket hardships upon all women." *Id.* at 243. It also fails to "provide an exception for rural women who live far from health centers," "rape or incest victims," or "victims of domestic violence or human trafficking." *Id.* Overall, the 24-hour waiting period is impermissibly broad to the same extent the 72-hour waiting period was in 2018. Because "[s]tare decisis instructs us to treat like cases alike," the result in this case is controlled by our decision four years ago in *PPH II* invalidating an extremely similar law. *June Med. Servs. L.L.C.*, 140 S. Ct. at 2141. For these reasons, I would not overrule *PPH II*, which would necessarily result in my conclusion that the 24-hour waiting period at issue is unconstitutional.

Appel, J., joins parts I–II of this opinion.

#21–0856, *Planned Parenthood of the Heartland v. Reynolds*

**APPEL, Justice (dissenting).**

"Liberty finds no refuge in a jurisprudence of doubt."[25] Yet, by rejecting the holdings in a 5–2 majority decision in *Planned Parenthood of the Heartland v. Reynolds ex rel. State* (*Planned Parenthood II*) decided only a few years ago in a nearly identical issue,[26] and punting the case back to the district court, the court creates a jurisprudence of doubt about a liberty interest of the highest possible importance to every Iowa woman of reproductive age.[27]

This jurisprudence of doubt is troublesome for three reasons. First, in recent years, approximately one in four women of reproductive age have exercised reproductive autonomy by choosing an abortion.[28] This jurisprudence of doubt will plainly impact many women and the men who support them. Second, the weight and depth of a woman's interest in reproductive autonomy involved in this case is so profound. As noted by Chief Justice Cady in *Planned Parenthood II*:

> Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own

---

[25]*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 844 (1992).

[26]*Planned Parenthood of the Heartland v. Reynolds ex rel. State* (*Planned Parenthood II*), 915 N.W.2d 206, 246 (Iowa 2018).

[27]Article I, section 9 of the Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law."

[28]Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904, 1907 (2017) (estimating nearly one in four women in the United States (23.7%) will have an abortion by age 45).

identity, destiny, and place in the world. Nothing could be more fundamental to the notion of liberty.[29]

Third, this jurisprudence of doubt is entirely avoidable. The decision in *Planned Parenthood II* was dispositive when it was issued and should be dispositive today.

I would take a different path. For the reasons expressed below, I would affirm the holding of *Planned Parenthood II* that a woman's liberty interest in reproductive autonomy is a fundamental right under article I, section 9 of the Iowa Constitution; the State may regulate only upon a showing of compelling state interest and only if the regulation is narrowly tailored to advance that interest.[30] Further, given the record presented, which is virtually the same as the record in *Planned Parenthood II*, I would find the 24-hour waiting period fails to pass constitutional muster under strict scrutiny review. But if we make the unfortunate choice of abandoning strict scrutiny, I would replace it, as a least harmful alternative, with an undue burden test "with teeth" to provide a woman's reproductive autonomy with as much constitutional protection as possible.

I recognize that I have written at length on these matters, but this case poses an extraordinarily important issue for the women and men of this state.

---

[29]*Planned Parenthood II*, 915 N.W.2d at 237.

[30]*Id.* at 238.

**I. Factual and Procedural Background.**

**A.** *Planned Parenthood I*: **Limited Health Benefits Outweighed by Burdens of Increased Travel, Increased Costs, and Risks to Privacy.**

1. *Overview.* In *Planned Parenthood of the Heartland, Inc. v. Iowa Board of Medicine* (*Planned Parenthood I*),[31] we considered the validity of rules promulgated by the board of medicine related to medication abortions.[32] The rules required that before providing a medication abortion, a physician was required to perform a pelvic examination.[33] Additionally, when the abortion-inducing drugs were provided to the patient, the physician was required to be physically present.[34] After the first abortion-inducing drug was provided, the physician was required to schedule a follow-up appointment at the same facility.[35]

Planned Parenthood attacked the rules as unconstitutional under the Iowa Constitution.[36] The board conceded that the Iowa Constitution provides for a right to an abortion but asserted that the right was coextensive with that available under the United States Constitution.[37] Planned Parenthood argued[38] for a strict scrutiny analysis under the Iowa Constitution over the less stringent

---

[31]*Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.* (*Planned Parenthood I*), 865 N.W.2d 252 (Iowa 2015).

[32]*Id.* at 255–61.

[33]*Id.* at 261.

[34]*Id.*

[35]*Id.*

[36]*Id.* at 261–62.

[37]*Id.* at 263.

[38]*Id.* at 254, 262 n.2.

"undue burden" test announced by the United States Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey*[39] and *Gonzales v. Carhart.*[40] We unanimously concluded that it was unnecessary to consider whether to adopt a strict scrutiny test because even under the undue burden test, the board's regulations did not pass constitutional muster.[41]

2. *Rejection of the less strict undue burden test.* In discussing the federal undue burden test, we stated that generally a challenger was required to show the regulation had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[42] We also noted that there were different versions of the undue burden test in the federal appellate courts for regulations where the state's interest was to protect the health of the woman.[43]

A version of the undue burden test adopted in the United States Court of Appeals for the Seventh and Ninth Circuits weighed the strength of the state's justification against the burdens on the woman to determine the undue burden

---

[39] *Casey*, 505 U.S. at 874.

[40] *Planned Parenthood I*, 865 N.W.2d at 254 (discussing *Casey*, 505 U.S. at 878–79, and *Gonzales v. Carhart*, 550 U.S. 124, 146, 158 (2007)).

[41] *Id.* at 262–63.

[42] *Id.* at 263 (quoting *Casey*, 505 U.S. at 877).

[43] *Id.* at 264.

question.[44] Under this approach, a relatively slight burden might outweigh a relatively slight state interest.[45]

On the other hand, the cases from the Fifth and Sixth Circuits engaged in a weaker version of the undue burden test, requiring only that the state set forth a justification sufficient to pass rational basis review without focusing on the strength of the state's justification.[46] Based on language in *Casey*, we adopted the undue burden test of the Seventh and Ninth Circuits.[47] *Planned Parenthood I*, however, left open the possibility of applying strict scrutiny or even a different, more stringent version of an undue burden test.

3. *Recognizing the harm of two trips.* In applying the stricter *Casey* test, we noted that if the rule were put in effect, telemedicine services would end and that women in Iowa would have to travel hundreds of miles to obtain an abortion.[48] We also canvassed Planned Parenthood's arguments that by requiring two visits to the same clinic, the board's rule "would cause a working mother to potentially miss two to four days of work and incur additional childcare expense."[49] Additionally, requiring two trips would impose significant financial strain on low-

---

[44]*Id.* ("[T]he feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous." (quoting *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013))) (citing *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 912–14 (9th Cir. 2014)).

[45]*Id.*

[46]*Id.* (citing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 593–99 (5th Cir. 2014); *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 513–18 (6th Cir. 2012)).

[47]*Id.* (holding that the "unnecessary health regulations" language in *Casey* requires the court to weigh the strength of the state's justification against the burden placed on a woman).

[48]*Id.* at 267.

[49]*Id.*

income women, and to some, these costs could be "prohibitive."[50] We noted the concern that the increased travel could cause additional burden to abused women who want to seek an abortion privately and discretely.[51] In the end, we concluded that the board's regulation showed "very limited health benefits" while making it more challenging for many women who wished to exercise their constitutional right to terminate a pregnancy.[52]

**B. *Planned Parenthood II*: Requirement of Two Trips to the Clinic Imposed by the 72-Hour Waiting Period Fails Strict Scrutiny.**

1. *Introduction.* In *Planned Parenthood II*, we considered the validity of a statute that restricted the exercise of the right to an abortion for a period of seventy-two hours after the initial visit to the doctor.[53] Planned Parenthood challenged the validity of the statute as violating due process[54] and equal protection[55] under the Iowa Constitution. Planned Parenthood further urged us to depart from federal precedent, find that the right to an abortion is a

---

[50]*Id.*

[51]*Id.* (noting that *Casey* struck down a spousal notification requirement as it was "likely to prevent a significant number of women from obtaining an abortion," (quoting *Casey*, 505 U.S. at 887–98)).

[52]*Id.* at 268.

[53]The statute in *Planned Parenthood II* provided that an abortion patient be informed of a number of things at least seventy-two hours before the scheduled procedure. Specifically, the patient must obtain a certification that the woman was given the opportunity to view ultrasound images and to hear a description and heartbeat of the fetus. The statute further required that the woman be provided with information related to options available to her and risk factors associated with an abortion. The statute provided exceptions to certification where a physician determined that an abortion was necessary to save the life of a pregnant woman or in certain medical emergencies. *See Planned Parenthood II*, 915 N.W.2d at 220–21.

[54]Iowa Const. art. I, § 9; *Planned Parenthood II*, 915 N.W.2d at 213.

[55]Iowa Const. art. I, §§ 1, 6; *Planned Parenthood II*, 915 N.W.2d at 244.

fundamental right under the Iowa Constitution, and adopt the strict scrutiny test.[56] We agreed and concluded that the statute violated both the due process clause and the equal protection clause of the Iowa Constitution.[57]

2. *Summary of the factual record.* The record showed that women of reproductive age in Iowa had one of the most restrictive access to obstetrician and gynecologist (OB/GYN) in the nation, having ranked forty-sixth at the time of the filing and dropped to forty-ninth by the time the decision came down.[58] "Sixty-six of Iowa's ninety-nine counties [did] not have an OB/GYN."[59] Because of the very limited availability of medical practitioners, Iowa women—and particularly rural patients—often wait two to six weeks to see an obstetrician.[60]

The evidence also showed that poverty was a major factor in family planning and abortion access.[61] More than half of Planned Parenthood's patients live below 110% of the federal poverty line.[62] Women at or near the poverty line have higher rates of unintended pregnancy and abortions than the population as a whole.[63] Women need to pay not only for the cost of abortion services, but also for the cost of "transportation, child care, lodging, and subsequent medical

---

[56]*Planned Parenthood II*, 915 N.W.2d at 232.

[57]*Id.* at 244–46.

[58]*Id.* at 218 & 218 n.2 (citing William F. Rayburn, *The Obstetrician–Gynecologist Workforce in the United States* 54 (Am. Cong. of Obstetricians & Gynecologists 2017)).

[59]*Id.* at 218.

[60]*Id.*

[61]*Id.* at 218–19.

[62]*Id.*

[63]*Id.* at 219.

costs."[64] One study showed that the majority of women who sought an abortion had already needed to "forego or delay food, rent, child care, or another essential financial cost to pay for the procedure."[65] Now consider what the delay and additional trips would add to the already onerous burden.[66] In Iowa, because of the lack of providers, 35% of all surgical patients and 25% of all medication patients had to travel at least fifty miles to the clinic.[67]

The evidence established that women who are subject to reproductive coercion face barriers to obtaining an abortion.[68] Victims of domestic violence must keep the pregnancy or the decision to terminate a secret from their abusers, so women must manage and overcome hurdles to obtaining an abortion as quickly as possible.[69]

The record in *Planned Parenthood II* also contained testimony and evidence related to the impact of a 72-hour waiting period on women seeking an abortion.[70] Studies concluded that the waiting period had no effect on the number of women who changed their minds about obtaining an abortion[71] and that the typical participant had an over 99% chance of reporting that the decision

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at 220.

[69] *Id.*

[70] *Id.* at 222–25. Seven studies were offered that developed data related to the impact of mandatory delay laws on the decision of women to obtain an abortion. *Id.* at 222–24.

[71] *Id.* at 223.

to terminate her pregnancy was right for her at a follow-up interview.[72] In addition, three physicians testified to the effect that women who seek abortions are firm in their decisions and patient uncertainty is very rare.[73]

As for travel, the record showed patients seeking an abortion were required to make two trips to the abortion provider due to the 72-hour delay statute, one for the preabortion certification and another for the procedure.[74] Two trips to a provider significantly increased the cost of obtaining an abortion, especially when a poor patient without an automobile who traveled by public transportation to the abortion clinic accumulated considerable loss of time and expense.[75] Most importantly, evidence established that the 72-hour delay in some instances would prevent an abortion,[76] a timely medication abortion,[77] increase the medical risk,[78] and harm domestic violence and assault victims by making it more difficult to keep their abortion-related activities confidential.[79]

3. *Merits of substantive due process.* After canvassing the record, we held that there was a substantive due process right under article I, section 9 of the Iowa Constitution related to reproductive autonomy and the right to obtain

---

[72]*Id.* at 224.

[73]*Id.* at 224–25.

[74]*Id.* at 227.

[75]*Id.* at 228.

[76]*Id.* at 229.

[77]*Id.* at 230.

[78]*Id.* at 230–31.

[79]*Id.* at 231.

abortion services.[80] In doing so, we emphasized that while history and tradition can be important in considering whether a substantive due process right is present, "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries."[81] We observed that foundational principles such as liberty "were purposely left to gather meaning from experience."[82] We reaffirmed that the Iowa Constitution "must have enough flexibility so as to be interpreted in accordance with the public interest. This means [the Iowa Constitution] must meet and be applied to new and changing conditions."[83] Our constitution, we declared forty years ago, "is a living and vital instrument."[84]

In *Planned Parenthood II*, we canvased a host of federal decisions finding fundamental substantive due process rights that safeguard personal autonomy, including the right to marriage,[85] the right to procreate,[86] the right to use contraception,[87] the right to family relationships,[88] and the right to determine the education of one's child.[89] We also found a similar line of Iowa cases

---

[80]*Id.* at 233–37.

[81]*Id.* at 233 (alteration in original) (quoting *Obergefell v. Hodges*, 576 U.S. 644, 664 (2015)).

[82]*Id.* at 235 (quoting *Nat'l Mut. Ins. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 646 (1949) (Frankfurter, J., dissenting)).

[83]*Id.* at 236 (quoting *Pitcher v. Lakes Amusement Co.*, 236 N.W.2d 333, 335–36 (Iowa 1975) (en banc)).

[84]*Id.* (quoting *In re Johnson*, 257 N.W.2d 47, 50 (Iowa 1977)).

[85]*Id.* at 234 (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967)).

[86]*Id.* (citing *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)).

[87]*Id.* (citing *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965)).

[88]*Id.* (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

[89]*Id.* (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

declaring, among other things, that "[t]he right to procreate is implied in the concept of ordered liberty and qualifies for due process protection as a fundamental right,"[90] and that due process under the Iowa Constitution "exists to prevent unwarranted governmental interferences with personal decisions in life."[91] We found that fundamental liberty interest in familial relationship holds a place for reproductive choices.[92]

We thereby declared that, "Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world."[93] We declared that under the Iowa Constitution, "implicit in the concept of ordered liberty is the ability to decide whether to continue or terminate a pregnancy."[94]

4. *Following Iowa precedent on strict scrutiny and rejecting the undue burden test in federal law.* We next considered the level of scrutiny proper for the

---

[90]*Id.* (quoting *McQuistion v. City of Clinton*, 872 N.W.2d 817, 832 (Iowa 2015)).

[91]*Id.* at 237 (quoting *McQuistion*, 872 N.W.2d at 832).

[92]*Id.* at 234. "[T]he familial relationship is a fundamental liberty interest . . . ." *Id.* (alteration in original) (quoting *State v. Seering*, 701 N.W.2d 655, 663 (Iowa 2005), *superseded by statute as stated in Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37 (Iowa 2021)). "We have repeatedly found fundamental interests in family and parenting circumstances." *Id.* (quoting *Callender v. Skiles*, 591 N.W.2d 182, 190 (Iowa 1999) (en banc)).

[93]*Id.* at 237.

[94]*Id.*

fundamental right to abortion.[95] We noted it was well settled in Iowa that "[i]f a fundamental right is implicated, we apply strict scrutiny."[96]

We noted, however, that *Casey* relaxed the demanding approach in *Roe v. Wade*,[97] claiming that it had "undervalue[d] the State's interest in potential life."[98] Under *Casey*, a state may enact a previability abortion restriction "in furtherance of its interest in promoting potential life" but "may not enact a regulation that 'has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.' "[99] While some state courts adopted the *Casey* undue burden test,[100] others did not.[101]

After careful deliberation, we rejected the *Casey* test.[102] We reasoned that "[a] standard that only reviews the burdens of the regulation fails to guarantee that the objective of the regulation is, in fact, being served and is inconsistent with the protections afforded to fundamental rights."[103] We cited to Justice

---

[95]*Id.* at 237–41.

[96]*Id.* at 238 (alteration in original) (quoting *Seering*, 701 N.W.2d at 662). We further noted that "[s]ubstantive due process 'forbids the government [from infringing] certain "fundamental" liberty interests at all, no matter what process is involved, unless the infringement is narrowly tailored to serve a compelling state interest.' " *Id.* (second alteration in original) (quoting *Bowers v. Polk Cnty. Bd. of Supervisors*, 638 N.W.2d 682, 694 (Iowa 2002)).

[97]*Roe v. Wade*, 410 U.S. 113 (1973).

[98]*Planned Parenthood II*, 915 N.W.2d at 238 (alteration in original) (quoting *Casey*, 505 U.S. at 873).

[99]*Id.* (quoting *Casey*, 505 U.S. at 877).

[100]*Planned Parenthood II*, 915 N.W.2d at 239.

[101]*Id.*

[102]*Id.* at 239–41.

[103]*Id.* at 240.

Antonin Scalia, criticizing that the "standardless nature"[104] of the undue burden test in *Casey* was so vague that it "place[s] all constitutional rights at risk."[105] We found the undue burden test provided "no real guidance and engenders no expectation among the citizenry that governmental regulation of abortion will be objective, evenhanded, or well-reasoned."[106]

"Ultimately, adopting the undue burden standard would relegate the individual rights of Iowa women to something less than fundamental";[107] we concluded, "It would allow the legislature to intrude upon the profoundly personal realms of family and reproductive autonomy, virtually unchecked, so long as it stopped just short of requiring women to move heaven and earth."[108] As a result, we decided to apply the strict scrutiny framework to "fulfill our obligation to act as a check on the powers of the legislature and ensure state actions are targeted specifically and narrowly to achieve their compelling ends."[109]

---

[104]*Id.* (quoting *Casey*, 505 U.S. at 992 (Scalia, J., concurring in the judgment in part and dissenting in part)).

> The inherently standardless nature of this inquiry invites the district judge to give effect to his personal preferences about abortion. By finding and relying upon the right facts, he can invalidate, it would seem, almost any abortion restriction that strikes him as "undue"—subject, of course, to the possibility of being reversed by a court of appeals or Supreme Court that is as unconstrained in reviewing his decision as he was in making it.

*Id.* (citing *Casey*, 505 U.S. at 992).

[105]*Id.* at 240 (alteration in original) (quoting *Casey*, 505 U.S. at 988).

[106]*Id.* (quoting *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 17 (Tenn. 2000), *superseded by constitutional amendment*, Tenn. Const. art. I, § 36).

[107]*Id.*

[108]*Id.*

[109]*Id.* at 240–41.

5. *Application of strict scrutiny under the Due Process Clause to the facts.* It is important to focus on what we characterized as the factual issue in the case: "whether requiring all women to wait at least three days between the informational and procedural appointments will impact patient decision-making."[110]

On this factual issue, we concluded that "an objective review of the evidence shows that women do not change their decision to have an abortion due to a waiting period."[111] We noted that even if the statute "did confer some benefit to the State's identified interest" in promoting life, "it sweeps with an impermissibly broad brush."[112] We observed that the statute required delay "regardless of the patient's decisional certainty, income, distance from the clinic, and status as a domestic violence or rape victim."[113] We therefore declared that the statute "takes no care to target patients who are uncertain when they present for their procedures but, instead, imposes blanket hardships upon all women."[114]

6. *72-Hour waiting period violated equal protection.* Having determined that the 72-hour waiting period violated article I, section 9 of the Iowa Constitution, we considered the alternate claim of Planned Parenthood that the waiting period

---

[110]*Id.* at 241.

[111]*Id.*

[112]*Id.* at 243.

[113]*Id.*

[114]*Id.*

also violated equal protection under article I, section 1[115] and section 6[116] of the Iowa Constitution. We concluded that it did.[117]

We observed that, "Profoundly linked to the liberty interest in reproductive autonomy is the right of women to be equal participants in society."[118] We noted that through much of our state and nation's history, biological differences were used to justify women's subordinate position in society.[119] And yet, "[a]utonomy is the great equalizer."[120] Equality and liberty, we opined, were irretrievably connected.[121] We cautioned that "[l]aws that diminish women's control over their reproductive futures can have profound consequences for women."[122] With that in mind, we concluded that the 72-hour waiting requirement violated equal protection under the Iowa Constitution.[123]

**C. Enactment of Iowa Code Section 146A (2021).** After we decided *Planned Parenthood II*, the Iowa Legislature responded by passing a virtually identical measure that differed in one respect: instead of requiring a 72-hour waiting period, the new legislation required a 24-hour waiting period.[124]

---

[115]Iowa Const. art. I, § 1 (the inalienable rights clause).

[116]Iowa Const. art. I, § 6 (the privileges and immunities clause).

[117]*Planned Parenthood II*, 915 N.W.2d at 244.

[118]*Id.* at 245.

[119]*Id.* at 244.

[120]*Id.* at 245 *see also* Ruth Bader Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L. Rev. 375, 383 (1985) [hereinafter Ginsburg].

[121]*Planned Parenthood II*, 915 N.W.2d at 245.

[122]*Id.*

[123]*Id.*

[124]*See* 2020 Iowa Acts ch. 1110, § 2 (codified at Iowa Code § 146A.1 (2021)).

Obviously, the legislature sought to avoid our holding in *Planned Parenthood II* by simply changing the length of the waiting period.

**D. Proceedings in District Court.** Planned Parenthood brought this action in the Iowa district court challenging the statute as unconstitutional. It raised a number of challenges, including a claim that the statute violated Iowa's single subject rule, that the prior decision in *Planned Parenthood II* had preclusive effect, and that the statute violated substantive due process, equal protection, and article I, section 1 of the Iowa Constitution.

Planned Parenthood moved for summary judgment, supported by a substantial appendix that contained testimonies and affidavits from the *Planned Parenthood II* litigation. In addition, Planned Parenthood offered additional evidence into the record from experts and providers. The State filed a cross-motion for summary judgment, arguing that as a matter of law, Planned Parenthood's single subject and issue preclusion claims failed.

The district court ruled in favor of Planned Parenthood on the single subject and issue preclusion grounds. The State appealed.

**II. Preliminary Questions.**

**A. Single Subject Claim Under Article III, Section 29.** Planned Parenthood attacks the combination of the 24-hour abortion waiting period with a measure regulating the procedure for termination of life support for minors as violating the single subject requirement of article III, section 29 of the Iowa

Constitution.[125] It is undisputed that after languishing in the house of representatives, the provision related to the 24-hour waiting period surfaced late at night, on the next to the last day of the session. It emerged as an amendment to an amendment of a bill related to withdrawal of life support from minors with minimal opportunity for hearings and debate.[126] The majority goes to great length to suggest that COVID-related issues explain the procedure utilized in this case. I found that discussion unpersuasive but that was beside the point.

Article III, section 29, is a relatively narrow provision that requires that all bills enacted by the Iowa General Assembly have a "single subject." The provision may be designed to promote accountability and transparency, but it does not vest this court with general police power to ensure that legislative leaders act courteously, provide advance notice of potentially controversial measures, and provide the public with a broad opportunity for input before legislation is enacted.

Further, having examined the single subject caselaw, it is generally rather unfavorable to the Planned Parenthood position. In some extreme examples this court has intervened, for instance, when substantive matters are buried in a doe editor's bill. But, as outlined by the majority, we have permitted some fairly broad titles as subjects for pretty diverse provisions. We have said that the single

---

[125]Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.

Iowa Const. art. III, § 29.

[126]Amendment H–8314 was proposed to amend House File 594. *See* H. Journal, 88th G.A., 1st Sess., at 758 (Iowa 2019).

subject rule should be "liberally construed,"[127] that it is violated "only in extreme cases" where the legislation is "clearly, plainly and palpably" unconstitutional,[128] and that the legislation is upheld where the question is "fairly debatable."[129]

I think our precedents may have been too forgiving. Those who wander the routunda of our state capitol during the waning hours or days of a legislative session may hear reference to "Frankenstein bills" containing a grab bag of subjects that plainly push the boundaries of article III, section 29. As colorfully noted in a case from Minnesota, the flouting of single subject provisions is a "worm that was merely vexatious in the 19th century [but] has become a monster eating the constitution in the 20th."[130]

That said, the subject "medical procedures" is marginally sufficient under our caselaw. It is, I suppose "fairly debatable" that the two provisions relate to a common subject. Although I might disagree with the thrust of the cases, I accept that stare decisis plays an important role here. So, reluctantly, I concur with the majority on the single subject issue.

**B. Issue Preclusion.**

1. *Positions of the parties.* Planned Parenthood argues issue preclusion applies because the current statute shares the same core features of the 72-hour delay law in *Planned Parenthood II.* This court had previously determined that

---

[127]*Long v. Bd. of Supervisors of Benton Cnty.*, 142 N.W.2d 378, 381 (Iowa 1966).

[128]*Utilicorp United Inc. v. Iowa Utils. Bd.*, 570 N.W.2d 451, 454 (Iowa 1997) (en banc) (quoting *State v. Mabry*, 460 N.W.2d 472, 474 (Iowa 1990)).

[129]*Mabry*, 460 N.W.2d at 474.

[130]*State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 784 (Minn. 1986) (en banc) (Yetka, J., concurring specially).

mandatory delay laws do not change people's minds.[131] Further, this court found that making multiple trips to a provider before having an abortion imposes a range of medical, financial, emotional, and social burdens on them.[132] On the legal questions, Planned Parenthood notes that the 24-hour waiting period does not sweep more narrowly than the 72-hour waiting period that "indiscriminately subjects all women to an unjustified delay in care, regardless of the patient's decisional certainty."[133]

The State responds that in order for issue preclusion to apply, the issues must be "precisely the same."[134] The State notes that courts should be especially warry of applying issue preclusion in constitutional adjudication.[135] And, according to the State, issue preclusion does not prevent a court with authority from overruling a decision decided under the wrong legal standard.[136] Because of the passage of time, the State argues that the circumstances with respect to abortion may have changed.

2. *Discussion.* I begin by examining the precise ruling of this court in *Planned Parenthood II.* In that case, we made alternative holdings.

---

[131]*Planned Parenthood II*, 915 N.W.2d at 241 ("The imposition of a waiting period may have seemed like a sound means to accomplish the State's purpose of promoting potential life, but as demonstrated by the evidence, the purpose is not advanced. Instead, an objective review of the evidence shows that women do not change their decision to have an abortion due to a waiting period.").

[132]*Id.* at 242–43 ("[T]he burdens imposed on women by the waiting period are substantial, especially for women without financial means . . . will inevitably delay their procedure while assembling the resources needed to make two trips to a clinic.").

[133]*Id.* at 243.

[134]*See Est. of Leonard v. Swift*, 656 N.W.2d 132, 147 (Iowa 2003).

[135]*See Montana v. United States*, 440 U.S. 147, 162–63 (1979).

[136]*See id.* at 161–62.

Our first holding was as follows:

> Strict scrutiny requires state actions be narrowly tailored to further a compelling state interest. *The overwhelming weight of the evidence demonstrates that requiring all women, regardless of decisional certainty, to wait at least seventy-two hours between appointments will not impact patient decision-making, nor will it result in a measurable number of women choosing to continue a pregnancy they otherwise would have terminated without the mandatory delay.* The Act, therefore, does not, in fact, further any compelling state interest and cannot satisfy strict scrutiny.[137]

In the alternative, we held:

> Even if the Act did confer some benefit to the State's identified interest, it sweeps with an impermissibly broad brush. The Act's mandatory delay indiscriminately subjects all women to an unjustified delay in care, regardless of the patient's decisional certainty, income, distance from the clinic, and status as a domestic violence or rape victim. The Act takes no care to target patients who are uncertain when they present for their procedures but, instead, imposes blanket hardships upon all women.[138]

Our first holding depended upon a finding of fact, namely, that a 72-hour delay did not have an impact on the decisions of women with respect to abortion.[139] That factual finding was necessary and essential to our first holding in *Planned Parenthood II,* but not to the alternative holding, which rested on the broad sweep of the statute.[140] In my view, the critical issue, then, is whether issue preclusion arises from what is only an alternate holding in a case.

---

[137]*Planned Parenthood II*, 915 N.W.2d at 243 (emphasis added).

[138]*Id.*

[139]*Id.* at 242–43.

[140]*Id.* at 243; *see Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 104–07 (Iowa 2011) (holding that when an issue of fact or law has been previously litigated and resolved by final judgment, and the resolution is essential to the judgment, the determination becomes conclusive, regardless of whether it is on an identical or different claim).

Under the Restatement (Second) of Judgments section 27 comment *i*, facts supporting an alternate "judgment is not conclusive with respect to either issue standing alone."[141] But under Restatement (First) of Judgments section 68 comment *n*, issue preclusion does arise from alternate judgments.[142] As far as I can tell, this is an issue of first impression in Iowa. In *Herrera v. Wyoming*, Justice Alito, in dissent, took the view that the Restatement (First) of Judgments had the sounder view.[143] I agree. I do not think the fact that the holdings in *Planned Parenthood II* are expressed in the alternative is an obstacle to issue preclusion if the elements are met.

The State claims that the factual issue in this case is different because of the statutes involved. In *Planned Parenthood II*, the delay was 72 hours, while in this case the mandatory delay is 24 hours. Obviously, there is a difference in the statutes. But the difference in the statutes does not alter the nature or scope of the finding of fact related to the impact of mandatory delay. The finding of fact is that a 72-hour waiting period has no impact on abortion decisions. If so, it seems to me that a delay of 24 hours is a lesser included fact that was determined in *Planned Parenthood II*.

There is authority for the proposition that even if there is a lack of total identity between the issues involved in two adjudications, the overlap may be so

---

[141]Restatement (Second) of Judgments § 27 cmt. *i*, at 259 (Am. L. Inst. 1982) [hereinafter Restatement (Second) of Judgments].

[142]A judgment based on alternative grounds "is determinative on both grounds, although either alone would have been sufficient to support the judgment." Restatement (First) of Judgments § 68 cmt. *n*, at 307–08 (Am. L. Inst. 1942).

[143]*Herrera v. Wyoming*, 139 S. Ct. 1686, 1710 (2019) (Alito, J., dissenting).

substantial that preclusion is appropriate. According to the Restatement (Second) of Judgments section 27 comment *c*,[144] a number of factors should be considered where there is a lack of total identity, including whether there is substantial overlap between the evidence or argument, whether there is new evidence available, and whether pretrial preparation or discovery would have been different. Section 27 comment *c* notes that even where different times are involved, the overlap can be substantial.[145] Here, applying the factors of the Restatement (Second), I would conclude that there is sufficient overlap to preclude relitigation of the factual issues regarding the impact of a waiting period on the exercise of abortion rights.

There is a potential issue of burden of proof. It may be argued that, depending upon the outcome of the litigation, the burden of proof in this case could shift to Planned Parenthood when the burden of proof in *Planned Parenthood II* was carried by the state. But the *standard* of proof will not change from, say preponderance of evidence to reasonable doubt. And in *Planned Parenthood II*, the finding was based on "overwhelming evidence." A mere shift in the burden of proof would have no impact on the specific factual finding in *Planned Parenthood II.*

The State asserts that it is entitled to argue for a different legal standard for determining the constitutionality of the 24-hour waiting period in this case. On this point, I generally agree with the State and the majority that in this case

---

[144]Restatement (Second) of Judgments, § 27 cmt. *c* at 252–53.

[145]*Id.*

the constitutional issue may be revisited. If upon reexamination we adhered to the strict scrutiny approach of *Planned Parenthood II*, as I think we should, then preclusion might apply. But the majority, however, has ruled out strict scrutiny.

Because the majority has ruled out the legal test utilized in *Planned Parenthood II*, the situation has changed. Now, even giving full effect to the factual finding in *Planned Parenthood II*, it is possible that the State may be entitled to prevail in this action. On remand, it is possible that the district court will adopt a one-pronged, skinny version of the undue burden test that does not require the State to show any benefit or advancement of state interests, but instead only requires a showing that the regulation does not impose a "substantial burden" on reproductive autonomy. If such is the case, the State could prevail notwithstanding the unfavorable fact-finding in *Planned Parenthood II*.

In sum, I would adhere to the strict scrutiny test and, if the strict scrutiny test were to be applied, the State would be precluded from relitigating its constitutional claim in this case. But, Planned Parenthood should be able to rely on the adverse fact-finding regarding the failure of the mandatory delay statute to further the state's interest in the subsequent litigation before the district court.

**III. A Threshold Question of Substance: Application of Stare Decisis.**

I join parts I and II of Chief Justice Christensen's compelling partial dissenting opinion in this matter on the question of stare decisis and add only a few brief words of my own. The general rule regarding stare decisis is that a prior

precedent is entitled to be given effect unless the prior decision has proved "unworkable in practice, does violence to legal doctrine, or has been so undermined by subsequent factual and legal developments that continued adherence to the precedent is no longer tenable."[146] None of these criteria are present here.

It is true, of course, that the United States Supreme Court is now on the verge of dramatically undercutting—if not overturning—*Roe*, notwithstanding fifty years of precedent.[147] Our judgment of contested issues under the Iowa Constitution, however, is independent of that of the United States Supreme Court.[148] While the new majority of United States Supreme Court is on the verge of overturning *Roe*, it will likely do so based upon legal doctrine that we specifically rejected in *Planned Parenthood II*. Further, the current majority on the United States Supreme Court is generally inclined to expand government power at the expense of individual liberties. We should not permit a federal court decision to be a thumb on the scale when we independently interpret Iowa law.[149]

Finally, another factor supporting stare decisis here is the fact that amending the Iowa Constitution is not nearly as arduous a process as amending the Federal Constitution. One of the reasons for a weaker doctrine of stare decisis

---

[146]*Youngblut v. Youngblut*, 945 N.W.2d 25, 44 (Iowa 2020) (McDonald, J., dissenting).

[147]*Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2021) (mem.) (granting certiorari).

[148]*State v. Ochoa*, 792 N.W.2d 260, 264–67 (Iowa 2010) (declining to take a lockstep approach and affirming that a state supreme court cannot delegate to any other court the power to independently interpret its state constitution).

[149]*Id.* at 267; *Callender*, 591 N.W.2d at 187.

in federal constitutional law is the difficulty of obtaining a constitutional amendment to overrule precedent. In Iowa, however, the process of constitutional amendment is relatively simple and requires only the approval of two separate sessions of the Iowa General Assembly to be put before the voters.[150] With the current unitary control of state government by a single party aligned with prolife advocates, a constitutional amendment related to abortion rights may soon appear on the ballot. A vote of the people approving a constitutional amendment overruling *Planned Parenthood II* would have much greater legitimacy than a rejection of stare decisis by this court of a 5–2 precedent established only a few years ago.

In my view, there is clearly no basis for overturning *Planned Parenthood II* based on stare decisis. And yet, even if we were to reexamine the issue, Chief Justice Cady was right in *Planned Parenthood II*. Here is why.

**IV. Overview of Development of the Federal Right to Reproductive Autonomy.**

**A. Introduction.** Despite what some might suggest, *Roe* did not suddenly emerge from the obscure primordial depths. Instead, it was a result of a steady and logical progression of caselaw development, going as far back as the Magna Carta.

**B. Early Predecessors to *Roe v. Wade*: Unenumerated Fundamental Interests About Private Matters.** The substantive due process doctrine that

---

[150]Iowa Const. art. X, § 1.

provided the underpinning for *Roe* has a long heritage. Justices[151] and scholars[152] have traced substantive due process back to the Magna Carta. It is believed that the Due Process Clause of the Fifth Amendment to the United States Constitution at the time of the drafting encompassed judicial recognition that unenumerated substantive rights served to limit congressional power, and the concept of due process posed substantive limitation on governments.[153] Sir Edward Coke considered the Magna Carta supreme, and as a statement "declaratory of the principal grounds of the fundamental laws of England."[154] As noted by Professor Gedicks, "One of the crucial stories behind substantive due process is how [the] Magna Carta, the due process of law, and the common law evolved into 'fundamental' or 'higher law . . . .' "[155] Gedicks also argued that the

---

[151]"Thus the guaranties of due process, though having their roots in Magna Carta's 'per legem terrae' and considered as procedural safeguards 'against executive usurpation and tyranny,' have in this country 'become bulwarks also against arbitrary legislation.' " *Poe v. Ullman*, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting) (quoting *Hurtado v. California*, 110 U.S. 516, 532 (1884)); *see Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citing the Magna Carta in connection with development of substantive due process).

[152]Frederick Mark Gedicks, *An Originalist Defense of Substantive Due Process: Magna Carta, Higher-Law Constitutionalism, and the Fifth Amendment*, 58 Emory L.J. 585, 594 (2009) [hereinafter Gedicks] ("The concept of due process as a substantive limitation on government originated in thirteenth-century England with the 'law of the land' clause of [the] Magna Carta."). Chapter 29 of the Magna Carta provides:

> N[o] freeman shall be taken or imprisoned or disseised of any freehold, or liberties, or free customs, or outlawed, or banished, or in any other way destroyed, nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land. To no one will we sell, to no one will we deny, or delay right or justice.

William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution*, 27 U. Mem. L. Rev. 333, 356 (1996–1997) (quoting Magna Carta ch. 29 (1225)).

[153]Gedicks, 58 Emory L.J. at 594.

[154]Thomas C. Grey, *Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought*, 30 Stan. L. Rev. 843, 852 (1978) (quoting 2 Edward Coke, *Institutes of the Laws of England,* (1648)).

[155]Gedicks, 58 Emory L.J. at 598.

Declaration of Independence's emphasis on natural rights was a direct refusal of the notion of Parliament supremacy.[156] The Declaration signaled the message: The due process of law limited the actions of both the Crown and Parliament; Britain's violation of the higher law, therefore, justified revolution.[157]

Early cases of the United States Supreme Court and its Justices recognized that there were limitations on government action that were not explicitly spelled out in the United States Constitution. In *Calder v. Bull*, Justice Chase noted that legislation "contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority."[158] In *Corfield v. Coryel*, Circuit Justice Washington emphasized fundamental rights of citizens including "the enjoyment of life and liberty."[159] Building on this tradition, several cases of the United States Supreme Court illustrated the notion that unenumerated rights—namely, rights not explicitly described with specificity— may be protected under the generously phrased "liberty" clause of the United States Constitution.[160]

In *Meyer v. Nebraska*, the United States Supreme Court considered the validity of a Nebraska statute that prohibited the teaching of foreign languages

---

[156]*Id.* at 622–23.

[157]*Id.* at 623.

[158]*Calder v. Bull*, 3 U.S. 386, 388 (1798).

[159]*Corfield v. Coryell*, 6 F. Cas. 546, 551–52 (Cir. Ct. E.D. Pa. 1823) (No. 3,230).

[160]*Union Pac. Ry. v. Botsford*, 141 U.S. 250, 256–57 (1891) (recognizing personal privacy); *see also Roe*, 410 U.S. at 152–53 (listing fundamental rights recognized such as the right to marriage, procreation, contraception, family relations, child rearing and education).

in schools.[161] The statute was enacted in 1919 in the aftermath of World War I and targeted the teaching of German.[162] The *Meyer* Court held that the statute violated the "liberty" clause of the Fourteenth Amendment.[163] The Court emphasized that the term "liberty" included a wide variety of what some critics today might consider unenumerated rights, including such rights not specifically mentioned in the Constitution, such as the right to contract, to engage in common occupations, to acquire useful knowledge, to marry, to establish a house and bring up children, and to worship God according to the dictates of conscience.[164] Notably, the Court stated that liberty generally included those privileges "recognized at common law as essential to the orderly pursuit of happiness by free men."[165] There is, of course, no express textual statement of these rights anywhere in the United States Constitution. But these rights fell under the general rubric of "liberty" and were entitled to constitutional protection.

Then, in *Pierce v. Society of Sisters*, the United States Supreme Court considered the validity of a statute that required that parents send their children to public schools.[166] The Court held that statute invalid, noting the liberty

---

[161]*Meyer*, 262 U.S. at 396–97.

[162]*Id.* at 397; *see also id.* at 400, 402.

[163]*Id.* at 399–400.

[164]*Id.* (citing a series of federal cases).

[165]*Id.*

[166]*Pierce*, 268 U.S. at 529–30, 530 n.1.

parents have to direct the upbringing and education of their children.[167] Again, there is no specific textual mention of the right to bring up and educate children in the United States Constitution, but the right was found to be protected under the general term "liberty" used in the Fourteenth Amendment.[168]

Finally, in *Skinner v. Oklahoma ex rel. Williamson*, the United States Supreme Court considered an equal protection challenge to an Oklahoma statute that prohibited certain criminals from having children.[169] The Court invalidated the statute and emphasized that "[m]arriage and procreation are fundamental to the very existence and survival of the race."[170] "Marriage and procreation" are not explicit in the United States Constitution, and yet, they were found to be within the scope of the open-textured phrase "liberty" and thus protected by the Due Process Clause of the Fourteenth Amendment.

**C. *Poe v. Ullman*: The Wisdom of the Great Judicial Conservative, John Marshall Harlan.** In *Poe v. Ullman*, the United States Supreme Court declined to consider the merits of a statute prohibiting contraceptive use.[171] In a famous dissenting opinion, Justice Harlan outlined the contours of substantive due process.[172] Due process, Justice Harlan noted, is by no means a mere

---

[167]*Id.* at 535 (declaring that the "fundamental theory of liberty" excludes any general power of the state and that rights guaranteed by the Constitution may not be abridged by legislative actions).

[168]*Id.*

[169]*Skinner*, 316 U.S. at 536.

[170]*Id.* at 541 ("We are dealing here with legislation which involves one of the basic civil rights of man.").

[171]*Poe*, 367 U.S. at 499–502 (majority opinion).

[172]*Id.* at 522, 539–45 (Harlan, J., dissenting).

procedural safeguard; to reduce its significance to mere protection of a procedural right would "fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in application to individuals, nevertheless destroy the enjoyment of all three."[173]

"[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution."[174] Within the liberty, Justice Harlan concluded, lies the freedom from substantial arbitrary impositions on private decisions, like the use of contraception.[175]

**D. *Griswold v. Connecticut*: Unenumerated Fundamental Right in Marriage Reaffirmed.** The United States Supreme Court considered the validity of a criminal statute regulating birth control in *Griswold v. Connecticut*.[176] In the opinion, Justice Douglas relied on a theory of unenumerated rights,[177] noting that the Court has endorsed rights that are not specifically mentioned in the Constitution.[178] Among these rights includes the penumbral rights of "privacy and repose."[179] He reasoned that various provisions of the Bill of Rights have

---

[173]*Id.* at 541.

[174]*Id.* at 543.

[175]*Id.* at 539 (concluding that the statute criminalizing married couples using contraceptives was an "unjustifiable invasion of privacy").

[176]*Griswold*, 381 U.S. at 480.

[177]*Id.* at 485 (recognizing that under the Constitution there are "penumbral rights").

[178]*Id.* at 482–83 (citing *Pierce*, 268 U.S. 510; *Meyer*, 262 U.S. 390 and various free speech cases, including *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

[179]*Id.* at 485.

penumbras creating a "zone of privacy"[180] worthy of constitutional protection, within which lies the right to be free from the police "search[ing] the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives."[181] In a manner reminiscent of natural law that precedes the adoption of the United States Constitution, Justice Douglas referred to a right of privacy "older than the Bill of Rights."[182]

Justice Goldberg, in a concurrence, linked privacy protection to liberty protected by the Fourteenth Amendment.[183] He recognized that the concept of liberty protects those rights that are fundamental and extend beyond the specific terms of the Bill of Rights.[184] In addition, Justice Goldberg cited the Ninth Amendment, which provides that "[t]he enumeration [of rights] in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."[185] "Although the Constitution does not speak in so many words of the right of privacy in marriage, I cannot believe that it offers these fundamental rights no protection."[186]

---

[180]*Id.* at 484–85.

[181]*Id.* at 485.

[182]*Id.* at 486.

[183]*Id.* at 487 (Goldberg, J., concurring).

[184]*Id.* at 486 ("[T]he concept of liberty is not so restricted and that it embraces the right of marital privacy though that right is not mentioned explicitly in the Constitution . . . ." (footnote omitted)).

[185]*Id.* at 488 (quoting U.S. Const. amend. IX); *see id.* at 490–91 (emphasizing that while the Ninth Amendment was rarely discussed, "[i]t cannot be presumed that any clause in the constitution is intended to be without effect," quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803), and while some might regard the Ninth Amendment a "recent discovery," it "has been a basic part of the Constitution which we are sworn to uphold" (alteration in original)).

[186]*Id.* at 495.

On standard of review, Justice Goldberg wrote that in a long series of cases involving fundamental rights, the Court had held that the rights may not be abridged merely upon "a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose."[187] Applying a strict scrutiny test, Justice Goldberg concluded that the blanket ban on use of contraceptives by married persons was not narrowly tailored to advance a compelling state interest.[188]

Finally, Justice Harlan concurred in the result but rested his opinion on a theory of substantive due process.[189] According to Justice Harlan, a substantive due process violation occurs when a statute violates basic values "implicit in the concept of ordered liberty."[190]

Justice White also affirmed that *Meyer*, *Pierce*, and *Skinner* had established that marriage and family matters are among "the basic civil rights of man."[191] Like Justice Goldberg, Justice White emphasized that statutes regulating the privacy and association of the marriage relationship require "strict scrutiny" review.[192]

**E. *Loving v. Virginia*: Unanimous Holding that the Right to Marry Is Protected by Substantive Due Process.** In *Loving v. Virginia*, the United States

---

[187]*Id.* at 497.

[188]*Id.* at 497–98.

[189]*Id.* at 501 (Harlan, J., concurring in the judgement).

[190]*Id.* at 500 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), *overruled by Benton v. Maryland*, 395 U.S. 784 (1969)).

[191]*Id.* at 503 (White, J., concurring in the judgement) (quoting *Skinner*, 316 U.S. at 541).

[192]*Id.* at 503–04 (quoting *Skinner*, 316 U.S. at 541).

Supreme Court considered the validity of a statute prohibiting interracial marriage.[193] Chief Justice Warren noted that, although nowhere mentioned in the Constitution, marriage was "one of the 'basic civil rights of man,' fundamental to our very existence and survival," and had "long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."[194] There is no explicit right to marriage in the Constitution, yet the opinion in *Loving* did not draw a single dissent.[195] The Court was unanimous apparently not only on the equal protection question but also on the question of substantive due process that built on the doctrine of early cases like *Skinner* and Justice Harlan's dissent in *Poe*.

**F. *Eisenstadt v. Baird*: Fundamental Right of the Decision to Bear a Child Outside of Marriage.** The United States Supreme Court again considered the validity of a statute that prohibited a person from distributing contraceptives to an unmarried person.[196] Framing the question in terms of equal protection, the Court held that the classifications in the statute failed even the least stringent review.[197] Specifically, "If the right of privacy means anything, it is the

---

[193]*Loving*, 388 U.S. at 2. Although much of the opinion concentrates on equal protection, Chief Justice Warren also considered the substantive due process implications of the statute.

[194]*Id.* at 12 (quoting *Skinner*, 316 U.S. at 541).

[195]Aaron J. Shuler, *From Immutable to Existential: Protecting Who We Are and Who We Want to Be with the "Equalerty" of the Substantive Due Process Clause*, 12 J.L. & Soc. Challenges 220, 263 (2010) [hereinafter Shuler].

[196]*Eisenstadt v. Baird*, 405 U.S. 438, 440–42 (1972).

[197]*Id.* at 454 ("If Griswold is no bar to a prohibition on the distribution of contraceptives, the State could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons. In each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious.").

right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."[198]

**G.** *Stanley v. Illinois*: **Reproductive Choices and Child Rearing as "Basic Civil Rights of Man."** In *Stanley v. Illinois*, the United States Supreme Court considered a statute that declared that the children of unwed fathers automatically became wards of the state upon the death of the mother.[199] The Court emphasized "[t]he rights to conceive and to raise one's children have been deemed 'essential.' "[200] Echoing *Loving*, these rights were "basic civil rights of man."[201] The integrity of the family once again found protection under the substantive due process rubric.[202]

**H. Summary.** Substantive due process has exceptional pedigree going back to the Magna Carta. The notion of liberty interests protected by substantive due process was a mainline development.[203] It is sometimes claimed that there is no specific language in the United States Constitution or in state constitutions limiting the right to abortion. Sure enough, the term "abortion" does not appear there. However, the right to reproductive autonomy should not be eviscerated by narrow textualism. Decision after decision involving intimate spheres of life such

---

[198]*Id. at* 453 (citing *Stanley v. Georgia*, 394 U.S. 557 (1969)).

[199]*Stanley v. Illinois*, 405 U.S. 645, 646–48 (1972).

[200]*Id.* at 651 (quoting *Meyer*, 262 U.S. at 399).

[201]*Id.* (quoting *Skinner*, 316 U.S. at 541).

[202]*Id.* at 657.

[203]For an excellent summary of the cases which form a basis for this discussion, see Shuler, 12 J.L. & Soc. Challenges at 267–93.

as the decisions related to family, education of children, whether to beget children, and whether to use contraception were found to be entitled to substantive due process protection. The great judicial conservative of the Warren years, Justice Harlan, embraced substantive due process in his famous dissent in *Poe*. Prior to *Roe*, there was a rich body of caselaw for the court to draw upon in considering application of substantive due process and privacy interests in the context of reproductive autonomy.

**V. *Roe v. Wade* and Its Immediate Progeny: Reproductive Autonomy Through Unenumerated Rights.**

**A. *Roe v. Wade*.** In 1973, a 7–2 majority of the United States Supreme Court decided the landmark case *Roe v. Wade*.[204] In that case, the Court declared a Texas criminal statute that made it a crime to "procure an abortion" violated a woman's right to privacy under the United States Constitution.[205]

In *Roe*, the Court relied on the right to privacy to invalidate the Texas law.[206] *Roe* recognized that the right to privacy is not expressly mentioned, but noted that roots may be found in the First Amendment, Fourth Amendment, Fifth Amendment, penumbras of the Bill of Rights, the Ninth Amendment, and in the concept of liberty guaranteed by the Fourteenth Amendment.[207] However, whether found in the Fourteenth Amendment's liberty interest or in the Ninth

---

[204] *Roe*, 410 U.S. at 113, 115.

[205] *Id.* at 117, 155, 166.

[206] *Id.* at 153–66.

[207] *Id.* at 152–53.

Amendment, *Roe* in no uncertain terms affirmed that the right to privacy is broad enough to encompass a woman's reproductive autonomy.[208]

With regard to history, the *Roe* Court canvassed federal and state court cases considering the validity of anti-abortion statutes[209] and concluded that even though the results were divided, most courts agreed that the right to privacy was broad enough to cover the right to decide whether to continue a pregnancy.[210] Yet, *Roe* recognized that the right was not absolute but may be justified by a "compelling state interest,"[211] which includes protecting the health of the mother as well as the potential human life. Once the point of viability is reached, the state may then enact regulation reasonably related to further the compelling state interests.[212] Although not stated explicitly, *Roe* established strict scrutiny with respect to regulation of abortion prior to viability.

Justice Stewart wrote a concurring opinion[213] that soon came to be widely followed, if not cited, in abortion jurisprudence. Justice Stewart found the right to abortion firmly anchored in "liberty" protected by the Fourteenth Amendment.[214] "In a Constitution for a free people, there can be no doubt that the meaning of liberty must be broad indeed."[215] He cited a laundry list of cases

---

[208]*Id.* at 153.

[209]*Id.* at 154–56.

[210]*Id.* at 155.

[211]*Id.* at 155–56.

[212]*Id.* at 163–64.

[213]*Id.* at 167 (Stewart, J., concurring).

[214]*Id.* at 170.

[215]*Id.* at 168 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972)).

where "specific right[s] of personal choice" were protected by the Constitution without being explicitly named in the Bill of Rights.[216]

Justice Stewart quoted Justice Harlan at length:

[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points priced out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . .[217]

Again, Justice Stewart echoed the views of Justice Frankfurter:

Great concepts like . . . "liberty" . . . were purposely left to gather meaning from experience. For they relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.[218]

Justice Stewart noted that the court, through a long line of well-established precedents, had made clear that "freedom of personal choice" in "marriage and family life" is one of the liberty interests safeguard by the Due Process Clause of the Fourteenth Amendment.[219] This freedom of personal choice certainly includes a woman's choice to continue or terminate a pregnancy because of the profound impact pregnancy and child-rearing would bring to

---

[216]*Id.*

[217]*Id.* at 169 (alteration in original) (quoting *Poe*, 367 U.S. at 543 (Harlan, J., dissenting)).

[218]*Id.* (omissions in original) (quoting *Nat'l Mut. Ins.*, 337 U.S. at 646 (Frankfurter, J., dissenting)).

[219]*Id.* at 169–70 (noting *Loving*, *Griswold*, *Meyer*, *Prince*, *Skinner*, and *Eisenstadt* as precedents).

her.[220] The right asserted by Roe, therefore, was clearly within the personal liberty protected by the Fourteenth Amendment.[221]

### B. Post-*Roe* Substantive Due Process Developments.

1. *Cleveland Board of Education v. Lafleur.* In the 1974 case *Cleveland Board of Education v. Lafleur*, the United States Supreme Court considered a school board rule that required teachers to take unpaid maternity leave.[222] Once again, the Court cited *Roe, Loving, Griswold, Pierce, Meyer, Prince v. Massachusetts*, and *Skinner* for the notion that choices with respect to personal and family life are protected by substantive due process.[223] The Court reaffirmed the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."[224] Substantive due process in the realm of family and child bearing matters was alive and well in *Cleveland Board of Education.[225]*

---

[220]Certainly the interests of a woman in giving of her physical and emotional self during pregnancy and the interests that will be affected throughout her life by the birth and raising of a child are of a far greater degree of significance and personal intimacy than the right to send a child to private school or the right to teach a foreign language . . . .

*Id.* at 170 (citations omitted) (quoting *Abele v. Markle*, 351 F. Supp. 224, 227 (D.C. Conn. 1972), *judgment vacated by Markle v. Abele*, 410 U.S. 951 (1973) (mem.)).

[221]*Id.*

[222]*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 632, 634 (1974).

[223]*Id.* at 640–41.

[224]*Id.* at 640 (quoting *Eisenstadt*, 405 U.S. at 453).

[225]Another case worth discussion is *Zablocki v. Redhail*, 434 U.S. 374 (1978). In *Zablocki*, the Court found invalid a Wisconsin statute that required persons with noncustodial children to show that they were financially supporting them before they could marry. *Id.* at 375–76. Justice Marshall wrote the opinion for the Court. *Id.* at 375. Much of the opinion rests on equal protection rather than substantive due process, but substantive due process was not ignored. Specifically, Justice Marshall noted that making personal decisions related to marriage must be left to the individual without government interference. *Id.* at 385. Further, the Court emphasized that while

2. *Moore v. City of East Cleveland.* In *Moore v. City of East Cleveland*, a city zoning ordinance restricted use of certain dwellings to a narrowly defined "single family."[226] The United States Supreme Court struck down the ordinance, as it did repeatedly before and after *Roe*, reaffirming "freedom of personal choice in matters of marriage and family life."[227] Once more, a cavalcade of the Court's substantive due process cases were cited.[228] Importantly, the Court quoted extensively from Justice Harlan's embrace of substantive due process in *Poe*.[229]

3. *Carey v. Population Services International.*[230] In a challenge to a contraception statute regarding the use of contraception by minors, the United States Supreme Court in *Carey v. Population Services International* underscored the liberty "interest in independence in making certain kinds of important decisions,"[231] which includes procreation and "individual autonomy in matters of childbearing."[232] The Court extended the protection of the use of contraception

---

the right to make decisions about marriage was fundamental, a state regulation that directly and substantially interfered with the right could survive only if the statute was narrowly tailored to further a compelling state interest. *Id.* at 385–86.

[226] *Moore v. City of E. Cleveland*, 431 U.S. 494, 495–96 (1977). Based on the ordinance, "family" did not include a mother living with her son and two grandsons. *Id.* In order to conform to the ordinance, the city directed Moore to expel one of her grandsons from her home. *Id.* She refused, was convicted of violating the ordinance, and appealed. *See id.* at 496.

[227] *Id.* at 499 (quoting *LaFleur*, 414 U.S. at 639–40).

[228] *Id.*

[229] *See id.* at 502; *see also* Shuler, 12 J.L. & Soc. Challenges at 273.

[230] *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977).

[231] *Id.* at 681, 684 (quoting *Whalen v. Roe*, 429 U.S. 589, 599–60 (1977)).

[232] *Id.* at 687.

and broadly characterized the protected right as "whether to bear or beget a child."[233]

4. *Bowers v. Hardwick (overruled by Lawrence v. Texas).* In a case running counter to the prevailing trend, a majority of the United States Supreme Court in *Bowers v. Hardwick* upheld a statute prohibiting "homosexual sodomy."[234] Justice White, writing for the majority, cited "tradition and history,"[235] and narrowly defined the protected right as the right to engage in homosexual sex,[236] and ultimately found no fundamental right to engage in homosexual sodomy.[237]

Justice Blackmun dissented and, among other things, cited Justice Holmes for the proposition

> that "[i]t is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."[238]

The traditional Judeo-Christian values, Justice Blackmun insisted, "cannot provide an adequate justification."[239]

---

[233]*Id.* at 686–87, 690–98 (quoting *Eisenstadt*, 405 U.S. at 453).

[234]*Bowers v. Hardwick*, 478 U.S. 186, 187–90 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003).

[235]*Id.* at 192–93.

[236]*Id.* at 190–91.

[237]*Id.* at 190–92, 196.

[238]*Id.* at 199 (Blackmun, J., dissenting) (second alteration in original) (quoting Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897)).

[239]*Id.* at 211.

129

Justice Stevens, joined by Justices Brennan and Marshall, also dissented. Justice Stevens emphasized the prior precedent and the importance of the right to make intimate personal decisions notwithstanding majority disapproval.[240]

But *Bowers* did not last. Seventeen years later, in *Lawrence v. Texas*, the United States Supreme Court reversed *Bowers*.[241] At the very beginning of the opinion, *Lawrence* declared, "Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."[242] The Court recognized that in substantive due process analysis, history and tradition are the starting point—not the ending point.[243] Additionally, the Court noted that the historical terrain was complicated and that many statutes prohibiting private homosexual conduct were not systematically enforced.[244] The Court concluded that *Bowers* was wrongly decided, approaching the issue from a broader perspective of the caselaw that emphasized autonomy and personal liberty— instead of being bound by historical practice.[245]

**C. *City of Akron*: The Rejection of a 24-Hour Waiting Period Under Strict Scrutiny of *Roe*.** Ten years after *Roe*, the United States Supreme Court in *City of Akron v. Akron Center for Reproductive Health, Inc.* considered the

---

[240]*Id.* at 216–18 (Stevens, J., dissenting).

[241]*Lawrence*, 539 U.S. at 564.

[242]*Id.* at 562.

[243]*Id.* at 567–68.

[244]*Id.* at 567–72.

[245]*Id.* at 578.

validity of an abortion statute that, among many things, required a 24-hour waiting period before obtaining an abortion.[246]

The Court held the mandatory 24-hour delay unconstitutional.[247] The Court affirmed the right of privacy "grounded in the concept of personal liberty guaranteed by the Constitution."[248] The Court acknowledged the many challenges the mandatory waiting period brought, including the increased costs for the two separate trips, prolonged delay due to scheduling conflicts, and increased risk associated with the unnecessary delay.[249] Ultimately, the Court ruled that the city failed to show any legitimate state interest was furthered by the waiting period, noting that whether to proceed with an abortion was an important decision best left to the physician to exercise discretion.[250]

**D. Summary.** *Roe* and its progeny built on the well-developed caselaw regarding the fundamental nature of personal autonomy and established that within the autonomy lies the decision to beget a child. Although *Roe* invoked many constitutional bases for its analysis, subsequent cases linked *Roe* to the long line of traditional substantive due process cases. While *Bowers* was in tension with this line of authority, it was soon overruled in *Lawrence*. Ten years

---

[246] *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 424 (1983), *overruled by Casey*, 505 U.S. 833 (majority opinion).

[247] *Id.* at 449–51.

[248] *Id.* at 419.

[249] *Id.* at 450.

[250] *Id.* (noting that under ethical standards of the profession, a physician will advise a woman to defer the abortion when the physician thinks this will be beneficial to her).

after *Roe*, the United States Supreme Court struck down a 24-hour mandatory delay rule in *Akron* as violating substantive due process.

**VI.** *Planned Parenthood of Southeast Pennsylvania v. Casey* **and Beyond.**

**A.** *Planned Parenthood of Southeast Pennsylvania v. Casey*: **Legitimacy Requires Upholding the "Essence" of** *Roe* **but Permits the Slippery Slope of the "Undue Burden" Test.** In *Casey*, the United States Supreme Court considered the constitutionality of a Pennsylvania statute that, among other things, required a woman give informed consent prior to an abortion procedure.[251]

In an unusual configuration, the main opinion was a joint effort by Justice O'Connor, Justice Kennedy, and Justice Souter.[252] The plurality opinion noted that nothing in *Roe* had been shown to be "unworkable."[253] The required determinations under *Roe* "fall within judicial competence."[254]

The plurality recognized the substantial reliance after two decades of following *Roe,* and that "people have organized intimate relationships and made choices that define their views of themselves and their places in society."[255]

---

[251]*Casey*, 505 U.S. at 844. The statute required patients to wait at least 24-hours before the abortion is performed, the consent of one parent for a minor seeking an abortion, subject to judicial bypass, and that a married woman sign a statement indicating that she had notified her husband of her intent to obtain an abortion. *Id.*

[252]*Id.* at 843–44.

[253]*Id.* at 855.

[254]*Id.*

[255]*Id.* at 856.

Women were able to "participate equally in the economic and social life" because *Roe* protected their "ability to control their reproductive lives."[256]

The plurality revisited *Roe* after twenty years of application and announced: "No evolution of legal principle has left *Roe*'s doctrinal footings weaker than they were in 1973. No development of constitutional law since the case was decided has implicitly or explicitly left *Roe* behind as a mere survivor of obsolete constitutional thinking."[257] *Roe*'s underpinning, its central holding recognizing the liberty interest on "whether to bear or beget a child" a fundamental right endured and proven workable.[258]

Further, the plurality cautioned that overruling *Roe* would risk causing both profound and unnecessary damage to the Court's legitimacy and commitment to the rule of law.[259] Therefore, while *Roe*'s trimester framework was replaced with the "undue burden" test,[260] its essence was nevertheless adhered to.[261]

---

[256] *Id.*

[257] *Id.* at 857; *see id.* at 861 ("*Roe* portends no developments at odds with other precedent for the analysis of personal liberty; and no changes of fact have rendered viability more or less appropriate as the point at which the balance of interests tips.").

[258] *Id.* at 851, 857–61 (quoting *Eisenstadt*, 405 U.S. at 453) (noting that subsequent constitutional development did not disturb or diminish the fundamental rights recognized in *Roe*, citing *Carey*, 431 U.S. 678, and *Moore*, 431 U.S. 494).

[259] *Id.* at 864–66.

[260] *Id.* at 873–74 (holding that the trimester framework for evaluation regulations was flawed because the "formulation it misconceives the nature of the pregnant woman's interest" and in practice "undervalues the State's interest in potential life, as recognized in *Roe*").

[261] *Id.* at 868–70.

The plurality rejected strict scrutiny review of abortion regulations in favor of an undue burden standard.[262] "[A]n undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[263]

Three Justices[264] considered a 24-hour waiting period valid under the undue burden standard.[265] They, however, expressed concern about the operation of the 24-hour delay regulation in practice.[266] Evidence showed that the regulation would result in delay in obtaining the procedure,[267] and that "for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24–hour waiting period will be 'particularly burdensome.' "[268]

There are several ways to interpret the amorphous undue burden test. Among the plurality, three Justices accepted the possibility that the waiting

---

[262]*Id.* at 871–74.

[263]*Id.* at 877.

[264]*Id.* at 843–44 (Justice O'Connor, Justice Kennedy, and Justice Souter).

[265]*Id.* at 885; *see id.* at 885–901. They concluded that *Akron* was wrongly decided and believed that requiring some period of reflection before a decision is made "does not strike us as unreasonable." *Id.* at 874–75, 885 (distinguishing law that has "incidental effect" of making abortion more difficult or more expensive from imposing an undue burden on a women's ability to procure abortion).

[266]*Id.* at 885–86 (admitting that it was "a closer question" whether the mandatory wait would be invalid in practice).

[267]*Id.*

[268]*Id.* at 886 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1352 (1990), *aff'd in part and rev'd in part,* 505 U.S. 833).

period could have the effect of "increasing the cost and risk of delay of abortions,"[269] and these effects did not on its face amount to "substantial obstacles."[270] In their mind, the state is permitted to enact persuasive measures which favor childbirth over abortion.[271] A burden would not be "undue" even if the government does not advance any health benefits.[272]

Justice Stevens, on the other hand, believed a state-imposed burden should be measured "both by its effects and by its character."[273] "A burden may be [considered] 'undue' either because the burden is too severe or because it lacks a legitimate, rational justification."[274] In his view, even applying the plurality opinion's undue burden test, the 24-hour waiting period was invalid.[275] Justice Stevens noted that the district court findings established the severity of the burdens that the 24-hour waiting period imposed on many women.[276] Even where the burden is "not especially onerous," the burden is undue because "there is no evidence that such a delay serves a useful and legitimate purpose."[277] Notably, Justice Stevens observed that there was no evidence mandatory delay

---

[269] *Id.* (quoting *Casey*, 744 F. Supp. at 1378).

[270] *Id.* at 887 ("A particular burden is not of necessity a substantial obstacle . . . in the context of this facial challenge . . . .").

[271] *Id.* at 886–87.

[272] *Id.* at 886.

[273] *Id.* at 920 (Stevens, J., concurring in part and dissenting in part).

[274] *Id.*

[275] *Id.* at 918, 922 (pointing out that the 24-hour waiting period arguably furthered the state's interests in two ways, "neither of which is constitutionally permissible").

[276] *Id.* at 920–21.

[277] *Id.* at 921.

benefited women or was necessary to allow physicians to properly inform the patients.[278] "The mandatory delay thus appears to rest on outmoded and unacceptable assumptions about the decisionmaking capacity of women."[279]

As part of the plurality, Justice Blackmun[280] feared that all that remained between upholding *Roe* and "the darkness" of reversal was a single vote.[281] The undue burden test, he noted, was far more manipulable than the trimester framework.[282] According to Justice Blackmun, "Strict scrutiny of state limitations on reproductive choice still offers the most secure protection of the woman's right to make her own reproductive decisions, free from state coercion."[283]

Applying strict scrutiny to the 24-hour waiting period, Justice Blackmun found the law invalid.[284] He noted that the "especially significant burdens [fell] on women living in rural areas and those women that have difficulty explaining their whereabouts [to, for instance, abusers]."[285] Justice Blackmun spoke strongly against exclusively relying on tradition and ignoring the effects of

---

[278]*Id.* at 918.

[279]*Id.*

[280]*Id.* at 922 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part).

[281]*Id.* at 922–23 (foretelling "the darkness as four Justices anxiously await the single vote necessary to extinguish the light [of the liberty interest protected by *Roe*]").

[282]*Id.* at 930.

[283]*Id.*

[284]*Id.* at 934.

[285]*Id.* at 937.

compelled childbirth and motherhood on the lives of women.[286] "[T]he State's compelling interest in maternal health has less to do with health than it does with compelling women to be maternal."[287] Finally, Justice Blackmun attacked the rational basis test as "arbitrary and capricious."[288] He also noted that the only example of a regulation that might fail the rational basis test would be to criminalize abortion when it is actually necessary to protect the life of the mother.[289]

On the newly minted undue burden test, the Chief Justice criticized it as made "out of whole cloth" instead of a product of stare decisis.[290] Moreover, the standard was "not built to last."[291] He predicted that what amounted to a "substantial obstacle" under the new test would be decided based upon subjective determinations of the judge.[292] Justice Scalia shared Chief Justice's sentiment. [293] He observed that "the standard is inherently manipulable and will prove hopelessly unworkable in practice."[294] Justice Scalia ridiculed the undue

---

[286]*Id.* at 941.

[287]*Id.*

[288]*Id.* at 941–42.

[289]*Id.* at 942.

[290]*Id.* at 944, 964 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). On that point, Justice Blackmun noted that if "the undue burden test is made out of whole cloth," as the Chief Justice contended, the "arbitrary and capricious" standard of the Chief Justice amounted to "new clothes." *Id.* at 942 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part).

[291]*Id.* at 964–65 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part).

[292]*Id.* at 965.

[293]*Id.* at 987–92 (Scalia, J., concurring in the judgment in part and dissenting in part).

[294]*Id.* at 986.

burden test as permitting the state to pursue its interest in promoting fetal life as long as those efforts are not "too successful."[295]

**B. Justice Scalia Was Right: *Carhart*, a Court Severed, Fractured, and Splintered.**

1. *Introduction.* In *Stenberg v.* Carhart, the United States Supreme Court considered the validity of a Nebraska statute criminalizing what it called "partial birth abortions."[296] The majority in *Stenberg* held that the statute failed to pass constitutional muster,[297] but the Court produced eight separate opinions on the issue. But then, somewhat signaling the difficulty of applying the undue burden test, only seven years later in *Gonzales v. Carhart*, a majority upheld a federal statute that similarly regulated "partial birth" abortions.[298]

2. *The eight opinions of* Stenberg v. Carhart. In *Stenberg*, the Court was divided over the right to abortion, differed on whether to apply an undue burden test, and differed on the application of that test.[299] Even among the *Stenberg* majority, Justices had different views on what would make certain burdens "due."[300] Justice O'Connor, for one, focused on the point that the statute was not narrowly tailored, but signaled that one that had an exception for the health of the mother might well survive constitutional muster.[301] Justice Ginsberg

---

[295] *Id.* at 992.

[296] *Stenberg v. Carhart*, 530 U.S. 914, 920–22 (2000).

[297] *Id.* at 918–19, 922.

[298] *Gonzales*, 550 U.S. at 132, 140, 167–68.

[299] *Stenberg*, 530 U.S. 914.

[300] *Id.*

[301] *Id.* at 947–51 (O'Connor, J., concurring).

focused on the character of the Nebraska statute, stressing that its "purpose or effect" failed the undue burden test.[302] The struggle could be summarized by what Justice Scalia had confessed, "[W]hat I consider to be an 'undue burden' is different from what the majority considers to be an 'undue burden'—a conclusion that cannot be demonstrated true or false by factual inquiry or legal reasoning."[303] And Justice Scalia was right.

3. Gonzales v. Carhart *reversal.* Following the United States Supreme Court's *Stenberg* holding, Congress responded by passing the Partial-Birth Abortion Ban Act of 2003.[304] Justice Kennedy, sitting in the majority, determined that unlike the Nebraska statute in *Stenberg*, the federal statute did not impose "undue burden" under *Casey*.[305]

Justice Ginsberg in dissent argued that the *Stenberg* majority held a statute was unconstitutional in part because it lacked a health exception.[306] Justice Ginsberg also canvassed the record regarding the health benefits of the abortion procedure in question and concluded that there was ample evidence that it had health benefits for some women.[307] Relevant to our discussion,

---

[302]*Id.* at 951–52 (Ginsburg, J., concurring).

[303]*Id.* at 954 (Scalia, J., dissenting).

[304]*Gonzales*, 550 U.S. at 132–33 (citing 18 U.S.C. § 1531).

[305]*Id.* at 156–67. Readers of the *Stenberg* opinion might be surprised that on the same issue of the lack of exception of the statute, Justice Kennedy noted that "medical uncertainty over whether the Act's prohibition creates significant health risks provides a sufficient basis to conclude in this facial attack that the Act does not impose an undue burden." *Id.* at 161–64.

[306]*Id.* at 173–74 (Ginsburg J., dissenting).

[307]*Id.* at 174–76.

Justice Ginsberg attacked the majority for use of the "antiabortion shibboleth" unsupported by reliable evidence that women come to regret their choices.[308]

**C. *Whole Woman's Health* and *June Medical Services*: Impact of Abortion Restrictions on Rural Women.** The United State Supreme Court continued to grapple with the burden of the undue burden test in *Whole Woman's Health v. Hellerstedt*[309] and *June Medical Services L.L.C. v. Russo*.[310] In these cases, the states of Louisiana and Texas imposed a requirement that (1) every doctor performing an abortion have admitting privileges at a hospital within thirty miles of where the abortions were performed, and (2) that an abortion facility must meet the minimum standards adopted for ambulatory surgical centers under state law.[311]

The *Whole Woman's Health* Court credited the district court's finding that abortion was an extremely safe procedure and that, as a result, no health problem could be "cured" by the statute.[312] Further, the Court noted that the requirement caused about half the abortion clinics to close.[313] The extra driving distance, "when viewed in light of the virtual absence of any health benefit[s]," amounted to a "substantial obstacle to a woman's choice."[314] "More fundamentally," the Court found the Texas law sought to force women "to travel

---

[308]*Id.* at 183–84.

[309]*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

[310]*June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020).

[311]*Id.* at 2112; *Whole Woman's Health*, 136 S. Ct. 2292, 2300.

[312]*Whole Woman's Health*, 136 S. Ct. at 2311–12.

[313]*Id.* at 2312.

[314]*Id.* at 2313 (quoting *Casey*, 505 U.S. at 895 (majority opinion)).

long distances to get abortions in crammed-to-capacity superfacilities" despite there being no threat to women's health to begin with.[315]

In *June Medical Services*, the Court, as in *Whole Women's Health*, noticed that the new requirement would make it hard for abortion providers to keep their practice,[316] which in turn would negatively impact on the abortion access.[317] Similar to our concern noted in *Planned Parenthood II*,[318] the *June Medical Services* Court was also concerned about the burden resulting from the closure of facilities would fall on "poor women, who are least able to absorb them."[319] The Court also rejected the state's argument that the act would not burden "*every* woman."[320] "As we stated in *Casey*, a State's abortion-related law is unconstitutional on its face if 'it will operate as a substantial obstacle to a woman's choice to undergo an abortion' in 'a large fraction of the cases in which [it] is relevant.' "[321]

There were bitter dissents in both *Whole Women's Health* and *June Medical Services* with members of the Court plainly differing on the application of the

---

[315]*Id.* at 2318.

[316]*June Med. Servs.*, 140 S. Ct. at 2123–24.

[317]*Id.* at 2128–29.

[318]*Planned Parenthood II*, 915 N.W.2d 206. See the discussion on Iowa women's limited access to OB/GYN services and impacts of two trips on lower income or battered women at part I.B.2.

[319]*June Med. Servs.*, 140 S. Ct. at 2130.

[320]*Id.* at 2132–33.

[321]*Id.* (alteration in original) (quoting *Casey*, 505 U.S. at 895).

*Casey* test. [322] A majority in *June Medical Services* was obtained only when Chief Justice Roberts voted with the majority, who did so based on stare decisis.[323]

**D. Summary.** The above caselaw demonstrates several things. First, it is clear that *Roe* has a sound doctrinal footing under the "liberty" clause of the Fourteenth Amendment and, by implication, under the "liberty" clause of the Iowa Constitution. To unravel *Roe* on the ground that there is no explicit reference to abortion in the Constitution is to threaten to unravel the extensive precedential network upon which *Roe* was based, certainly including *Griswald* and *Eisenstadt.* Second, the effort to lessen the reach of *Roe* as the authors of the joint opinion in *Casey* had hoped without eviscerating the right as Justice Blackmun had feared has proved very difficult. The *Casey* undue burden test has been subject to persistent attack by those opposed to reproductive autonomy pretty much from day one. If the undue burden test is to have any significant meaning, there must be some kind of spine built into it.

**VII. Overview of Development of the Right to Reproductive Autonomy Under State Constitutions.**

**A. Introduction.** Of the states that have considered the matter, eleven[324] have found a right to abortion that requires application of strict scrutiny in

---

[322]*See Whole Woman's Health*, 195 S. Ct. at 2321 (Thomas, J., dissenting), 2330 (Alito, J., dissenting); *June Med. Servs.*, 140 S. Ct. at 2142 (Thomas, J., dissenting), 2153 (Alito, J., dissenting), at 2171 (Gorsuch, J., dissenting), 2182 (Kavanaugh, J., dissenting).

[323]*June Med. Servs.*, 140 S. Ct. at 2133. Like Chief Justice Christensen in this case, Chief Justice Roberts believed that the legitimacy of the Court required him to follow recent precedent. *Id.* at 2134–35 (Roberts, C.J., concurring in judgment).

[324]*State v. Planned Parenthood of Alaska*, 171 P.3d 577, 582 (Alaska 2007); *People v. Belous*, 458 P.2d 194, 199–200 (Cal. 1969); *Gainsville Woman Care, LLC v. State*, 210 So. 3d 1243, 1246 (Fla. 2017); *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 765–66 (Ill. 2013);

reviewing state regulation of abortion (Alaska, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Minnesota, Montana, Tennessee,[325] Washington), while three states have found a right to abortion that subjects state regulation to some kind of undue burden test.[326] Only a few have declined to find a right to abortion.[327]

**B. California: Unenumerated Rights, History, and Recognizing the Right to Reproductive Autonomy Before *Roe v. Wade*.** Many people think the United States Supreme Court was the first to recognize a constitutional right to reproductive autonomy. Such an impression, however, would be incorrect. As is often the case, a state court decision plowed the ground first. Prior to *Roe*, the California Supreme Court held that a woman had a liberty interest in her right to abortion in *People v. Belous*.[328]

In *Belous*, the California Supreme Court noted that the right to an abortion followed from the caselaw of the United States Supreme Court as well as its own

---

*Planned Parenthood II*, 915 N.W.2d at 232; *Hodes & Nauser v. Schmidt*, 440 P.3d 461, 496 (Kan. 2019) (per curiam); *Planned Parenthood League of Mass. v. Att'y Gen.*, 677 N.E.2d 101, 103–04 (Mass. 1997); *Women of the State of Minn. v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995) (en banc); *Armstrong v. State*, 989 P.2d 364, 375 (Mont. 1999); *Sundquist*, 38 S.W.3d at 17; *State v. Koome*, 530 P.2d 260, 265–66 (Wash. 1975) (en banc).

[325]Tennessee later passed a constitutional amendment that superseded the *Sundquist* holding. *See* Tenn. Const. art. 1 § 36.

[326]*Pro-Choice Miss. v. Fordice*, 716 So. 2d 645, 655 (Miss. 1988) (en banc); *Right to Choose v. Bryne*, 450 A.2d 925, 934–35 (N.J. 1982); *Preterm Cleveland v. Voinovich*, 627 N.E.2d 570, 577 (Ohio Ct. App. 1993).

[327]*See, e.g., Mahaffey v. Att'y Gen.*, 564 N.W.2d 104, 111 (Mich. Ct. App. 1997) (per curiam).

[328]*Belous*, 458 P.2d at 199–200, 206.

cases related to marriage, family, and sex.[329] Further, it emphasized that while the right to an abortion is not specifically enumerated in either the United States Constitution or the California Constitution, it was no impediment to the existence of the right.[330] In support of unenumerated rights, the California Supreme Court cited cases related to the right to vote,[331] the right to travel,[332] and the right to unsegregated schools.[333]

Notably, the *Belous* court addressed the role of historical practice reflected in an 1850 anti-abortion statute.[334] The *Belous* court noted that at the time, "[s]urgeons did not know how to control infection[s]" and mortality rates from abortion were high.[335] But in modern times, the risk arose not from therapeutic abortions performed by physicians but by abortions performed by untrained persons.[336] Thus, a statute originally designed to protect women became, in the words of the California Supreme Court, "a scourge."[337] The *Belous* court noted that perhaps the law was valid when first enacted, but changed circumstances

---

[329]*Id.* at 199–200 (citing *Perez v. Lippold*, 198 P.2d 17, 19 (Cal. 1948) (en banc); *Custodio v. Bauer*, 59 Cal. Rptr. 463, 472–73 (Ct. App. 1967)) (noting *Griswold*, *Loving*, *Skinner*, *Pierce*, *Meyer* as relevant Supreme Court cases).

[330]*Id.* at 200. Interestingly, the *Belous* court did not clearly establish the constitutional basis of reproductive autonomy in California. *See also Comm. to Def. Reprod. Rts. v. Myers*, 625 P.2d 779, 784–89 (Cal. 1981) (reaffirming *Belous* protections under the California Constitution).

[331]*Belous*, 458 P.2d at 200 (citing *Carrington v. Rash*, 380 U.S. 89, 96 (1965)).

[332]*Id.* (citing *Kent v. Dulles*, 357 U.S. 116, 125 (1958)).

[333]*Id.* (citing *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954)).

[334]*Id.* at 200.

[335]*Id.*

[336]*Id.* at 200–01.

[337]*Id.* at 201.

raised questions today about the law's validity.[338] The *Belous* court observed, "Constitutional concepts are not static. . . . Our United States Supreme Court said, regarding the equal protection clause of the Fourteenth Amendment . . . . Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era."[339]

**C. Tennessee: Right to Procreational Autonomy.** The Tennessee Supreme Court considered the validity of a statute requiring a 48-hour waiting period and imposing criminal sanctions on physicians who fail to comply in *Planned Parenthood of Middle Tennessee v. Sundquist*.[340] The *Sundquist* court determined that the right to an abortion was protected by a larger privacy interest in "procreational autonomy."[341] It concluded that although abortion was not specifically mentioned in the Tennessee Constitution, reproductive autonomy was "inherent in our most basic concepts of liberty."[342] It also found the procreational autonomy to be included in the various liberties protected by the Tennessee Constitution's Declaration of Rights, which was intended to "reserve to the people various liberties and to protect the free exercise of those liberties from governmental intrusion."[343]

---

[338] *Id.* at 202.

[339] *Id.* (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 669 (1966)).

[340] *Sundquist*, 38 S.W.3d at 3.

[341] *Id.* at 12–15.

[342] *Id.* at 12 (quoting *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992)).

[343] *Id.*

Declining to follow the federal undue burden test, the *Sundquist* court adopted a more demanding strict scrutiny test as the proper standard of review.[344] According to the *Sundquist* court:

> [T]he Casey test offers our judges no real guidance and engenders no expectation among the citizenry that governmental regulation of abortion will be objective, evenhanded, or well-reasoned. This Court finds no justification for exchanging the long established constitutional doctrine of strict scrutiny for a test, not yet ten years old and applicable to a single, narrow area of the law, that would relegate a fundamental right of the citizens of Tennessee to the personal caprice of an individual judge.[345]

The *Sundquist* court proceeded to consider the validity of a 24-hour waiting period under Tennessee law.[346] It recognized that while the United States Supreme Court struck down a similar waiting period in *Akron*, it changed course in *Casey* where, applying the undue burden test, the 24-hour waiting period survived constitutional challenge.[347] And yet, the *Sundquist* court found *Akron* the more persuasive precedent.[348] It cited with approval the trial court findings that most women had seriously contemplated their decision before making their appointment and that "[t]o *mandate* that she wait even longer insults the intelligence and decision-making capabilities of a woman."[349] The *Sundquist* court observed that "the waiting period increases a woman's financial and psychological burdens, since many women must travel long distances and be

---

[344]*Id.* at 17.

[345]*Id.*

[346]*Id.* at 18–25.

[347]*Id.* at 23.

[348]*Id.* at 23–24.

[349]*Id.* at 23.

absent from work to obtain an abortion."[350] It further found the two-trip requirement "especially problematic for women who suffer from poverty or abusive relationships."[351]

The *Sundquist* court concluded that the waiting period failed strict scrutiny.[352] In the alternative, the *Sundquist* court found that even when applying the undue burden test of *Casey,* the waiting period was unconstitutional as it was not intended as a period of reflection but instead as an obstacle to abortion.[353]

**D. Kansas: Embracing Natural Rights in the Modern Context Requires Rejection of the Undue Burden Test.** The Kansas Supreme Court recently considered whether there was a right to reproductive autonomy in *Hodes & Nauser v. Schmidt.*[354] Relying upon the declaration of rights provision of the Kansas Constitution, it answered in the affirmative.[355]

The *Hodes* court forcefully emphasized the strength of the right to personal autonomy: "[N]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person."[356] The *Hodes* court cited the famous dissent of Justice

---

[350]*Id.* at 24.

[351]*Id.*

[352]*Id.*

[353]*Id.*

[354]*Hodes & Nauser*, 440 P.3d at 466.

[355]*Id.* at 483–91.

[356]*Id.* at 481 (quoting *Botsford*, 141 U.S. at 251).

Brandeis: "The makers of our Constitution . . . conferred, as against the Government, *the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.*"[357] Another case cited was *Pratt v. Davis*, where an Illinois appellate court declared "under a free government at least, the free citizen's first and greatest right, which underlies all others—the right to the inviolability of his person, in other words, his right to himself—is the subject of universal acquiescence."[358] In short, the *Hodes* court found the right to personal autonomy a right of the highest order.

The *Hodes* court also recognized that historically women were treated with "paternalistic attitude" and a belief that women did not have the same rights as men.[359] It pointed out that historically, women did not have the right to vote, could not serve on juries, and could not be admitted to the practice of law.[360] But, the Kansas Supreme Court declared, "We no longer live in a world of separate spheres for men and women. True equality of opportunity in the full range of human endeavor is a Kansas constitutional value . . . ."[361] As a result, "rather than rely on historical prejudices in our analysis, we look to natural

---

[357]*Id.* at 481–82 (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347 (1967)).

[358]*Id.* at 482 (quoting *Pratt v. Davis*, 118 Ill. App. 161, 166 (1905), *aff'd* 79 N.E.2d 562 (Ill. 1906)).

[359]*Id.* at 491.

[360]*Id.* at 490–91.

[361]*Id.* at 491.

rights and apply them equally to protect all individuals. Territorial and early state statutes do not compel another result or rationale."[362]

In considering individual liberties, the *Hodes* court noted that, as in Iowa, the Kansas Bill of Rights begins with a declaration of rights, not an enumeration of government power.[363] "By this ordering, demonstrating the supremacy placed on the rights of individuals, preservation of these natural rights is given precedence over the establishment of government."[364]

Having found a right to reproductive autonomy under the Kansas Constitution, the *Hodes* court rejected the undue burden test of *Casey* because "the undue burden standard has proven difficult to understand and apply."[365] Further, the *Hodes* court observed that the caselaw applying the *Casey* undue burden test contained "shifting and conflicting pronouncements" that "leave the exact contours of the undue burden test murky."[366] It agreed with our critique that the undue burden test left judges to subjectively gauge the strength of the interests involved.[367] Noting that a majority of state courts applied strict scrutiny in protection of the abortion right, the court believed strict scrutiny would best protect its constitutional obligation and "the inalienable natural rights of all Kansans today."[368]

---

[362] *Id.*

[363] *Id.* at 491–92; *see also* Iowa Const. art. I, § 1.

[364] *Hodes & Nauser*, 440 P.3d at 492.

[365] *Id.* at 494.

[366] *Id.* at 495.

[367] *Id.* (citing *Planned Parenthood II*, 915 N.W.2d at 239).

[368] *Id.* at 496.

**E. Minnesota: Fundamental Privacy Right Requires Strict Scrutiny.**

The Minnesota Supreme Court reviewed the right to abortion in *Women of the State of Minnesota v. Gomez.*[369] The *Gomez* court noted that the right to privacy was implicated in the rights and privileges clause, the due process clause, and the search and seizure clause of the Minnesota Constitution.[370] It found that the "right [of privacy] begins with protecting the integrity of one's own body and includes the right not to have it altered or invaded without consent."[371] In language very similar to what Chief Justice Cady said in *Planned Parenthood II*, the *Gomez* court declared:

> We can think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion. Indeed, this decision is of such great import that it governs whether the woman will undergo extreme physical and psychological changes and whether she will create lifelong attachments and responsibilities.[372]

The Minnesota court emphasized that because the challenged provisions in the case constituted an infringement on the fundamental right to privacy, the statutes were subject to strict scrutiny.[373]

**F. Alaska: "[F]ew Things are More Personal than a Woman's Control of Her Body."**[374] The Alaska Supreme Court found a "fundamental right to

---

[369] *Gomez*, 542 N.W.2d 17.

[370] *Id.* at 26–27 (citing Minn. Const. art. I, §§ 2, 7, 10).

[371] *Id.* at 27 (alteration in original) (quoting *Jarvis v. Levine*, 418 N.W.2d 139, 148 (Minn. 1988) (en banc)).

[372] *Id.*

[373] *Id.* at 31.

[374] *Planned Parenthood of Alaska*, 171 P.3d at 581 (quoting *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968 (Alaska 1997)).

reproductive choice" in the privacy provision of the Alaska Constitution.[375] The court stated that the right to privacy is broader under the Alaska Constitution because privacy is explicitly mentioned.[376] On the question of strict scrutiny, the Alaska Supreme Court emphasized, "[F]ew things are more personal than a woman's control of her body, including the choice of whether and when to have children . . . ."[377]

**G. Summary.** The state supreme courts have approached the question of reproductive autonomy in a number of ways. However, it is clear that, by one approach or another, a majority of states that have considered the matter have affirmatively found a right to reproductive autonomy sufficiently broad to support a right to an abortion. Further, the right to reproductive autonomy is often found to be fundamental, and therefore government regulations impacting the fundamental interests are subject to strict scrutiny. It is beyond dispute that the approach of this court in *Planned Parenthood II* was not an outlier in the developing state constitutional jurisprudence on reproductive autonomy.

**VIII. The Right to Liberty Under the Due Process Clause of the Iowa Constitution Includes a Right to Reproductive Autonomy.**

**A. The Primacy of Rights Under the Iowa Constitution.** At the threshold of the Iowa Constitution is the Iowa Bill of Rights, signaling in no uncertain terms that the protection of individual liberties is a primary purpose of the Iowa

---

[375]*Id.* at 582.

[376]*Id.* at 581 (citing Alaska Const. art. I, § 22).

[377]*Id.* at 581 (quoting *Valley Hosp. Ass'n,* 948 P.2d at 968).

Constitution.[378] Although not addressed by the majority, the placement of the Iowa Bill of Rights in the Iowa Constitution as the very first substantive article is not happenstance.[379] The very first topic addressed in our state constitution is not to empower legislatures to compel the majority's view of public policy; instead, the very first article of the Iowa Constitution erects a fence against legislative intrusion into the private sphere of the individual.

There is ample constitutional history to support the primacy of the Iowa Bill of Rights in the Iowa Constitution. As noted by George W. Ells, the chair of the committee drafting Iowa's Bill of Rights:

> [The Bill of Rights] will probably be read more by the people than any other clause in the Constitution, and therefore it should receive the consideration of this Convention to a greater degree than any other subject which may be discussed here. . . . I hold that the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights.[380]

Members of the committee were unanimous in their desire to have the Iowa Bill of Rights "enlarge, and not curtail the rights of the people," to ensure that Iowans have "all the rights which freeman may enjoy under any charter of liberty," and "to put upon record every guarantee that could be legitimately

---

[378] *See* Donald P. Racheter, *The Iowa Constitution: Rights over Mechanics*, *in* The *Constitutionalism of American States* 479 (George E. Connor & Christopher W. Hammons eds., 2008).

[379] The Committee on the Bill of Rights at the Iowa Constitutional Convention of 1857 desired to have "the best and most clearly defined Bill of Rights." 1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857) [hereinafter *The Debates*].

[380] *Id.* at 102–03.

placed there in order that Iowa . . . might . . . have the best and most clearly defined Bill of Rights."[381]

Unequivocally, Ells insisted that the safeguard of the Iowa Bill of Rights was fundamental and the discussion of the rights of the people shall enjoy "the utmost latitude."[382] This is so because "the history of the world teaches us the absolute necessity of guarding well the rights of the people; for power is always receding from the many to the few."[383] The Iowa Bill of Rights, Ells proclaimed, "ought to . . . place the proper restrictions upon the powers of the Legislature."[384]

According to Ells, "[The Iowa Bill of Rights] stands there in the beginning like a sentinel guarding the gates of a city; and it is a warning to all who come there that unless they give the sign-manuel, they cannot enter."[385] The very first sentinel guarding against intrusive legislative actions is the inalienable rights clause of the Iowa Constitution.[386] Within the very first article of the Iowa Constitution, the very first section emphasizes the inalienable rights of citizens that simply cannot be trampled upon by majority action.[387] It reads: "All men and women are, by nature, free and equal, and have certain inalienable rights— among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and

---

[381]*Id.* at 100.

[382]*See id.*

[383]*Id.*

[384]*Id.* at 168.

[385]*Id.* at 168–69.

[386]Iowa Const. art. I, § 1.

[387]*Id.*

happiness."[388] According to one speaker at the constitutional convention, even before an expansive amendment changing the word "independent" to "equal" in article I, section 1,[389] the provision "comprehends every thing that we can claim by the laws of nature and Nature's God."[390]

The history and language ultimately adopted makes it crystal clear that preserving for individuals the widest range of permissible individual choice is at the heart of our constitutional scheme.[391] The core rights of individuals are "inalienable"—rights that are not subject to a trump played by a transient legislative majority. And it is the courts that must enforce those rights, just as they were designed to do. As one Iowa case declared, in a mild understatement, "[T]he constitutional right to life and liberty and to acquire, possess, and enjoy property is not a mere glittering generality without substance or meaning."[392]

It has become fashionable, however, in some legal circles, to emphasize deference to legislative action in all contexts. That, of course, is what the parliamentary system is all about. And yet we do not have a parliamentary system.[393] While a polite curtsy may be made to article I of the Iowa Constitution, individual liberties are rendered unenforceable by meaningless rational basis

---

[388]*Id.*

[389]*The Debates*, at 103.

[390]*Id.* at 104.

[391]*See Hoover v. Iowa State Highway Comm'n*, 222 N.W. 438, 439 (Iowa 1928) ("Appearing . . . at the very threshold of the Iowa Bill of Rights, [article I, section 1's] constitutional safeguard is thereby emphasized and shown to be paramount.").

[392]*State v. Osborne*, 154 N.W. 294, 300 (Iowa 1915).

[393]*United States v. Gillock*, 445 U.S. 360, 369 (1980) (distinguishing American federalism from the English parliamentary system).

tests. The practical impact is an ever-increasing, steady march of increased government power into the private lives of individuals. And this is precisely what is at stake in this case.

While Planned Parenthood brought a claim in this litigation under article I, section 1, it did not rely on this clause in its motion for summary judgment or on appeal.[394] Nonetheless, article I, section 1 provides the overarching architecture for how liberty interests are to be handled by the courts. Specifically, article I, section 1 embraces a Lockean theory of liberty which assigns a fundamental role to individual decision-making and autonomy.[395] The liberty interest in reproductive autonomy established by article I, section 9 of the Iowa Constitution must be interpreted in light of the general provisions of article I, section 1.

**B. Early Iowa Cases and Unenumerated Rights.** The Iowa Supreme Court historically has recognized that under the Iowa Constitution, there are unenumerated rights. Indeed, article I, section 25 of the Iowa Constitution provides, "This enumeration of rights shall not be construed to impair or deny others, retained by the people."[396] More than a century ago in *State ex rel. Burlington & Missouri River Railroad Co. v. County of Wapello*, we noted that the object of article I, section 25 was "to bring these unenumerated rights retained

---

[394]Planned Parenthood did raise the issue in its motion for declaratory judgment and injunctive relief.

[395]*See generally* Jeffrey S. Koehlinger, Note, *Substantive Due Process Analysis and the Lockean Liberal Tradition: Rethinking the Modern Privacy Cases*, 65 Ind. L.J. Rev. 723 (1990).

[396]Iowa Const. art. I, § 25.

by the people, founded equally, it may be, upon natural justice and common reason, as those that are specified within the censorship of courts of justice."[397] More recently, in *May's Drug Stores, Inc. v. State Tax Commission*, we once again recognized that article I, section 1 was designed to secure citizens' preexisting common law rights—sometimes known as natural rights—from unwarranted government restrictions.[398] These cases also drive any interpretation of substantive due process under article I, section 9 of the Iowa Constitution.

**C. A Woman's Liberty Interest in Controlling Her Own Body and Destiny is Protected by the Due Process Clause of the Iowa Constitution.**

1. *A woman has a liberty interest in reproductive autonomy.* In *Planned Parenthood II*, a 5–2 majority of this court determined that a woman has a fundamental constitutional right to reproductive autonomy under the Iowa Constitution.[399] In my view, the conclusion that a woman has a fundamental interest in reproductive autonomy is well-founded.

Our exploration of the issue in *Planned Parenthood II* was thorough and persuasive. Citing *Casey*, we noted the decision to continue or end a pregnancy is among "the most intimate and personal choices a person may make in a lifetime" and is "central to personal dignity and autonomy."[400] We echoed the observations of *Casey*, "The mother who carries a child to full term is subject to

---

[397] *State ex rel. Burlington & Mo. River R.R. v. County of Wapello*, 13 Iowa 388, 413 (1862). *See generally* Louis Karl Bonham, Note, *Unenumerated Rights Clauses in State Constitutions*, 63 Tex, L. Rev. 1321 (1985).

[398] *May's Drug Stores, Inc. v. State Tax Comm'n*, 45 N.W.2d 245, 250 (Iowa 1950).

[399] *Planned Parenthood II*, 915 N.W.2d at 234, 246.

[400] *Id.* at 236 (quoting *Casey*, 505 U.S. at 851).

anxieties, to physical constraints, to pain that only she must bear,"[401] and, "[t]he destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society."[402]

In light of the above, we solemnly stated:

> Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world. Nothing could be more fundamental to the notion of liberty. We therefore hold, under the Iowa Constitution, that implicit in the concept of ordered liberty is the ability to decide whether to continue or terminate a pregnancy.[403]

Even the dissent in *Planned Parenthood II* agreed. According to the dissent, no one can doubt that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free."[404] But as pointed out by Planned Parenthood, such autonomy and dominion would be invaded if the state were permitted to compel a woman to continue a pregnancy and incur medical risk, emotional harm, and life-changing alteration in her economic and domestic situation that arises from an unwanted pregnancy.

2. *Prior Iowa precedent provides a foundation.* Our decision in *Planned Parenthood II* was well-founded in decades of Iowa precedent. In *State v. Pilcher*, we recognized that before the state could invade fundamental rights such as

---

[401]*Id.* at 236–37 (quoting *Casey*, 505 U.S. at 852).

[402]*Id.* at 237 (quoting *Casey*, 505 U.S. at 852).

[403]*Id.* at 237.

[404]*Id.* at 249 (Mansfield, J., dissenting) (alteration in original).

privacy, there must be a compelling necessity.[405] In *Sanchez v. State*, we canvassed federal caselaw and stated with approval that fundamental liberty interests include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion."[406] In *State v. Heemstra*, we again approved the proposition that an individual's right of privacy is "a fundamental tenet of the American legal tradition."[407] The same is true in *State v. Seering*, where we held that if a fundamental right is implicated, the court applies strict scrutiny.[408]

3. *The right to reproductive autonomy is rooted in substantive due process.* As the lengthy discussion of federal and state caselaw in parts V, VI, and VII of this opinion demonstrates, the right to reproductive autonomy falls comfortably within the "liberty" interests that over time have come to be protected under Federal and State Constitutions. Recently, in *McQuistion v. City of Clinton*, we noted that "the due process clause of our constitution exists to prevent unwarranted governmental interferences with personal decisions in life."[409] Certainly, the ability of women to participate freely in society is dramatically

---

[405]*State v. Pilcher*, 242 N.W.2d 348, 359 (Iowa 1976) (en banc).

[406]*Sanchez v. State*, 692 N.W.2d 812, 820 (Iowa 2005) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted)).

[407]*State v. Heemstra*, 721 N.W.2d 549, 561 (Iowa 2006) (quoting *Jaffee v. Redmond*, 51 F.3d 1346, 1355–56 (7th Cir. 1995)), *superseded in part by statute*, 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code section 622.10(4)(*a*)(2) (2013)), *as recognized in State v. Leedom*, 938 N.W.2d 177, 190 (Iowa 2020).

[408]*Seering*, 701 N.W.2d at 662.

[409]*McQuistion*, 872 N.W.2d at 832 (citing *Hensler v. City of Davenport*, 790 N.W.2d 569, 583 (Iowa 2010)).

affected by limitations on their reproductive choices.[410] The notion that the Iowa Constitution creates a zone of autonomy for women to make intensely personal choices is not some radical theory but is well-established in state and federal law.

**IX. The Scope of Liberty Interests is Not Frozen by Historical Practice.**

**A. A Constitution Is Interpreted in the Present for the Present.** Anti-reproductive autonomy proponents often argue that fundamental rights are limited to those that are deeply rooted in our nation's "history and tradition."[411] Efforts to trace the scope of reproductive autonomy centuries ago could be interesting, and yet, discovery of historical practice did not compel a result in *Planned Parenthood II* and should not compel such a result today.

We have repeatedly affirmed that the Iowa Constitution is a "living and vital instrument."[412] While we take historical matters into consideration, we bear in mind "the evils sought to be avoided by the Constitution"[413] and the intention that our constitution should "endure for an extended future period."[414] Forty

---

[410]*Casey*, 505 U.S. at 856; *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 557 (1989) (Blackmun, J., concurring in part and dissenting in part).

[411]*Hensler*, 790 N.W.2d at 581 (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (plurality opinion)).

[412]*Redmond v. Carter*, 247 N.W.2d 268, 275 (Iowa 1976) (en banc) (LeGrand, J., concurring specially); *In re Johnson*, 257 N.W.2d at 50; *see Skiles*, 591 N.W.2d at 190 (citing *Carter*, 247 N.W.2d at 273 (majority opinion)); *see also United States v. Classic*, 313 U.S. 299, 316 (1941) ("For in setting up an enduring framework of government [the framers] undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words . . . as the revelation of the great purposes which were intended to be achieved by the [Federal] Constitution as a continuing instrument of government.").

[413]*Gallarno v. Long*, 243 N.W. 719, 723 (Iowa 1932).

[414]*Edge v. Brice*, 113 N.W.2d 755, 759 (Iowa 1962).

years ago, we overruled precedent and found a statute violated equal protection of the law because the justification was "totally lacking in substance in today's circumstances" and declared that "the present has a right to govern itself."[415] We recognized that this flexibility "is a source of [the constitution's] strength, longevity and vitality."[416] Again, twenty years ago in *Callender v. Skiles*, we declared that substantive due process rights "should not ultimately hinge upon whether the right sought to be recognized has been historically afforded. Our constitution is not merely tied to tradition, but recognizes the changing nature of society."[417] Further, we have declared that the purpose of the constitution "is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption."[418] We have emphatically rejected the attempt to restrict our inquiry of liberty interest to what happened in the distant past; instead, we have decided "[i]n evaluating what process is due, we look to the nature of the liberty interest involved."[419] For those who seek to impose historical shackles on our constitutional interpretation, there is a lot of inconsistent Iowa caselaw to confront.

---

[415] *Miller v. Boone Cnty. Hosp.*, 394 N.W.2d 776, 780–81 (Iowa 1986) (en banc) (finding the statute in question violated equal protection despite prior precedent, noting that "the shift in reasoning 'is an example of the continual reexamination of rationales and principles that is necessary in constitutional decisionmaking'" (quoting *Hunter v. N. Mason High Sch.*, 539 P.2d 845, 851 (Wash. 1975) (en banc))).

[416] *Id.* (quoting *Hunter*, 539 P.2d at 851).

[417] *Skiles*, 591 N.W.2d at 190 (citing *Redmond*, 247 N.W.2d at 273).

[418] *In re Johnson*, 257 N.W.2d at 50 (citing *Redmond*, 247 N.W.2d at 275 (LeGrand, J., concurring specially)).

[419] *Skiles*, 591 N.W.2d at 190.

**B. Women were Excluded from Political Participation and Treated as Second Class Citizens in the Early History of Iowa and the Nation.** It makes little sense to determine whether women have a fundamental right to reproductive autonomy from the lens of the white males who fashioned the United States and Iowa Constitutions. At the time of the drafting of the Iowa Constitution, Iowa society—and society across the nation—was patriarchal in nature.[420] There were no women members of the Iowa constitutional conventions and no women members of the legislature.[421] Women were not trusted with the right to vote, and, even when the franchise was extended to African-Americans after the Civil War,[422] the right to vote was not extended to women until decades later.[423] There were, of course, a few rare women who managed to enter the learned professions, but women's role in society was highly gendered and hardly equal. So the *men* in the Iowa General Assembly enacted statutes related to abortion, and the *men* reelected the representatives, and the *men* served on the courts, while the women stayed home.

---

[420]"In 1857, the newly-ratified Iowa Constitution restricts the right to vote and to run for the Iowa General Assembly to white males over the age of 21." *See* Iowa State Univ., *Women's Suffrage in Iowa* [hereinafter *Women's Suffrage in Iowa*], https://cattcenter.iastate.edu/timeline/ [https://perma.cc/3Q8B-MZMD] (last visited June 14, 2022). When the Fourteenth Amendment was ratified, it clearly defined "citizens" and "voters" as male. Nat'l Women's Hist. Museum, *Timeline: Woman Suffrage Timeline (Apr. 12, 2018) [hereinafter Timeline: Woman Suffrage],* https://www.womenshistory.org/exhibits/timeline-woman-suffrage [https://perma.cc/AG9W-2X68].

[421]*See Women's Suffrage in Iowa.*

[422]The Fifteenth Amendment to the United States Constitution was passed in 1870, giving African-American *males* the right to vote. *See Timeline: Woman Suffrage.*

[423]The Senate passed the Nineteenth Amendment on June 4, 1919, and the Iowa Legislature voted to ratify it on July 2, 1919. *See Women's Suffrage in Iowa.*

No one can deny that the role of women in society was dramatically different in the middle of the nineteenth century than it is today. The right to autonomy and reproductive freedom should be evaluated based on the real impact on women's lives in today's society, and their ability to lead an autonomous life in today's age. What is "fundamental" should not be based on highly patriarchal attitudes that may have been endemic among the men when the Iowa Constitution was adopted and when women were excluded from participating in the political and economic life of the country. Does anyone really think that the right to autonomy and reproductive freedom should be determined by the views of 18th and 19th century men that solely controlled the political process at the time?

**C. Consequences of Rigid Historicism.** If we were to adopt the view that the only thing that mattered in the interpretation of open-textured, constitutional provisions like due process was historical practice centuries ago, the impact on American jurisprudence would be devastating.

Let's look at its impact of civil rights. Because segregation in public schools was practiced at the time of the Fourteenth Amendment, such segregation would be constitutionally permitted today and *Brown v. Board of Education*[424] would be overruled. In fact, in *Brown*, parties argued extensively about what would be the faithful reading of the Fourteenth Amendment to the United States Constitution

---

[424]*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954).

based on the post-war history.[425] Chief Justice Warren did not shy away to admit that the first case decided by the Court after the Fourteenth Amendment was adopted actually interpreted the Amendment "as proscribing all state-imposed discriminations against the Negro race."[426] Although Chief Justice Warren claimed the historical record was "inconclusive,"[427] ample record would have pointed to the nation's long and ugly history of slavery and racism as its deeply rooted history and tradition. Yet, Chief Justice Warren emphatically refused to let the solemn inquiry of equality be stifled in the dead hand of history: "[W]e cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. We must consider public education in the light of its full development and its *present* place in American life throughout the Nation."[428]

And the Court did not turn the clock back. Time and time again, when deciding fundamental rights that later became the ethos of the American society, courts did not end their inquiries in history. *Loving* did not end in the long history of legislative prohibition of interracial marriage.[429] *Griswold* did not end in the

---

[425]*Id.* at 489 ("The most avid proponents of the post-War Amendments undoubtedly intended them to remove all legal distinctions among 'all persons born or naturalized in the United States.' Their opponents, just as certainly, were antagonistic to both the letter and the spirit of the Amendments and wished them to have the most limited effect. What others in Congress and the state legislatures had in mind cannot be determined with any degree of certainty.").

[426]*Id.* at 490 (citing *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 67–72 (1873)).

[427]*Id.* at 489.

[428]*Id.* at 492–93 (emphasis added).

[429]*Loving*, 388 U.S. at 9–12.

history of nonrecognition of the right to contraception.[430] *Lawrence*[431] overruled *Bowers*[432] against the lengthy history of criminalizing homosexual sodomy.

Let's talk about what used to be deeply rooted in our nation's history and tradition. In *Bowers*, the Court noted, "The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy."[433] The *Bowers* Court also pointed out that proscriptions against sodomy "have ancient roots."[434] Therefore, "to claim that a right to engage in such conduct is 'deeply rooted in this Nation's history and tradition' or 'implicit in the concept of ordered liberty' is, at best, facetious."[435] If that did not yet sound familiar, try this: "The case also calls for some judgment about the limits of the Court's role in carrying out its constitutional mandate."[436] Indeed, because the historical intent of the Fourteenth Amendment was to protect recently released slaves, a strong historical-intent argument could be made that women are not "persons" within the Fourteenth Amendment, the same kind of reasoning that supported the decision in *Dred Scott v. Sandford*.[437]

---

[430] *Griswold*, 381 U.S. at 486.

[431] *Lawrence*, 539 U.S. at 578.

[432] *Bowers*, 478 U.S. at 192–94.

[433] *Id.* at 190.

[434] *Id.* at 192–94 (recounting history from the ratification of Bill of Rights to 1961 when all fifty states still outlawed sodomy).

[435] *Id.* at 194.

[436] *Id.* at 190.

[437] *Dred Scott v. Sandford*, 60 U.S. (19. How.) 393, 421–23 (1857) (enslaved party), *superseded by constitutional amendment*, U.S. Const. amend. XIII.

The mistake of the *Bowers*-line of argument is, of course, that it fails to "appreciate the extent of the liberty at stake."[438] A faithful reading of *Brown* and *Lawrence* compels us to reject limiting our reading of fundamental rights by using 18th century mentality.

Consider also the impact of a dead constitutional approach on our system of government. Here in Iowa, the one-person-one-vote principle embraced in *Baker v. Carr* had a dramatic impact by requiring that the Iowa Senate be apportioned based on population.[439] But the constitutional interpretation that supported *Baker* cannot be found in 1789, when the historic practice in statehouses was to have apportionment based on other than one-person-one-vote principals. So, that decision is wrong, too, if based on historical practice. Because in 1857 there was no public recognition of the rights of gays and lesbians, our decision in *Varnum v. Brien*,[440] and the subsequent adoption of constitutional protections for gay rights by the United States Supreme Court in *Obergefell v. Hodges*[441] would be out the window.

**D. Relevance of Historic Restrictions on Abortion.** The history of abortion regulation is often relied upon to defeat reproductive autonomy for today's women. But the history is complicated. A lot of discussion centers on the criminalization of abortion in the early history of the nation, and yet there are

---

[438] *Lawrence*, 539 U.S. at 567.

[439] *Baker v. Carr*, 369 U.S. 186, 207–08 (1962).

[440] *Varnum v. Brien*, 763 N.W.2d 862, 906–07 (Iowa 2009).

[441] *Obergefell*, 576 U.S. at 681.

records showing that convictions of abortion were rare.[442] Notably, abortion was not a crime at common law at all stages.[443] According to the American Historical Association, "American history and traditions from the founding to the post-Civil War years included a woman's ability to make decisions regarding abortion, as far as allowed by the common law."[444]

Iowa's first recorded territorial law relating to abortion was in 1839.[445] This territorial law was limited to only miscarriages that were procured through poisons, and did not target abortion through other means.[446] In Iowa, abortion appears to have been common in the nineteenth century notwithstanding statutory provisions.[447] As noted by one contemporaneous medical society commentator, "criminal abortion is astonishingly common," and that "even abortions were produced in most instances by the regular profession of the

---

[442]Brief for Am. Hist. Ass'n & Org. of Am. Historians as Amici Curiae Supporting Respondents at 29, *Dobbs v. Jackson Women's Health Org.* (No. 19–1392) (argued Dec. 1, 2021) ("Conviction is the exception, instead of . . . the rule," (quoting O.E. Herrick, *Abortion and Its Lesson*, Mich. Med. News (Jan. 10, 1882) (omission in original))).

[443]*Roe*, 410 U.S. at 140.

[444]Brief for Am. Hist. Ass'n & Org. of Am. Historians as Amici Curiae Supporting Respondents at 30, *Dobbs* (No. 19–1392).

[445]Iowa Stat. Laws, Courts § 18 (1839).

[446]*Id.* ("[E]very person who shall administer, or cause to be administered or taken, any such poison, substance, or liquid, with the intention to procure the miscarriage of any woman being with child, and shall thereof be duly convicted, shall be imprisoned for a term not exceeding three years, and fined in a sum not exceeding one thousand dollars.").

[447]*See* J.W.H. Baker, *Medicine Not an Exact Science*, 1 Transactions of the Iowa State Med. Soc'y 9, 13 (1871) ("Much has been written upon the subject of criminal abortion, and much more needs to be written, in order to correct the public opinion that there is no crime in inducing this act."); J.C. Stone, *Report on the Subject of Criminal Abortion*, 1 Transactions of the Iowa State Med. Soc'y 26, 29 (1871) ("Iowa fills her quota of [criminal abortion] as surely as she filled the broken ranks of her regiments during the late war.").

state."[448] Additionally, enforcement of abortion prohibitions in Iowa seems to have been less than zealous with roughly thirty-two documented abortion-related convictions from 1860s to 1920s.[449] Thus, the historical grounds "are not without doubt and, at the very least, are overstated."[450]

Motivations behind the criminalization of abortion should not escape our evaluation. Records show that the foremost advocates of criminalization of abortion were virulently sexist and racist.[451] The leading advocate of criminalization, Dr. Horatio Storer and his colleagues, vigorously resisted the entry of women into the medical profession.[452] They defined abortion as "a female crime,"[453] a breach of marital duty, and accused those women who sought abortion as lazy,[454] against the maternal instinct, and "avoid[ing] the labor of

---

[448]C.E. Ruth, *Removal of the Secundines in Abortion*, 8 Transactions of the Iowa State Med. Soc'y 55, 61 (1890) (remarks of Dr. Hutchins).

[449]For complete Iowa record from the 1860s to 1920s, see Appendix A.

[450]*Lawrence*, 539 U.S. at 571.

[451]"The antiabortion campaign repeatedly insisted that women's reproductive conduct demanded regulation, using arguments which are striking in their rhetorical range and tenor. These arguments provide ample evidence that the campaign itself was the product of sexual conflict reaching far beyond the question of abortion." Reva Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 Stan. L. Rev. 261, 300 (1992) [hereinafter Siegel].

[452]*Id.* at 286, 300–02.

[453]*Id.* at 300–01 ("It identified them, in order of culpability, as the pregnant woman, her female friends and acquaintances, nurses, midwives and female physicians—then husbands, quacks and professed abortionists, and druggists, but rarely, if ever, male physicians in regular standing.")

[454]"Is it not arrant laziness, sheer, craven, culpable cowardice, which is at the bottom of this base act? . . . . Have you the right to choose an indolent, selfish life, neglecting the work God has appointed you to perform?" *Id.* at 301–03 (omission in original) (quoting Augustus Gardner, *Physical Decline of American Women, reprinted in* Augustus K. Gardner, *Conjugal Sins Against the Law of Life and Health* 199, 230 (1870)).

caring for and rearing children."[455] Storer also believed abortion risked letting white people be outnumbered by immigrants.[456] I decline to embrace a tradition with obvious sexist and racial motivation into our modern jurisprudence of reproductive autonomy.

**X. Deciding the Appropriate Standard of Review for Reproductive Autonomy.**

**A. Introduction.** Once a right to reproductive autonomy is established, a question arises regarding the level of scrutiny that should be applied to legislation that impinges on that right. One might ask why such a test is required at all. The state, however, has an interest, for example, in ensuring that women are well informed about abortion before they give their consent to the procedure.[457] A standard needs to be developed to provide a framework for determining whether the woman's autonomy interests prevails over the asserted interest of the state.

Under the established approach to Iowa substantive due process analysis, the critical issue is whether the constitutional right involved is considered "fundamental."[458] Therefore, in *Planned Parenthood II*, we adhered to our precedent and adopted a strict scrutiny test.[459] Aside from precedent, strict

---

[455]*Id.* (quoting James C. Mohr, *Abortion in America: The Origins and Evolution of National Policy, 1800–1900*, 89 (1978)).

[456]*Id.* at 298–99 ("[W]hile the great territories of the far West, just opening to civilization, and the fertile savannas of the South, now disinthralled and first made habitable by freemen, offer homes for countless millions yet unborn. Shall they be filled by our own children or by those of aliens?" (quoting Horatio Robinson Storer, *Why Not? A Book for Every Woman* 17 (1866))).

[457]*Planned Parenthood II*, 915 N.W.2d at 241.

[458]*Hensler*, 790 N.W.2d at 580–81.

[459]*Planned Parenthood II*, 915 N.W.2d at 240–41.

scrutiny is the appropriate test because of the depth of the interest a woman has in her reproductive autonomy.

Nonetheless, it is worth the time to consider the possible alternative tests to strict scrutiny and why they are insufficient. We are not, however, bound from adopting a test stricter than that in *Planned Parenthood I.* In *Planned Parenthood I,* we accepted the framework as presented by the parties.[460]

**B. Inadequacy of Rational Basis Test.** At the outset, we should at all costs avoid utilizing a "rational basis test" to consider the validity of statutes and regulations that impinge upon reproductive autonomy. Such a test, unacceptable in many contexts, would be completely unacceptable in the context of a woman's right to reproductive autonomy.

The rational basis test is in many cases a complete farce. It has been used to justify requiring that only licensed morticians could sell caskets;[461] only licensed florists could sell flowers;[462] and that riverboat pilots are restricted to certain members of families.[463] As noted by one scholar:

> The rational basis test as applied by the Supreme Court is such a permissive level of review that it is effectively not judicial review at all. It permits the most irrational of legislation to become the law of the land, no matter how needless, wasteful, unwise, or improvident it might be.[464]

---

[460]*Planned Parenthood I,* 865 N.W.2d at 262–63.

[461]*Powers v. Harris,* 379 F.3d 1208, 1211, 1215 (10th Cir. 2004).

[462]*Meadows v. Odom,* 360 F. Supp. 2d 811, 822–25 (M.D. La. 2005), *vacated as moot* 198 F. App'x 348 (5th Cir. 2006) (per curiam).

[463]*Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans,* 330 U.S. 552, 553–56, 564 (1947).

[464]James M. McGoldrick, Jr., *The Rational Basis Test and Why It Is So Irrational: An Eighty-Year Retrospective,* 55 San Diego L. Rev. 751, 752–54 (2018) (footnotes omitted); *see also*

Because the rational basis test is such a weak test that favors the government over individual rights, it has no place whatsoever in the evaluation of statutes or regulations that impinge on the fundamental right of reproductive autonomy.

The problem with the rational basis test is not only the weakness of the test on its face, it has sometimes been said to require court's to consider any "conceivable basis" to support the statute even if the basis has not been advanced by the state.[465] Under the rational basis test, then, the court is no longer a neutral arbiter, but instead gets off the bench, sits at counsel's table for the state, and acts as a friend or advisor to the state. A rational basis test where the judge is obligated to dream up reasons to support an infringement of reproductive autonomy will not be well received by women desperate to regain a degree of control over their lives by exercising their right to reproductive choice.[466]

Application of the rational basis test to abortion regulation will drain the legitimacy of the courts by appearing to favor one party—the government—over the individual. Applying this test for abortion rights is completely inconsistent

---

Thomas B. Nachbar, *The Rationality of Rational Basis Review*, 102 Va. L. Rev. 1627, 1629 (2016) ("RATIONAL basis review is the poor stepchild of judicial review. Requiring only that regulations . . . be rationally related to a legitimate governmental interest, it is widely regarded as virtually 'no review at all.'" (footnotes omitted) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 323 n.3 (1993) (Stevens, J., concurring in judgment))).

[465] *Beech Commc'ns, Inc.*, 508 U.S. at 314–15 (majority opinion).

[466] I recognize that there are a handful of cases labeled "rational basis" that apply more bite than usual. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). I also recognize that we embraced a rational basis test with some teeth in *Racing Ass'n of Central Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004). None of these cases, however, offer tests that would provide adequate protection for reproductive autonomy. The tougher review in *Racing Ass'n of Central Iowa* is under substantial pressure from the current majority, which generally seeks to lessen judicial review of legislative action.

with the primacy of individual liberties under the Iowa Constitution. As was apparent to George Ells but seems lost today, an important purpose of the state is to advance civil liberties and encourage the widest possible sphere of autonomy under article I, section 1 of the Iowa Constitution, and all other provisions of the Bill of Rights. The rational basis test does the opposite—it enlists the judiciary as a partisan to choke and strangle the scope of "inalienable" individual liberties.

### C. Inadequacy of the Undue Burden Test, Even "with Teeth."

1. *Introduction.* Having rejected the rational basis test, I now turn to the undue burden test. It is important to recognize that there is no one undue burden test. There are many variations. The undue burden test "with teeth" presented below is consistent with this court's approach in *Planned Parenthood I* and follows the general outline of an article in the literature.[467]

2. *Features of an undue burden test with teeth.* Although there are many possible variants, here is the outline of an undue burden test "with teeth." First, the state must empirically show that the law substantially advances a legitimate government purpose.[468] If the state fails to demonstrate factually that the law advances a legitimate government purpose, the law is invalid.[469] Under this element, the state cannot make hypothetical arguments but must present

---

[467]Niraj Thakker, Student Article, *Undue Burden with a Bite: Shielding Reproductive Rights from the Jaws of Politics*, 28 U. Fla. J.L. & Pub. Pol'y 431 (2017) [hereinafter Thakker].

[468]*Id.* at 469 ("If a State either fails to provide any empirical data to support the law or fails to articulate a legitimate interest, the statute must be deemed unconstitutional.").

[469]*Id.*

admissible evidence on the question of whether the restriction advances a legitimate state interest. If the state makes an adequate showing, the next step is to proceed to the second question.[470]

The second question is whether the statute has the purpose or effect of imposing a substantial obstacle in the path of women seeking an abortion.[471] Under the "purpose" prong, the court should look for the predominant factor motivating the legislation.[472] If the predominant purpose of the legislation is to provide an obstacle or hurdle to reproductive autonomy, the statute should be invalid. If the primary purpose is to advance a legitimate state interest, the analysis proceeds to the "effect" prong of the undue burden test.[473]

Under the effect prong, the court then examines whether the law presents a substantial obstacle in the path of women seeking an abortion.[474] The effect element breaks down into several elements: The first task is to identify "the relevant group of women to which the law applies."[475] The second question, in my view, is whether the benefits conferred by the law significantly outweigh the burdens imposed on reproductive freedom.[476] In engaging in this inquiry, as Justice Breyer did in *Whole Woman's Health*,[477] the court should conduct a

---

[470]*Id.*

[471]*Id.*

[472]*Id.* at 470.

[473]*Id.*

[474]*Id.* at 471–73.

[475]*Id.* at 471.

[476]*See id.*

[477]*Whole Woman's Health*, 136 S. Ct. at 2309–10; *see also* Thakker, 28 U. Fla. J.L. & Pub. Pol'y at 471.

balancing analysis and weigh the strength of the state's justification against the burden placed on a woman seeking an abortion.[478] A showing of burden is minimal when challenging a law with marginal benefits. But, a greater showing of burden is required when a law seeks to achieve substantial benefits. The third question is to conduct a balancing test based upon the cumulative restrictions of the law.[479]

3. *Shortcomings of undue burden compared with strict scrutiny.* In my view, although this test is consistent with the one followed in *Planned Parenthood I*, it is deficient compared to the strict scrutiny approach in *Planned Parenthood II*. No matter how it is framed, the undue burden test has spongy elements. Determining the purpose of a restriction can be difficult and certainly risks thrusting the court into a potential morass. And, determining what amounts to a "substantial obstacle" to reproductive freedom is subjective. For example, some may regard the economic hardships experienced by poor women as inconsequential based upon their life experience. In making the determination of what is "substantial," one's view on reproductive autonomy may play a role. As seen in part VII.A above, the undue burden test has been rejected by a majority of state courts recognizing reproductive autonomy. We should do the same.

---

[478]This is consistent with what we held in *Planned Parenthood I*, 865 N.W.2d at 264 (rejecting the Fifth and Sixth Circuits' approach, which only requires the state set forth a justification sufficient to pass rational basis review and not consider the trength of the state's justification).

[479]Thakker, 28 U. Fla. J.L. & Pub. Pol'y at 471.

**D. Strict Scrutiny Test Traditionally Associated with Fundamental Interests.** So, that leaves the strict scrutiny test. At the outset, as I have emphasized, the strict scrutiny test has been long linked to due process violations involving fundamental interests. Exactly what is a fundamental interest, of course, has been the subject to some debate, but I find it very hard to come to any other conclusion with respect to a woman's right to reproductive autonomy.

And, if so, the strict scrutiny model gives a woman sufficient freedom of action to exercise her fundamental rights without state interference. Under the strict scrutiny test, reproductive autonomy does not turn on the perception of a judge or group of judges regarding whether a restriction is a "substantial" burden. A woman has a substantial arena of private choice free from state interference.

**XI. Inalienable Rights Clause Not Presented.**

In the pleadings, Planned Parenthood asserted a right to reproductive autonomy under the inalienable rights clause of article I, section 1 of the Iowa Constitution. The merits of this potentially powerful theory[480] were not presented in the motion and cross-motion for summary judgment. There has been no briefing on appeal related to the issue. The status of any article I, section 1 claim, and the standards that might arise from such a claim, have not been decided today.

---

[480] *See generally* Bruce Kempkes, *The Natural Rights Clause of the Iowa Constitution: Whern the Law Sits Too Tight*, 42 Drake L. Rev. 593 (1993); *see also Hodes & Nauser*, 440 P.2d at 492.

## XII. Iowa Code Section 146A.1(1) Violates Equal Protection.

I fully incorporate the equal protection reasoning of the five-member majority in *Planned Parenthood II*.[481] In *Planned Parenthood II*, we found that a 72-hour waiting period imposed by statute violated equal protection under article I, sections 1 and 6 of the Iowa Constitution. As pointed out by Planned Parenthood, and consistent with what we had observed in *Planned Parenthood II*,[482] while women and men are not similarly situated in biological term, they are nevertheless similarly situated with respect to reproductive autonomy. We noted that the decision whether to bear children is critical to "a woman's autonomous charge of her life's full course . . . , her ability to stand in relation to man, society, and the state as an independent, self-sustaining, equal citizen."[483] Yet, we noted that "[w]ithout the opportunity to control their reproductive lives, women may need to place their educations on hold, pause or abandon their careers, and never fully assume a position in society equal to men, who face no such similar constraints for comparable sexual activity."[484] We cited *United States v. Virginia* in support of the notion that equal protection prevents governments from "den[ying] to women, simply because they are women, full citizenship stature—

---

[481]*Planned Parenthood II*, 915 N.W.2d at 246.

[482]*Id.* at 244–46 (noting our notion of equal protection recognizes that "biological differences have been used to justify women's subordinate position in society" and observing that limiting women's reproductive autonomy prevents women from being equal participants in society).

[483]*Id.* at 245 (omission in original) (quoting Ginsburg, 63 N.C. L. Rev at 383) ("[I]f the Court had added a distinct sex discrimination theme to its medically oriented opinion, the storm *Roe* generated would have been less furious.").

[484]*Id.*

equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capabilities."[485] We found that restrictions on abortion fundamentally impair full participation of women in society and therefore violated equal protection.[486]

Nothing in the law has changed since our equal protection holding in *Planned Parenthood II*. Stare decisis comes into play. We should adhere to our precedent on this important issue.

## XIII. The Consequences of the Majority Decision.

Constitutional liberties are often destroyed "not with a bang, but a whimper."[487] I fear for the future of reproductive autonomy in Iowa. The majority today "casts into darkness the hopes and visions of every woman in this country who had come to believe that the Constitution guaranteed her the right to exercise some control over her unique ability to bear children."[488]

---

[485]*Id.* (alteration in original) (quoting *United States v. Virginia*, 518 U.S. 515, 532 (1996)).

[486]*Id.* at 245–46. For discussion of antisubordination theory of equal protection, see Siegel, 44 Stan. L. Rev. at 351–54 ("From a historical perspective it is clear that abortion-restrictive regulation is caste legislation, a traditional mode of regulating women's conduct, concerned with compelling them to perform the work that has traditionally defined their subordinate social role and status. . . .[I]t is also clear that this society's reasons for enacting restrictions on abortion have been deeply entangled in its conceptions of women as mothers."); Ruth Colker, *Anti-Subordination Above All: Sex, Race and Equal Protection*, 61 N.Y.U. L. Rev. 1003, 1003 (1986) ("Anti-subordination . . . argues that it is inappropriate for groups to be subordinated in society. [It] rejects policies, even if facially neutral, that perpetuate the historical subordination of groups, while embracing even facially differentiating policies that ameliorate subordination."); Ginsburg, 63 N.C. L. Rev. at 383 ("The conflict, however, is not simply one between a fetus' interests and a woman's interests, narrowly conceived, nor is the overriding issue state versus private control of a woman's body for a span of nine months. Also in the balance is a woman's autonomous charge of her full life's course—as Professor Karst put it, her ability to stand in relation to man, society, and the state as an independent, self-sustaining, equal citizen." (footnote omitted)).

[487]*Webster*, 492 U.S. at 557.

[488]*Id.*

The majority has chosen to simply rule that strict scrutiny is not the applicable test of a statute regulating abortion under the due process clause of article I, section 9 of the Iowa Constitution and has remanded the case to the district court for further consideration of other issues. The problem with this approach is twofold. First, the majority opinion grossly understates the importance of this life-changing abortion decision on women. Second, the majority opinion eliminates a strong, workable, and widely accepted barrier to governmental intrusion into the reproductive choices of a woman and invites us to stare into the standard-less abyss.

For those who favor a woman's autonomy and personal freedom, this is an unwelcome development. A strong barrier to state interference in a woman's right to determine whether to have an abortion has been removed by the majority. And the right to abortion is left in a free fall. Make no mistake—reproductive rights are at great risk with this decision.

But while the majority does not give substantial direction to the district court, I have some thoughts to seek to salvage what can be salvaged from the decision. First, the district court must recognize the rights primacy of the Iowa Constitution and reject summarily a rational basis test, which is too often no test at all. Second, if a version of the undue burden test is to be adopted, it must be with teeth. That means that the open channel for a woman to obtain an abortion must be broad enough to allow every woman a substantial, meaningful opportunity to exercise her choice free from interference by the state. And third, this case provides a good test as to whether there will be any teeth in an undue

burden test as the regulation involved is pointless, imposes burdens on especially poor women, intrudes on the relationship between patient and physician, and does all this with little appreciable gain. A weak undue burden test will either be no test at all or be subject to the steady drum beat of diminution that ultimately leads to a complete lack of respect for women's reproductive autonomy.

**XIV. Conclusion.**

For the above reasons, I would affirm the decision of the district court.

## APPENDIX A

## Abortion-Related Convictions in Iowa from the 1860s to 1920s[489]

**1860s:**

| | | |
|---|---|---|
| Elijah Sells, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns, of the State of Iowa For the Years 1860–1*, 23–25, 50–51 (1862) | reporting no convictions for abortion-related offenses in 1860 or 1861 |
| James Wright, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa, For the Years 1862–3*, 27, 66 (1864) | reporting no convictions for abortion-related offenses in 1862 or 1863 |
| James Wright, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa, For the Years A.D. 1864–5*, 41, 93 (1865) | reporting no convictions for abortion-related offenses in 1864 or 1865 |
| Ed Wright, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa, For the Years A.D. 1866–7*, 5–47, 88 (1868) | reporting no convictions for abortion-related offenses in 1866 or 1867 |

**1870s:**

| | | |
|---|---|---|
| Ed Wright, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa For the Years 1870 and 1871*, 40, 88 (1872) | reporting no abortion-related crimes for 1870 or 1871 |
| Josiah T. Young, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa For the Years 1874 and 1875*, 18, 64–65, 87, 135–36 (1875) | reporting one conviction for "[p]roducing abortion" by a hotel keeper in Clinton County in 1874; one conviction for "[m]anslaughter (committing abortion)" by a physician in Floyd County in 1875 |
| Josiah T. Young, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa For the Years 1876 and 1877*, 65, 82–83, 126, 155–56 (1877) | reporting three convictions for abortion by laborers in Tama County in 1876; one conviction for abortion by a housekeeper in Mahaska County in 1877 |

---

[489] Criminal reports for biennial years 1868–69, 1872–73, and 1915–16 were unable to be located.

| J.A.T. Hull, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa for the Years 1878 and 1879*, 63–64, 90, 129–30 (1879) | reporting no convictions for abortion-related offenses in 1878; one conviction of "Abortion, attempt to produce" by a teacher in Harrison County in 1879 |
|---|---|---|

**1880s:**

| J.A.T. Hull, Off. of Sec'y of State | *Report of the Secretary of State, in Relation to the Criminal Returns of the State of Iowa For the Years 1880 and 1881*, 54–56, 116–18 (1881) | reporting no convictions for abortion in 1880 or 1881 |
|---|---|---|
| J.A.T. Hull, Off. of Sec'y of State | *Report of the Secretary of State in Relation to the Criminal Returns of the State of Iowa For the Years 1882 and 1883*, 10, 65–67, 129–31 (1884) | reporting one conviction for abortion by a farmer in Buchannan County in 1882 but no abortion-related convictions in 1883 |
| Frank D. Jackson, Off. of Sec'y of State | *Report of the Secretary of State in Relation to the Criminal Returns of the State of Iowa, For the Years 1884 and 1885*, 66–68, 84, 120, 125–27 (1885) | reporting one conviction for producing an abortion by a druggist in Howard County in 1884, two convictions in abortion in Dubuque County in 1885, and one conviction of an attempted abortion by a farmer in Washington County in 1885 |
| Frank D. Jackson, Off. of Sec'y of State | *Report of the Secretary of State in Relation to the Criminal Returns of the State of Iowa. For the Years 1886 and 1887*, 68–70, 140–42 (1887) | reporting no abortion-related crimes for 1886 or 1887 |
| Frank D. Jackson, Off. of Sec'y of State | *Report of the Secretary of State in Relation to the Criminal Returns of the State of Iowa, For the Years 1888 and 1889*, 59–61, 93 (1888) | reporting no abortion-related convictions in 1888 and only one conviction for "[a]ttempting to produce the miscarriage of pregnant woman" by a farmer in Jefferson County in 1889 |

**1890s:**

| W.M. McFarland, Off. of Sec'y of State | *Report of the Secretary for State Relating to Criminal Convictions of the Years 1890 and 1891*, 44, 67–69, 142–45 (1891) | reporting one conviction for abortion by a painter in Montgomery County in 1890 but no such convictions in 1891 |
|---|---|---|
| W.M. McFarland, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions for the Years 1892 and 1893*, 77–80, 148–50 (1893) | reporting no abortion-related convictions in 1892 or 1893 |
| W.M. McFarland, | *Report of the Secretary of State Relating to Criminal Convictions* | reporting one conviction for abortion by an agent in Dubuque County in 1894, three convictions for abortion in Polk County in |

| Off. of Sec'y of State | *for the Years 1894 and 1895*, 23, 49, 71–72, 124, 147–49 (1895) | 1894, one conviction for abortion in Polk County in 1895 |
|---|---|---|
| Geo. L. Dobson, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions for the Years 1896 and 1897*, 71–72, 125, 141–43 (1897) | reporting no abortion-related convictions in 1896 and one conviction for "[p]roducing miscarriage of a pregnant woman" by a dentist in Scott County in 1897 |
| G.L. Dobson, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions for the Years of 1898 and 1899*, 42, 61, 70–72, 129, 137, 146–48 (1899) | reporting no abortion-related convictions in 1898 or 1899 |

**1900s:**

| William B. Martin, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions for the Years 1900 and 1901*, 54, 70–72, 130, 142–44 (1901) | reporting one conviction for abortion by a carpenter in Ringgold County in 1900 and one conviction for attempting to produce a miscarriage by a physician in Van Buren County in 1901 |
|---|---|---|
| W.B. Martin, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions of the State of Iowa for the Years 1902 and 1903*, 78–81, 154–56 (1903) | reporting no abortion-related convictions in 1902 or 1903 |
| W.B. Martin, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions of the State of Iowa for the Year Ending September 30, 1904, and the Year Ending September 30, 1905*, 79–82, 158–60 (1905) | reporting no abortion-related convictions in 1904 or 1905 |
| William B. Martin, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions For the Year 1906*, 87–89 (1906) | reporting no abortion-related convictions in 1906 |
| W.C. Hayward, Off. of Sec'y of State | *Report of the Secretary of State Relating to Criminal Convictions For the Biennial Period Ending September 30, 1908*, 80–82, 88, 158–60 (1908) | reporting no abortion-related convictions in 1907 and one conviction for "[a]ttempt to produce miscarriage" by a paperhanger in Audubon County in 1908 |
| Iowa Bd. of Parole | *Report of the Iowa Board of Parole Relating to Its Operations from July 1, 1910, to June 30, 1910, Inclusive* 79–80, 130–31 (1910) | reporting no abortion-related convictions in 1909 or 1910 |

**1910s:**

| Iowa Bd. of Parole | *Second Biennial Report of the Iowa Board of Parole Relating to Its Operations from July 1, 1910, to June 30, 1912, Inclusive* 64, 81–82, 134–36 (1913) | reporting a conviction for "[a]ttempting to produce a miscarriage" in Polk County in 1911 and no abortion-related convictions in 1912 |
|---|---|---|
| Iowa Bd. of Parole | *Third Biennial Report of the Iowa Board of Parole Relating to Its Operations from July 1, 1912, to June 30, 1914, Inclusive* 39, 94–96, 161–63 (1914) | reporting one conviction for abortion by a housewife in Blackhawk County with the sentence "not passed" in 1913 and no abortion-related convictions in 1914 |
| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1918 Including Criminal Statistics* 55–57, 91–93 (1918) | reporting no abortion-related convictions for 1917 or 1918 |
| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1920 Including Criminal Statistics* 23–24, 27–28 (1920) | reporting no abortion-related convictions for 1919 and two convictions for "[a]ttempt to produce miscarriage" in 1920 |

**1920s:**

| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1922 Including Criminal Statistics for Each County of the State* 20–21 (1922) | reporting no abortion-related offenses between July 1, 1920 to June 30, 1922 |
|---|---|---|
| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1924 Including Criminal Statistics for Each County of the State* 20–23 (1924) | reporting one person received a prison sentence for "[a]ttempt to produce miscarriage" between July 1, 1922 to June 30, 1923, and one person received a prison sentence for "[a]ttempt to produce miscarriage" between July 1, 1923 to June 30, 1924 |
| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1926 Including Criminal Statistics for Each County of the State* 18–21 (1926) | reporting one person received a prison sentence for "[a]ttempt to produce miscarriage" between July 1, 1925 to June 30, 1926, but no abortion-related offenses for July 1, 1924 to June 30, 1925 |
| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1928 Including Criminal Statistics for Each County of the State* 12–16 (1928) | reporting two people received prison sentences for "[a]ttempt to produce miscarriage" between July 1, 1926 to June 30, 1927, but not for July 1, 1927 to June 30, 1928 |

| Iowa Bd. of Parole | *Report of the Board of Parole for the Biennial Period Ending June 30, 1930 Including Criminal Statistics for Each County of the State* 12–16 (1930) | reporting no abortion-related offenses between July 1, 1928 to June 30, 1930 |